No. 26-2238

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

———————————

AMERICAN ACADEMY OF PEDIATRICS,
*Plaintiff-Appellee*,

v.

JAMES UTHMEIER, ATTORNEY GENERAL
OF THE STATE OF FLORIDA, in his official capacity,
*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Northern District of Illinois

———————————

## EMERGENCY MOTION FOR STAY PENDING APPEAL
## AND IMMEDIATE ADMINISTRATIVE STAY

———————————

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

JASON HILBORN
  *Deputy Attorney General for Civil Enforcement*

DAVID M.S. DEWHIRST
  *Solicitor General*
JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
VINCENT LI
  *Deputy Solicitor General*
SAMUEL F. ELLIOTT (Fla. Bar No. 1039898)
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
samuel.elliott@myfloridalegal.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION .......................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 2

ARGUMENT .................................................................................................. 6

    A.    The Attorney General Is Likely to Succeed on Appeal. ................................ 6

        1.    The district court lacks personal jurisdiction. ........................................... 6

        2.    Venue is improper. ................................................................................. 11

        3.    *Younger* demands abstention. .................................................................. 12

    B.    The Remaining Stay Factors Favor Defendant............................................ 19

CONCLUSION................................................................................................ 20

CERTIFICATE OF SERVICE............................................................................ 21

CERTIFICATE OF COMPLIANCE.................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.,*
  751 F.3d 796 (7th Cir. 2014)................................................................. 6, 7, 10

*Ariel Invs., LLC v. Ariel Cap. Advisors LLC,*
  881 F.3d 520 (7th Cir. 2018).................................................................... 10

*Arkebauer v. Kiley,*
  985 F.2d 1351 (7th Cir. 1993).................................................................. 15

*Calder v. Jones,*
  465 U.S. 783 (1984)................................................................................. 8

*Collins v. Kendall Cnty.,*
  807 F.2d 95, 101 (7th Cir. 1986).............................................................. 14

*Defense Distributedv. Grewal,*
  971 F.3d 485 (5th Cir. 2020).................................................................... 11

*Dombrowski v. Pfister,*
  380 U.S. 479 (1965)................................................................................. 14

*Ford-Reyes v. Progressive Funeral Home,*
  418 F. Supp. 3d 286 (N.D. Ill. 2019)........................................................ 12

*Frost v. Nessel,*
  712 F. Supp. 3d 1008 (W.D. Mich. 2024).................................................. 16

*Gamble v. United States,*
  587 U.S. 678 (2019) ................................................................................ 12

*Grando Corp. v. Rochford,*
  536 F.2d 197 (7th Cir. 1976).............................................................. 15, 16

*Hayes v. Bd. of Educ. of the City of Chicago,*
  No. 24-2890, 2026 WL 1488048 (7th Cir. May 28, 2026) ....................... 10

*Illinois v. Trump,*
  155 F.4th 929 (7th Cir. 2025) ................................................................... 6

*John Crane, Inc. v. Shein L. Ctr., Ltd.,*
  891 F.3d 692 (7th Cir. 2018).................................................................... 8

ii

*Ken-N.K., Inc. v. Vernon Twp.*,
 18 F. App'x 319 (6th Cir. 2001) .................................................................. 15

*Leroy v. GreatWestern United Corp.*,
 443 U.S. 173 (1979) .................................................................................. 12

*Maryland v. King*,
 567 U.S. 1301 (2012) ................................................................................ 19

*Nader v. Keith*,
 385 F.3d 729 (7th Cir. 2004) ..................................................................... 13

*Netflix, Inc. v. Babin*,
 388 F.4th 1080, 1092 (5th Cir. 2023) ......................................................... 19

*Perez v. Ledesma*,
 401 U.S. 82 (1971) ..................................................................................... 14

*Safe Haven Sober Houses, LLC v. City of Bos.*,
 517 F. Supp. 2d 557 (D. Mass. 2007) .......................................................... 15

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
 591 U.S. 197 (2020) ................................................................................... 13

*Sekerez v. Supreme Ct. of Indiana*,
 685 F.2d 202 (7th Cir. 1982) ................................................................ 15, 16

*Starr v. Fed. Aviation Admin.*,
 589 F.2d 307 (7th Cir. 1978) ..................................................................... 19

*Walden v. Fiore*,
 571 U.S. 277 (2014) ............................................................................ 8, 9, 10

*Wallace v. Herron*,
 778 F.2d 391 (7th Cir. 1985) ....................................................................... 8

*Wilson v. Thompson*,
 593 F.2d 1375 (5th Cir. 1979) .................................................................... 15

