**No. 26-2238**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

———————————

AMERICAN ACADEMY OF PEDIATRICS,
*Plaintiff-Appellee,*

v.

JAMES UTHMEIER, ATTORNEY GENERAL
OF THE STATE OF FLORIDA, in his official capacity,
*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the Northern District of Illinois

———————————

**REPLY IN FAVOR OF EMERGENCY MOTION
FOR STAY PENDING APPEAL**

———————————

JAMES UTHMEIER
  *Attorney General*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

JASON HILBORN
  *Deputy Attorney General for
Civil Enforcement*

DAVID M.S. DEWHIRST
  *Solicitor General*

JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*
VINCENT LI
  *Deputy Solicitor General*
SAMUEL F. ELLIOTT (Fla. Bar No. 1039898)
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
samuel.elliott@myfloridalegal.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

ARGUMENT .................................................................................................................. 1

    A.    *Younger*'s bad faith exception demands that state courts adjudicate the merits of state prosecutions in the first instance. .................................................... 1

    B.    The Enforcement Action Is Meritorious. ....................................................... 2

        1.    The Florida Antitrust Act claim is meritorious. ....................................... 3

        2.    The FDUTPA and Florida RICO Act claims are meritorious. ................... 6

CONCLUSION ............................................................................................................. 11

CERTIFICATE OF SERVICE ....................................................................................... 12

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Society ofMechanical Engineers, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982) ................................................................... 3, 4, 6, 8

*Allied Tube &Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988) ..................................................................... 4, 8, 10

*Wilk v. AmericanMedical Association*,
  895 F.2d 352 (7th Cir. 1990) ........................................................ 4, 5, 8

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983) ............................................................................... 10

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
  447 U.S. 557 (1980) ............................................................................. 10

*Davis v. Powertel, Inc.*,
  776 So. 2d 971 (Fla. 1st DCA 2000) ...................................................... 7

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965) ............................................................................... 1

*Mulholland v. Marion County Election Board*,
  746 F.3d 811 (7th Cir. 2014) ............................................................. 1, 2

*Netflix, Inc. v. Babin*,
  88 F.4th 1080 (5th Cir. 2023) ............................................................... 2

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) ............................................................................... 2

*Perez v. Ledesma*,
  401 U.S. 82 (1971) ................................................................................. 6

*Sekerez v. Supreme Ct. of Indiana*,
  685 F.2d 202 (7th Cir. 1982) ................................................................. 1

*Younger v. Harris*,
  401 U.S. 37 (1971) ................................................................................. 1

**Statutes**

Fla. Stat. § 542.18 ..................................................................................................... 3

Fla. Stat.  § 817.40(5) .............................................................................................. 8

Fla. Stat.  §§ 895.03(3)-(4), 895.02(8)(a)36 ...................................................... 7

Fla. Stat. § 501.204(1) .............................................................................................. 6

Fla. Stat. § 501.203(8), ............................................................................................. 8

Fla. Stat. § 542.16 ..................................................................................................... 3

## ARGUMENT

Nothing more is needed to reject AAP's personal jurisdiction and venue arguments, which alone warrant a stay. But the Attorney General briefly responds to AAP's *Younger* arguments, which misstate the governing standard and caricature his Florida state law claims.

### A.    *Younger*'s bad faith exception demands that state courts adjudicate the merits of state prosecutions in the first instance.

*Younger* is clear: abstention is required unless "the threat to the plaintiff's federally protected rights . . . cannot be eliminated by his defense against a single criminal prosecution." *Younger v. Harris*, 401 U.S. 37, 46 (1971). The only case in which the Supreme Court has ever applied the bad-faith exception involved a prosecutor who continued to pursue his repeatedly rejected claims. *Dombrowski v. Pfister*, 380 U.S. 479, 487–88 (1965). Therefore, courts across the country apply the multiple prosecution rule. *See, e.g.*, *Sekerez v. Supreme Ct. of Indiana*, 685 F.2d 202, 208 (7th Cir. 1982).

AAP counters with *Mulholland v. Marion County Election Board*, 746 F.3d 811 (7th Cir. 2014). But that dicta[1] only proves the Attorney General's point. The county election board's investigation "shave[d] very close to harassment or bad faith prosecution" because the board *had previously been enjoined from enforcing the same statute. Id.* at 813, 818. This Court inferred bad faith not from its own assessment of the

---

[1] The case didn't satisfy the *Younger* abstention elements because the underlying action—an investigation by the county election board—was not "judicial in nature." 746 F.3d at 813.

investigation's merit, but because the merits had already been adjudicated against the election board, yet it continued to bring new prosecutions. *Id.*

AAP also claims that "[c]ourts routinely analyze the merits of underlying claims to evaluate whether, under *Younger*, a case was brought in bad faith." Response 20. Yet AAP cites just two cases: *Nieves v. Bartlett*, 587 U.S. 391 (2019) and *Netflix, Inc. v. Babin*, 88 F.4th 1080 (5th Cir. 2023). *Nieves* had nothing to do with *Younger* abstention. And the key indicum of bad faith in *Netflix* was that the prosecutor filed a child pornography indictment after declining Netflix's offer to "share proof that the actress over eighteen years old." *Netflix*, 88 F.4th at 1093–94. This weak authority doesn't support Judge Kennelly's overhaul of the bad-faith exception to commandeer Judge Porter's authority to adjudicate state law claims in his Florida court.