*Woodke v. Dahm*,
 70 F.3d 983 (8th Cir. 1995) ....................................................................... 12

*Yelp Inc. v. Paxton*,
 137 F.4th 944 (9th Cir. 2025) ............................................................... 17, 18

*Yelp Inc. v. Paxton*,
 No. 23-CV-04977-TLT, 2024 WL 413464 (N.D. Cal. Feb. 1, 2024) ................ 18

iii

*Younger v. Harris,*
401 U.S. 37 (1971) ........................................................................ 13, 14, 15, 16, 19

**Statutes**

28 U.S.C. § 1391(b) ........................................................................................ 12

28 U.S.C. § 1391(b)(2) ............................................................................. 11, 12

42 U.S.C. § 1983 ............................................................................................ 10

§ 501.203(8), Fla. Stat. .................................................................................... 4

**Rules**

Fla. R. Civ. P. 1.070(j) .................................................................................. 18

Fla. R. Civ. P. 1.190(a) ................................................................................. 19

iv

## INTRODUCTION

The American Academy of Pediatrics (AAP) accomplished an unprecedented feat of civil procedure. It convinced a federal district court in Chicago to enjoin Florida's Attorney General from pursuing an enforcement action against AAP in Florida state court for violations of Florida state law. And AAP did so without suggesting that the Florida state court was unable or unwilling to fairly adjudicate AAP's defenses.

That injunction is historic, for all the wrong reasons. So far as Appellant Florida Attorney General James Uthmeier can tell, no federal court has *ever* enjoined an enforcement action pending in another State in this context, let alone an enforcement action filed by another State's chief legal officer.

Unsurprisingly, the district court's reasoning is equally novel. Regarding personal jurisdiction, out-of-state law enforcement officers now subject themselves to a defendant's home-state jurisdiction whenever that defendant experiences the "effect[s]" of the suit at home. *See* Ex.1, Opinion 19. Regarding venue, the locus of the plaintiff's "injury" is now a proper venue in tort actions. Opinion 26–27. And regarding abstention, *Younger*'s narrow bad-faith exception now federalizes large swaths of state prosecutions and civil enforcement actions based on any federal court's initial misimpressions of the state action's merit. Opinion 37–51. These conclusions share two common features: (1) each aggrandizes federal courts at States' expense; and (2) each ignores binding precedent.

The Order is lawless. *See* Ex. 2. The issuing Chicago-based court lacks any jurisdiction over the chief legal officer of a distant State. Because the Order, requires

1

the Attorney General to stop pursuing a valid state enforcement action in his state, this Court should stay the Order pending appeal.  And because the Order requires the Attorney General to explain "within 48 hours" "what he has done to comply with this preliminary injunction," Order 2, this Court should **administratively stay the Order pending review by 12pm CT, June 10, 2026**.  Federalism, comity, and respect for this Court's binding precedents require nothing less.

### FACTUAL AND PROCEDURAL BACKGROUND

The core factual and procedural background takes place in Florida and Florida state court.  For many years, the clinical guidelines for the treatment of pediatric gender dysphoria were dominated by three trusted professional medical associations: AAP, the World Professional Association for Transgender Health (WPATH), and Endocrine Society.  But we now know that these guidelines were never good-faith efforts to follow the evidence wherever it led; rather, through "panel stacking" and willful blindness to obvious conflicts of interest, *id.* ¶¶12, 166–78, 209–27, 237, AAP and its co-conspirators ensured that the guidelines would embrace the so-called "gender-affirming care" offered by their members and disparage the counseling-based treatment offered by their members' competitors.  *Id.* ¶¶61–62, 107.

One of AAP's primary contributions to the enterprise was a "policy statement" published in 2018 ("the Policy Statement").  *Id.* ¶59.  The Policy Statement concluded that puberty blockers are "reversible" and that gender-affirming care results in minors having fewer mental health concerns.  *Id.* ¶80.  "In contrast," it concluded that counseling-based approaches are "associated with adverse mental health outcomes, including suicidality" and "considered outside the mainstream of traditional medical

practice." *Id.* ¶61.  The Policy Statement adopted the following recommendations: social transitioning at any age, puberty blockers as early as the onset of puberty, cross-sex hormones from early adolescence onward, and breast and genital surgeries for adolescents on a case-by-case basis.  ECF 1-1 6.