### B.    The Enforcement Action Is Meritorious.

It shouldn't be relevant to granting a stay, but the Attorney General's enforcement claims are well-founded. AAP suggests that the Attorney General "offers little to no response" in defense of its Enforcement Action. Response 21. If true, that would be unremarkable: abstention, jurisdiction, and venue settle this matter. In reality, however, the Attorney General refers this Court to his 65-page motion in Florida's Nineteenth Judicial Circuit, which "catalogues the legal authority for the Attorney General's claims" and "rebuts each of the district court's critiques." ECF 2-1 (cleaned up).

2

### 1. The Florida Antitrust Act claim is meritorious.

The Florida Antitrust Act declares that "[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful." Fla. Stat. § 542.18. Section 542.18 is construed "liberally" to "compliment the body of federal law prohibiting restraints of trade or commerce." § 542.16, Fla. Stat.

AAP and the district court reckon that that the Enforcement Action is meritless because "all of the State's claims are necessarily premised on the notion that AAP's speech and activities were 'commercial' or affected a commercial market, but AAP is a non-profit that does not sell any form of gender-affirming care." Response 20–21. But leading cases reject that very notion.

Begin with *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, where the Supreme Court decided that an association of mechanical engineers restrained trade in violation of § 1 of the Sherman Act when one of the association's subcommittees leaders used the association's standards to harm a competitor. 456 U.S. 556, 559–64, 577 (1982). The association claimed immunity because "it [wa]s a nonprofit organization, not a business seeking profit." *Id.* at 576. But it is "beyond debate that nonprofit organizations can be held liable under the antitrust laws." *Id.* (collecting cases). "Although [the association] may not operate for profit, it does derive benefits from its codes, including the fees the [association] receives for its code-related publications and services, the prestige the codes bring to the [association], [and] the influence they permit [the association] to wield[.]" *Id.*

The association's backup argument was that it couldn't be held liable for the acts of its subcommittee members. *Id.* at 573. The Court disagreed: by "cloak[ing]

3

its subcommittee officials with the authority of its reputation, [the association] permit[ted] those agents to affect the destinies of businesses and thus gives them the power to frustrate competition in the marketplace." *Id.* at 570–71. Standards-setting organizations "can be rife with opportunities for anticompetitive activity," especially when standards are developed by "members of the industries regulated [there]by." *Id.* at 571. By "entrust[ing]" its heating boiler standards to members of the heating boiler market "without any meaningful safeguards," the association was vicariously liable for restraining trade in violation of § 1 of the Sherman Act. *Id.* at 572.

*Allied Tube & Conduit Corp. v. Indian Head, Inc.* reiterated that standards-setting "involves the exercise of market power" and observed that "any agreement to exclude [a product or service] from the [association's standards] is in part an implicit agreement" between the association's members "not to trade in that [product or service]." 486 U.S. 492, 507 (1988). Thus, standards-setting organizations are subject to antitrust liability when they "bias the process by . . . stacking the private standard-setting body with decisionmakers" possessing an "economic interest in restraining competition." *Id.* at 510–11.

In *Wilk v. American Medical Association*, this Court held that a non-profit medical association (AMA) violated § 1 of the Sherman Act by publishing a policy statement that called chiropractors "unscientific practitioners." 895 F.2d 352, 355 (7th Cir. 1990). The jury found that chiropractors competed with medical doctors (AMA's members) in the same nationwide market, and that AMA's policy statement was intended to drive chiropractors out of the market. *Id.* at 360–61. AMA argued "there

4

was plenty of material supporting the belief that all chiropractic was unscientific," but this was no defense. *Id.* at 363. Section 1 of the Sherman Act is concerned not with the accuracy of association standards, but rather the neutrality of the process used to create those standards: Because "it was very clear that the [AMA] Committee's members did not have open minds to pro-chiropractic arguments or evidence," the standards illegally restrained trained. *Id.* at 363.