AAP's departure from its customary standards-setting protocols was striking. Ordinarily, AAP policy statements endure a robust process involving "an evidence review, collaborative writing among the group of expert authors[,] and submission to multiple groups of peers for review."  *Id.* ¶219.  The Policy Statement, however, was conceptualized, drafted, reviewed, revised, and approved by one person—Dr. Jason Rafferty.  *Id.* ¶220.  Concentration of authority in a single author would be curious enough; even stranger is that Dr. Rafferty was completing his medical residency at the time.  *Id.* ¶221.  Stranger still, Dr. Rafferty's nascent practice consisted largely of prescribing puberty blockers and cross-sex hormones to minors.  *Id.* ¶222–24.  Put differently, AAP abandoned its ordinary procedural safeguards designed to separate editorial control and entrusted its clinical guidelines for treating pediatric gender dysphoria to an inexperienced market participant with conflicts of interest.

A double peer-reviewed "fact check" quickly concluded that "the references that AAP cited as the basis of their policy instead outright contradicted that policy" and "AAP told neither the truth nor the whole truth, committing sins both of commission and of omission, asserting claims easily falsified."  *Id.* ¶229.

Systematic reviews published by national health agencies soon confirmed that AAP's recommendations are not—and never were—backed by credible evidence.

These systematic reviews of pediatric gender dysphoria—the "gold standard" in evidence-based medicine—have uniformly concluded that there is "no credible evidence" that puberty blockers are reversible or that any sex interventions effectively alleviate gender dysphoria in children and adolescents. *Id*. ¶¶109–51. The systematic reviews further determined that the AAP guidelines lacked "methodological rigor" and relied on little more than "circular" references. *Id*. ¶¶136–43, 298. Thus, national health agencies recommend a different model of care. *Id*. ¶¶119, 123, 135, 150.

Undeterred, AAP and its co-conspirators continue to falsely and misleadingly advertise that puberty blockers are reversible, that sex interventions are the only "evidence-based" treatment for pediatric gender dysphoria, and that their guidelines are nonbiased and methodologically robust. *Id*. ¶¶238–68.

Deceiving consumers is illegal in Florida, including when the deception is perpetrated by, as here, non-profit entities. *See* Fla. Stat. § 501.203(8). So, on December 9, 2025, the Attorney General sued under the Florida Deceptive and Unfair Trade Practices Act and the Florida Racketeer Influenced and Corrupt Organizations Act in Florida's Nineteenth Judicial Circuit (the "Enforcement Action"). ECF 1-2. The Attorney General amended the complaint on March 16, 2026, adding a claim under the Florida Antitrust Act. ECF 21-1 ¶¶276–84.

Eschewing standard procedure—defending its conduct in Florida state court— AAP opted to mount its defense on its home turf. AAP filed this action on March 4, 2026. ECF 1. Its complaint alleges that the Enforcement Action constitutes retaliation for activity protected by the First Amendment and viewpoint discrimination. *Id*.

¶¶4, 20 ("the Complaint").  AAP filed a motion for preliminary injunction the same day.  ECF 4.  The Attorney General opposed and moved to dismiss, citing the many flaws in AAP's request: the lack of personal jurisdiction over Florida's Attorney General, improper venue, *Younger* abstention, and the feeble merits of AAP's retaliation claim.  *See* ECF 21.

Meanwhile in Florida, on May 6, 2026, AAP and its co-defendants moved to dismiss the Amended Complaint in Florida state court.  *Off. of the Att'y Gen., State of Florida, Dept. of Legal Affs. v. WPATH et al.*, No. 2025-CA-002660, DE 30, 31, 43 (Fla. 19th Jud. Cir. Ct.).  The Attorney General opposed the motions to dismiss on May 27, 2026.  *Id.*, DE 56.  AAP's reply brief is due on June 17, 2026.  *Id.*, DE 55.

Back in federal court, the district court, on June 2, 2026, denied the Attorney General's motion to dismiss and granted AAP's motion for preliminary injunction. ECF 35 ("the Opinion").  On June 8, 2026, the Court entered a Preliminary Injunction Order.  ECF 39 ("the Order").  The Order enjoins the Attorney General from "pursuing its Enforcement Action against AAP," any "further unlawful action," and affirmatively requires that the Attorney General "shall file a status report ... within 48 hours ... advising what he has done to comply with this preliminary injunction."  Order 2.

The Attorney General noticed the appeal and moved the district court to stay its Order.  ECF 40, 41.  The district court hasn't yet ruled on that motion.[1]  The Attorney General now moves this Court to stay the injunction.

---

[1] Given the district court's 48-hour deadline for part of the injunction, it would be "impracticable" for the Attorney General to wait for its ruling.  *See* Fed. R. App. P.