The Amended Complaint demonstrates a remarkably similar course of conduct on the part of AAP. Just as AMA entrusted its policy statement on chiropractors to their competitors, AAP entrusted its policy statement on non-"gender affirming" counselors to Dr. Jason Rafferty, whose "nascent practice consisted largely of pre-scribing of puberty blockers and cross-sex hormones." ECF 21-1 ("Am. Compl.") ¶¶220–25. Just as AMA's policy statement damaged chiropractors by calling them "unscientific practitioners," AAP's policy statement damaged non-"gender affirming" counselors by stating that their methods "have been proven to be not only unsuccess-ful but also deleterious" and are "considered outside the mainstream of traditional medical practice." ECF 1-1 4. Just as AMA's subcommittee members "did not have open minds to pro-chiropractic arguments or evidence," Dr. Rafferty and others "ex-clu[ded] entire literatures" that did not advance AAP's "goal in ensuring that gender-affirming care is accessible." Am. Compl. ¶191, 229.

And just as it did not matter that the AMA was a non-profit that does not sell treatment, it does not matter that "AAP is a non-profit, and it does not sell any form of gender-affirming care." Opinion 39. The Supreme Court could not have made this

5

point clearer than it did in *Hyrdrolevel Corp.*: it is "beyond debate that nonprofit [standards-setting] organizations can be held liable under the antitrust laws." *Id.* at 576 (collecting cases).

AAP cannot shift the blame to the Policy Statement authors. The district court countenanced the allegation that "the authors of AAP's policy statement provide gender-affirming care themselves and therefore had a financial interest in developing medical standards that would yield credibility to gender-affirming care." Opinion 41 (quotation omitted). It concluded, however, that the Attorney General's antitrust claim is doomed because the Amended Complaint "does not explain why AAP's *leadership* agreed to publish the policy statement and continues to adhere to it." *Id.* The Supreme Court rejected the same argument in *Hydrolevel Corp.* 456 U.S. at 576.

The district court's suggestion that the antitrust claim is so objectively weak that the Attorney General must subjectively lack any "hope" of success is beyond the pale. *Perez v. Ledesma,* 401 U.S. 82, 85 (1971); Opinion 37.

### 2. The FDUTPA and Florida RICO Act claims are meritorious.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The Florida RICO Act similarly makes it unlawful to conduct an enterprise through a pattern of misleading advertising. Fla. Stat. §§ 895.03(3)-(4), 895.02(8)(a)36., 817.41(1).

The district court decided the Attorney General subjectively believes his FDUTPA and Florida RICO Act claims are "without hope" for two reasons: (1) because the Policy Statement is not "commercial in nature," Opinion 39, 42; and

6

(2) because the Attorney General mischaracterizes the Policy Statement.  Opinion 43–51.  Both are off base.

**1**.  The first reason takes a myopic view of the Amended Complaint and Florida law.  The Amended Complaint alleges that AAP made false statements regarding the evidence behind gender-affirming care, the reversibility of puberty blockers, and the methodological rigor of its Policy Statement "through many mediums."  Am. Compl. ¶294.  For instance, AAP's website claims that its policy statements are "are written by medical experts," "reflect the latest evidence in the field," and "are evidence driven, nonpartisan and rigorously reviewed."  *Id.* ¶58.  None of that is true with respect to the Policy Statement.  *See id.* ¶¶220–29, 280.  The district court did not grapple with these non-Policy Statement misrepresentations—it read them out of the Amended Complaint.

In any event, the Policy Statement is sufficiently commercial for FDUTPA and the Florida RICO Act.  Without citing *any* Florida law or caselaw, the district court determined the Policy Statement could not have been published "in the conduct of trade or commerce" because "AAP is a non-profit, and it does not sell any forms of gender-affirming care."  Opinion 39.  But FDUTPA defines "trade or commerce" to "include the conduct of any trade or commerce, however denominated, *including any nonprofit or not-for-profit person or activity*."  § 501.203(8), Fla. Stat. (emphasis added).  Standards-setting associations that do not "operate for profit" still "derive benefits" from their standards, including "the influence they permit [the association] to wield."  *Hydrolevel*, 456 U.S. at 576; *see also Allied Tube*, 486 U.S. at 507

7

(standards-setting by non-profit associations is a "commercial activity"). The Policy Statement was a "not-for-profit activity" meeting FDUTPA's definition of "trade or commerce."

This is also sufficient for Florida's RICO Act. The Amended Complaint alleges that AAP disseminated false and misleading statements in its Policy Statement with the intent of inducing the public to purchase property (puberty blockers and cross-sex hormones) and services ("social transitioning" and surgeries) from its members. *See* Fla. Stat. § 817.40(5); Am. Compl. ¶222, 226–27, 296. That the Policy Statement accomplished this goal "indirectly" makes no difference. Fla. Stat. § 817.40(5).