## ARGUMENT

A party moving to stay an injunction pending appeal must show "(1) a likelihood of success on the merits, and (2) a threat of irreparable harm absent a stay." *Illinois v. Trump*, 155 F.4th 929, 936 (7th Cir. 2025). If the movant makes this showing, this Court considers "(3) the balance of harms" and "(4) the public interest." *Id.* (quotation omitted). Every factor favors a stay.

### A.     The Attorney General Is Likely to Succeed on Appeal.

The Attorney General will likely succeed on the merits. The Order eviscerates core principles of personal jurisdiction, venue, and abstention—any one of which warrants a stay.

### 1. The district court lacks personal jurisdiction.

The Northern District of Illinois lacks personal jurisdiction over Florida's Attorney General. That statement should be apparent to most observers.

To satisfy due process for specific personal jurisdiction, the defendant must have "'certain minimum contacts' with the forum state such that the 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800–01 (7th Cir. 2014). "Crucially, not just any contacts will do: 'For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.'" *Id.* "Furthermore, the relation between the defendant and the forum must arise out of contacts that the

---

8(a)(2)(A)(i); *see also Count US IN v. Morales*, 172 F.4th 974, 975 (7th Cir. 2026) (finding stay motion at district court impracticable when deadline "fast approaching").

6

defendant himself creates with the forum. Contacts between the plaintiff ... and the forum do not satisfy this requirement." *Id.*

Florida's Attorney General sued AAP in Florida state court. That doesn't create personal jurisdiction over the Attorney General in Illinois. The district court concluded otherwise by cobbling together three implausible jurisdictional hooks: (i) the fact that AAP is headquartered in Illinois and the "harm would be felt there," Opinion 17; (2) the Attorney General served AAP in Illinois to initiate the Florida lawsuit, Opinion 20; and finally that (3) the requests for relief against AAP would "reach across state lines," Opinion 23. Remarkably, the district court itself *agreed* that the first two hooks were weak. *See* Opinion 19 ("It is not clear that this [argument] alone suffices for personal jurisdiction"); Opinion 22 ("In the Court's view, these cases establish that contacts incidental to out-of-state litigation are not sufficient on their own to establish personal jurisdiction."). Yet the district court found that the relief requested in Florida state court, plus the bad arguments mentioned above, "cinches the case for personal jurisdiction." Opinion 23. That math doesn't add up; several bad arguments don't amount to one passing argument. This alone warrants a stay.

### i. Serving the Amended Complaint did not establish personal jurisdiction in Illinois.

The Attorney General has only one suit-related contact with the Illinois: service of the Amended Complaint. But this Court has repeatedly held that contacts "incidental to litigation proceeding elsewhere" do not suffice for specific personal jurisdiction. *John Crane, Inc. v. Shein L. Ctr., Ltd.*, 891 F.3d 692, 696 (7th Cir. 2018) (cleaned up). "[D]irecting pleadings, discovery, and other litigation communications

to an Illinois citizen facing suit in some other state—even in furtherance of a tortious scheme—is simply not the same as targeting that citizen *in Illinois*."  *Id.*; *see also Wallace v. Herron*, 778 F.2d 391, 394 (7th Cir. 1985) ("[T]he defendants filed ... motions on behalf of their clients in a California court pursuant to a California lawsuit, and it would be unreasonable to require the defendants to appear in Indiana to defend this suit on the basis of such attenuated contacts.").

> ii. *The Attorney General has no other jurisdictionally relevant contacts with Illinois.*

The district court also acknowledged that "contacts incidental to out-of-state litigation are not sufficient on their own to establish personal jurisdiction."  Opinion 22.  It concluded, however, that effects allegedly felt by AAP in Illinois constitute additional contacts between the Attorney General and Illinois.  Opinion 19.  The district court relied heavily on *Calder v. Jones*, where the Supreme Court held that California courts had personal jurisdiction over a Florida newspaper's editor and reporter in a defamation claim brought by a California-based actress.  465 U.S. 783, 785 (1984).  According to the district court, "the 'crux' of *Calder*"—construed later in *Walden v. Fiore*, 571 U.S. 277 (2014)—is whether the defendant's conduct had an "intended effect" on residents of the forum state.  Opinion 19.  It determined that the Attorney General "has engaged in sustained public commentary" about AAP that has been "broadcast nationwide."  *Id.*  The district court then found that AAP sustained "general harm to its reputation among Illinois residents" and assumed that the alleged "security issues at [AAP's] events" and "harass[ment]" of AAP's members also

8

occurred in Illinois. *Id.* That, the district court concluded, amassed sufficient contacts under *Calder*.