**2**. Next, the district court concluded that the FDUTPA and Florida RICO Act claims are certain to fail because AAP did not make the false statements attributed to it by the Attorney General. In fact, the district court declared that the Amended Complaint presents "a distorted and at times outright dishonest depiction of AAP's conduct." Opinion 50. This conclusion rests on the district court's distorted presentation of the Amended Complaint and the Policy Statement.

The most egregious example concerns AAP's claims regarding puberty blockers. According to the Opinion, the Amended Complaint alleges that the Policy Statement refers to puberty blockers as "fully reversible." Opinion 47. The Amended Complaint does not allege that the Policy Statement refers to puberty blockers as "fully reversible." The Amended Complaint *does* allege that AAP used the phrase "fully

8

reversible" elsewhere, *see* Am. Compl. ¶294, and that is true.[2]  The district court's declaration that "AAP does not represent that puberty blockers are fully reversible" is incorrect.  Opinion 47.

The district court also incorrectly states that the Policy Statement and later-published systematic reviews "largely overlap" in terms of their discussions about the risks of puberty blockers.  *Id.* at 49.  Not so.  The Cass Review—widely considered the most comprehensive review on the subject ever published—concluded that puberty blockers may permanently change the trajectory of psychosexual and gender identity development, Am. Compl. ¶132; that risk is nowhere to be found in the Policy Statement.  The Cass Review found that there is "no evidence that puberty blockers buy time to think," *id.* at ¶131; the Policy Statement calls puberty blockers "reversible treatments" (as opposed to cross-sex hormones which it calls "partially reversible") that "provide time up until 16 years of age for the individual and the family to explore gender identity."  ECF 1-1 5, 6.  The Cass Review "found no evidence that puberty blockers improve body image or dysphoria," Am. Compl. ¶130; the Policy Statement concluded that "pubertal suppression in children who identify as TGD generally leads to improved psychological functioning in adolescence and young adulthood."  ECF 1-1 5.  This is no mere "difference in tone."  Opinion 49.

---

[2] For example, the Attorney General believes that the "fully reversible" claim appears in AAP's "Point-of-Care Quick Reference" for gender identity.  Amy Weimer, *Point-of-Care Quick Reference: Gender Identity*, American Academy of Pediatrics Publications (Aug. 20, 2021), https://doi.org/10.1542/aap.ppcqr.396041.

Finally, the district court overlooks a double-peer reviewed article concluding that: "the references that AAP cited as the basis of their policy instead outright contradicted that policy"; "AAP gave readers exactly the reverse of what was contained in its own sources"; "[i]n its policy statement, AAP told neither the truth nor the whole truth, committing sins both of commission and of omission, asserting claims easily falsified by anyone caring to do any fact checking at all;" and [a]ny assertion that [AAP's] policy is based on evidence is demonstrably false." Am. Compl. ¶229. The article was published by Dr. James M. Cantor, a homosexual psychologist who "describes himself as a liberal atheist and, above all, a scientist." Jonathan Montpetit & Sylvène Gilchrist, *U.S. conservatives are using Canadian research to justify anti-trans laws*, CBC News (Oct. 21, 2023), https://www.cbc.ca/news/investigates/james-cantor-gender-affirming-care-bans-1.6979356.

Because AAP's false and misleading statements are intended to deliver commercial benefits to its members, they are not protected by the First Amendment. *See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 563 (1980); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 66 (1983). Nor does the First Amendment shield AAP's anticompetitive conduct. *See Allied Tube*, 486 U.S. at 507–10.

*     *     *

When assessed plainly and not selectively excerpted, the strength of the merits speak for itself. Yet the Attorney General ends where he began. Per *Younger*, this Court has no business adjudging those merits. Florida's courts are fully capable of

10

adjudicating these claims and AAP's defenses. Federal courts aren't constitutionally empowered to look over the shoulder of state enforcement proceedings. And that's doubly true when they utterly lack personal jurisdiction.

## CONCLUSION

This Court should stay the preliminary injunction pending appeal.

June 12, 2026

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General*

*/s/ Samuel F. Elliott*

RYAN D. NEWMAN
  *Chief Deputy Attorney General*

DAVID M.S. DEWHIRST
  *Solicitor General*
JASON J. MUEHLHOFF
  *Chief Deputy Solicitor General*

JASON HILBORN
  *Deputy Attorney General for Civil Enforcement*

VINCENT LI
  *Deputy Solicitor General*
SAMUEL F. ELLIOTT (Fla. Bar No. 1039898)
  *Deputy Solicitor General*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
samuel.elliott@myfloridalegal.com

*Counsel for Attorney General*
*James Uthmeier*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on June 12, 2026, to all counsel of record.

*/s/ Samuel F. Elliott*
Deputy Solicitor General

12

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 2,589 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft in Century Schoolbook-point font, a proportionally spaced typeface.

/s/ *Samuel F. Elliott*
Deputy Solicitor General