Inventive, but doubly fallacious: this mischaracterizes *Walden* and misapplies the facts at hand. First, *Walden* rejected the general proposition attributed to it by the district court: that "intended effects" necessarily equate to meaningful contacts. Rather, *Walden* explained that "[t]he crux of *Calder* was that the reputation-based 'effects' *of the alleged libel* connected the defendants to California, not just to the plaintiff" because "publication to third persons is a necessary element of libel." *Walden*, 571 U.S. at 287–88 (emphasis added). In that sense, "the defendants' intentional tort *actually occurred in California.*" *Id.* at 288 (emphasis added). This follows because the connection between the defendants and California "was largely a function of the nature of the libel tort." *Id.* at 297. Even then, the publication had to be "combined with the various facts that gave the article a California focus," including the defendants' "phone calls to 'California sources.'" *Id.* at 287–88. *Walden* was a *Bivens* action, not a libel case. *Id.* at 281. The Supreme Court therefore held that the defendant had "no jurisdictionally relevant contacts with Nevada," despite knowing that his conduct would cause the plaintiffs to "suffer[] foreseeable harm in Nevada." *Id.* at 289.

This Court heeds *Walden*'s instruction against extending *Calder* beyond the libel tort. *See Advanced Tactical*, 751 F.3d at 802; *Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, 881 F.3d 520, 523 (7th Cir. 2018).

The Opinion contradicts this binding precedent.  AAP sued under 42 U.S.C. § 1983 for First Amendment retaliation and viewpoint discrimination.  ECF 1.  Unlike the defamation claim in *Calder*, publication of damaging comments to third parties is not an element of AAP's claims.  Therefore, the Attorney General's public commentary about AAP in Illinois is not a "jurisdictionally relevant contact[]" between the Attorney General and Illinois.  *Walden*, 571 U.S. at 289.[2]

Similarly, publication of the Attorney General's statements is irrelevant because the state action underlying AAP's claims is the *Enforcement Action*.  AAP has not requested a preliminary injunction against the Attorney General's "public commentary," Opinion 19, nor could it.  *See Hayes v. Bd. of Educ. of the City of Chicago*, 2026 WL 1488048, at *8 (7th Cir. May 28, 2026) ("[U]nconstitutional retaliation by a public official requires more than criticism or even condemnation." (quotation omitted)).  In short, the district court should not have considered the alleged effects felt by AAP in Illinois at all, let alone the effects of the Attorney General's nonactionable speech.

As a final hedge, the district court states that what "cinches the case for personal jurisdiction" is that the Enforcement Action "seeks to reach across state lines to halt AAP's conduct in Illinois and nationwide."  Opinion 23.  But here again, the district court flouts *Walden* by confusing effects *felt by the plaintiff in the forum state* with contacts *between the defendant and the forum state*.  The only authority cited on this point is *Defense Distributed v. Grewal*, but that decision is as inapposite as it is

---

[2] None of the Attorney General's commentary has been directed at Illinois.

10

nonbinding. 971 F.3d 485, 495 (5th Cir. 2020) (holding cease-and-desist letter consti-tuted "physical entry" into Texas).

Here, the only contact between Illinois and the Attorney General was service of the Amended Complaint. That is insufficient. But it's worth noting the breadth of the district court's logic. Under this theory of personal jurisdiction, *any* state attorney general exposes himself to the defendant's home jurisdiction with every enforcement action. The effects of the lawsuit will always be felt in the defendant's home state, service of process almost always requires a trip to the defendant's headquarters, and any request for injunctive relief will bleed over to other States. That's not how juris-diction works.

### 2. Venue is improper.

AAP asserts that venue lies in the Northern District of Illinois under 28 U.S.C. § 1391(b)(2), which allows a civil action to be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." AAP claims that venue is proper there because that's where it is allegedly suffering injury. ECF 1 ¶26.

Disconcertingly, the district court agreed, citing the Second and Ninth Cir-cuits. Opinion 26. Yet it ignored the other side of the circuit split. *See, e.g.*, *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995) ("We think it far more likely that by refer-ring to 'events or omissions giving rise to the claim,' Congress meant to require courts to focus on relevant activities of the defendant, not of the plaintiff.").

This Court should reject the district court's plaintiff-centric interpretation of 28 U.S.C. § 1391(b)(2) for two reasons. First, it departs from the Supreme Court's

11

decision in *Leroy v. Great Western United Corp.*, which held that that "statutorily specified venue" doesn't exist "to provide for venue at the residence of the plaintiff." 443 U.S. 173, 183–84, 185 (1979). Second, the district court's interpretation would render § 1391(b)'s other provisions largely superfluous. Indeed, if harm to a plaintiff were enough to satisfy § 1391(b)(2), "neither of the other alternatives—Section 1391([b])(1) and ([b])(3)—would ever have to be looked at, for a plaintiff could always bring suit at its home base on the premise that it has suffered harm there." *Ford-Reyes v. Progressive Funeral Home*, 418 F. Supp. 3d 286, 291 (N.D. Ill. 2019).

Because venue is improper, the Attorney General is again likely to succeed on appeal.

### 3. *Younger* demands abstention.

Part of the Constitution's genius is that it "split the atom of sovereignty." *Gamble v. United States*, 587 U.S. 678, 688 (2019) (quotation omitted). The Framers cracked the code. The "solution to governmental power and its perils" lies in dividing that power between the federal branches *and also* between the federal government and the States. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020).

*Younger* abstention merely articulates a longstanding practice essential to "Our Federalism." *Younger v. Harris*, 401 U.S. 37, 44 (1971). It embodies the principle, dating back to "the beginning of this country's history," *id.* at 43, that federal courts do not preside over state courts, and that any injunction issued by the former to the latter affronts the State's sovereignty. Indeed, *Younger* simply reiterated what the Court had held "time and time again": "that the normal thing to do when federal

12

courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Id.* at 45.

The doctrine is straightforward: "If a person is believed to have violated a state law, the state has instituted a criminal, disciplinary, or other enforcement proceeding against him, and he has a federal defense, he cannot scurry to federal court and plead that defense as a basis for enjoining the state proceeding." *Nader v. Keith*, 385 F.3d 729, 732 (7th Cir. 2004) (collecting cases). Here, the Florida Attorney General sued in Florida state court to enforce Florida state law. AAP scurried to a federal court a thousand miles away and raised a federal defense as a basis for enjoining the state proceeding. *Younger* prevents precisely this type of gamesmanship.

But the district court hated neither the player nor the game. The district court acknowledged that the Enforcement Action meets all the elements for *Younger* abstention. Opinion 28–29. But it nevertheless refused to abstain, relying on a "bad-faith exception" that has never been applied by the Supreme Court or the Seventh Circuit in the 55 years since *Younger* was decided.

> i. *The bad-faith exception applies when a state enforcement authority persists in the face of unsuccessful state enforcement actions.*

Under the narrow bad-faith exception to *Younger* abstention, federal courts may enjoin state enforcement actions brought "in bad faith without hope of obtaining a valid conviction." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971). The Supreme Court has applied this exception just once (six years before *Younger*): *Dombrowski v. Pfister*, 380 U.S. 479 (1965). There, a state judge "quashed ... arrest warrants as not based on probable cause." *Id.* at 487–88. Despite the state court's orders, the prosecutor

13

"continu[ed] to threaten to initiate new prosecutions of appellants under the same statutes." *Younger*, 401 U.S. at 48. Under these "unusual circumstances," defending the criminal prosecution in state court "[would] not assure adequate vindication of constitutional rights." *Id.* at 48–49 (quotation omitted). The Court therefore declined to abstain.

*Younger* clarified that "the cost, anxiety, and inconvenience of having to defend against a single ... prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Id.* at 46. "[T]he threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single ... prosecution." *Id.* Courts and legal commentators have therefore concluded that the bad-faith exception applies "to only one specific set of facts: where state officials initiate *repeated* prosecutions to harass an individual or deter his conduct, and where the officials have no intention of following through on these prosecutions." *Ken-N.K., Inc. v. Vernon Twp.*, 18 F. App'x 319, 324 n.2 (6th Cir. 2001) (emphasis added); *see also Safe Haven Sober Houses, LLC v. City of Bos.*, 517 F. Supp. 2d 557, 563 (D. Mass. 2007); Erwin Chemerinsky, *Federal Jurisdiction* § 13.4 (4th ed. 2004).

This Court has vigilantly thwarted attempts to extend the bad-faith exception beyond the circumstances presented by *Dombrowski*. *See Grando Corp. v. Rochford*, 536 F.2d 197, 204 (7th Cir. 1976); *Sekerez v. Supreme Ct. of Indiana*, 685 F.2d 202, 208 (7th Cir. 1982); *Collins v. Kendall Cnty.*, 807 F.2d 95, 101 (7th Cir. 1986). Indeed, it has *never* applied the exception.

14

The district court bucked this authority.  Its reasoning would transform a "very narrow gate for federal intervention" into a torrential floodgate.  *Arkebauer v. Kiley*, 985 F.2d 1351, 1358 (7th Cir. 1993).  First, the district court made new law by relying on *Wilson v. Thompson*, 593 F.2d 1375 (5th Cir. 1979), and holding that the bad-faith exception "is not limited to situations of repeated or multiple prosecutions."  Opinion 38.  This Court has never cited that holding favorably, and *Wilson* all but acknowledges that it is irreconcilable with *Younger*.  *Compare Younger*, 401 U.S. at 46, *with Wilson*, 593 F.2d at 1381 n.6.

The district court also worried that, under the "multiple prosecution rule," "federal courts would have to permit state officials one bad-faith prosecution against a person or entity, regardless of how clear it is that the prosecution's sole purpose is to deter the exercise of constitutional rights."  Opinion 38.  But this Court's precedents disallow the district court from alleviating its concerns in this way.  Lower courts may disagree with this Court's holdings, but they must follow them.  This "concern" also fails to pay state courts "proper respect."  *Younger*, 401 U.S. at 44.  Comity requires federal courts to accept that state courts are equally capable of vindicating parties' constitutional rights.  *Id.* at 49.  This framework protects the interests of individual litigants while respecting States as equal sovereigns.  At bottom, *Younger* precludes AAP from effectuating removal of the Enforcement Action from Florida's Nineteenth Judicial Circuit to the Northern District of Illinois.

15

> *ii. The bad-faith exception does not authorize federal courts to conduct a first-instance merits analysis of the state enforcement action.*

Having dispensed with "bright-line rules," the district concluded that AAP's factual allegations form a "mosaic of [subjective] bad faith." Opinion 54. The district court credited "three indicia of bad faith": (1) the merit of the Amended Complaint, (2) the Attorney General's public comments, and (3) that the Attorney General did not serve the initial complaint on AAP and its state court co-defendants before filing the Amended Complaint. Opinion 37.

To begin, the district court erred by analyzing the merits of the Enforcement Action. Whereas this Court evaluates bad faith based on how *state courts* have resolved the merits of *prior* state enforcement actions, *see Grando Corp.*, 536 F.2d at 204; *Sekerez*, 685 F.2d at 205, the district court enjoined the *very first* state enforcement action against AAP based on *its own* assessment of the action's legal merit. This bizarre version of the bad-faith exception—good news to state criminal defendants everywhere—"swallow[s] the rule and effectively extend[s] [the exception] [to] every instance in which a defendant has a good faith argument that his alleged actions do not satisfy the elements in the charging statute." *Frost v. Nessel*, 712 F. Supp. 3d 1008, 1015 (W.D. Mich. 2024), *aff'd*, No. 24-1132, 2025 WL 1136288 (6th Cir. Apr. 17, 2025). Such "federaliz[ation]" of state law achieves "the exact result *Younger* abstention is designed to prevent." *Id.*

Worse, the suggestion that the Enforcement Action is so "objectively weak" that the Attorney General subjectively believes it has no chance of success is risible, especially considering that the Opinion failed to cite *a single case interpreting*

16

Florida's law relevant in the suit.  The legal authority for the Attorney General's claims is catalogued in his response to the motions to dismiss filed in the Nineteenth Judicial Circuit.  *WPATH*, No. 2025-CA-002660, DE No. 56.  While the Attorney General maintains that the merits of the Enforcement Action should play no role in federal courts' application of the bad-faith exception, each of the district court's critiques are rebutted by the Attorney General's response.  *Id.*

*iii. The Attorney General's public comments are not evidence of bad faith.*

AAP and the district court point to public comments about AAP and gender-affirming care as evidence that the Enforcement Action was brought in bad faith.  Opinion 51–52.  The relevance of these sorts of public statements to the bad faith inquiry was recently dismissed by the Ninth Circuit in a strikingly similar case, *Yelp Inc. v. Paxton*, 137 F.4th 944 (9th Cir. 2025).  In 2022, Yelp began notifying its users that "crisis pregnancy centers" "typically provide limited medical services and may not have licensed medical professionals onsite."  *Id.* at 948.  Yelp removed the notice, but the Texas Attorney General nevertheless filed "a civil enforcement action against Yelp in Texas state court" alleging that the notice "was false and misleading" under Texas law.  *Id.* at 949.  Yelp brought a First Amendment retaliation claim and sought a preliminary injunction in federal district court in California.  *Id.*  The district court abstained under *Younger*.  Yelp appealed, arguing that the bad-faith exception applied.  As evidence of bad faith, Yelp noted that "in announcing his enforcement action, the Attorney General highlighted a 'lengthy public statement' from Yelp's CEO vowing to 'fight[] the legal battle against abortion bans,' after *Dobbs*."  Brief for Yelp Inc. at 16, *Yelp Inc. v. Paxton*, 2023 WL 9326179 (N.D. Cal. Feb. 1, 2024).

17

The Ninth Circuit rejected this "evidence": Under Yelp's argument, state enforcement actions would become "retaliatory whenever they touch on hot-button issues." 137 F.4th at 956. While Texas's action "implicate[d] a sensitive matter on which people disagree," that did not make it "retaliatory within the meaning of *Younger*'s bad faith exception." *Id.* Neither did Attorney General Paxton's press release suggest bad faith, "even if it used strong rhetoric." *Id.* "[T]reating the commonplace stridency of prosecutorial press releases as synonymous with bad faith would lead to federal courts enjoining state court proceedings with great regularity, contrary to the Supreme Court's direction that *Younger*'s exceptions are narrow." *Id.*

The district court likewise erred by accepting the Attorney General's comments as evidence of bad faith—comments that, notably, express an expectation of success. ECF 1 ¶¶169–71.

> ### iv. Compliance with the Florida Rules of Civil Procedure is not evidence of bad faith.

Lastly, AAP argued that the Attorney General's failure to prosecute the case is evidence of bad faith. *Id.* ¶138. No such failure occurred.[3] Under the Florida Rules of Civil Procedure, plaintiffs have 120 days to serve their initial pleading. Fla. R. Civ. P. 1.070(j). The rules also allow a plaintiff to amend a pleading once as a matter of course at any time before a responsive pleading is served. Fla. R. Civ. P. 1.190(a). The Attorney General filed the Amended Complaint and served AAP the following day—well before the service deadline. *See* ECF 22-2, 22-3. Compliance with state

---

[3] Though the district court accepted it wholesale, this argument by AAP is frivolous and sanctionable.

18

court procedure does not evidence bad faith.[4]

AAP's "evidence" comes nowhere close to satisfying AAP's burden of presenting the "well-nigh irrefragable proof" necessary to overcome the presumption that the Enforcement Action is being prosecuted in good faith. *Starr v. Fed. Aviation Admin.*, 589 F.2d 307, 315 (7th Cir. 1978). The Court should stay the Order on this basis, too.

### B.    The Remaining Stay Factors Favor Defendant

The Attorney General will suffer irreparable harm without a stay. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up).

The "balance of harms" and the "public interest" both favor a stay as well. If the injunction isn't stayed, the State would suffer the sovereign harm of being told by a faraway federal judge that it cannot pursue a civil enforcement action brought under Florida state law in Florida state court, and its consumers would continue to suffer the consequences of AAP's illegal conduct. If the injunction is stayed, AAP will merely continue asserting its First Amendment defense in state court, which is not an irreparable injury. *Younger*, 401 U.S. at 45–46.

---

[4] The Opinion likened this case to *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1092 (5th Cir. 2023). But that case involved a prosecutor who "drop[ped] the initial indictment" and "filed four new indictments" after the case sat idle for a year. *Id.* at 1092. Here, the Attorney General simply added a claim to his complaint within the time allotted by rules of procedure. He did not drop any of his initial claims or launch additional lawsuits. The key indicium of bad faith in *Netflix* was that the prosecutor filed an indictment for child pornography despite proof that the actress was an adult. *Id.* at 1093–94. The comparison to *Netflix* is strained to say the least.

19

\*    \*    \*

Federalism's core tenets shouldn't be so flippantly ignored. This unprecedented Order will introduce chaos into a Florida proceeding; but its mischief won't stop there. Its reasoning will place every state court enforcement action under the paternalistic tutelage of federal district courts from Puerto Rico to Alaska. That should not stand.

## CONCLUSION

This Court should issue an immediate administrative stay before 12pm CT on June 10, 2026. It should then stay the preliminary injunction pending appeal.

20

June 9, 2026

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

JASON HILBORN
  *Deputy Attorney General for Civil Enforcement*

Respectfully submitted,

*/s/ Samuel F. Elliott*

DAVID M.S. DEWHIRST
  *Solicitor General*
JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
VINCENT LI
  *Deputy Solicitor General*
SAMUEL F. ELLIOTT (Fla. Bar No. 1039898)
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
samuel.elliott@myfloridalegal.com

*Counsel for Attorney General*
*James Uthmeier*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on June 9, 2026, to all counsel of record.

*/s/ Samuel F. Elliott*
Deputy Solicitor General

21

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,197 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft in Century Schoolbook-point font, a proportionally spaced typeface.