In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 26-2238

AMERICAN ACADEMY OF PEDIATRICS,

*Plaintiff-Appellee*,

*v.*

JAMES UTHMEIER, Attorney General of the State of Florida,
*Defendant-Appellant*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No.1:26-cv-02401— **Matthew F. Kennelly**, *Judge*.

_____

DECIDED JUNE 22, 2026

_____

Before HAMILTON, SCUDDER, and JACKSON-AKIWUMI, *Circuit Judges*.

PER CURIAM. In December 2025, James Uthmeier, the Attorney General of the State of Florida, sued the American Academy of Pediatrics, the World Professional Association for Transgender Health, and the Endocrine Society in Florida state court. General Uthmeier alleged and announced publicly that through their policy statements and legal filings supporting access to gender-affirming care, the organizations

violated the Florida Deceptive and Unfair Trade Practices Act, Florida's Racketeer Influenced and Corrupt Organizations (RICO) Act, and, later, Florida antitrust law. Three months later, General Uthmeier had not yet even served the organizations with process, but the pending case was hanging over those defendants. The American Academy of Pediatrics (AAP), an Illinois non-profit, then sued General Uthmeier in federal court in Illinois. AAP sued under 42 U.S.C. § 1983. It contends that the Florida enforcement action was brought in bad faith in violation of the First Amendment to retaliate against AAP's advocacy for gender-affirming care.

The district court granted AAP's motion for a preliminary injunction, enjoining General Uthmeier from pursuing his state court action against AAP. General Uthmeier has appealed and moved for a stay of the preliminary injunction pending our full and expedited consideration of his appeal of the preliminary injunction. See Fed. R. App. P. 8.

The issue before us is narrow. We do not decide the merits of the preliminary injunction. We consider only whether we should stay the district court's injunction pending our expedited consideration of the appeal. We deny the requested stay pending appeal. We recognize that an injunction against a pending state enforcement action like this raises serious federalism concerns that are the foundation of *Younger* abstention. See *Younger v. Harris*, 401 U.S. 37 (1971) (reversing injunction against criminal proceeding brought in good faith). The *Younger* abstention doctrine, however, has always included an exception for proceedings brought in bad faith. *Id*. at 46–50, citing *Dombrowski v. Pfister*, 380 U.S. 479 (1965) (reversing denial of injunction against criminal proceedings brought in bad faith). In this case, the district court made detailed findings

indicating the Florida proceeding has been brought in bad faith, so that *Younger* abstention should not apply. The district court also explained why personal jurisdiction and venue in Illinois are supported by law.

The district court's decision finds strong support from decisions by both the Fifth Circuit and the D.C. Circuit, decisions with which neither General Uthmeier nor our dissenting colleague engages. See *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020) (holding that Texas district court should have enjoined bad-faith enforcement action brought in New Jersey by state attorney general); *Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025) (affirming D.C. injunction against bad-faith investigation by attorney general in Texas). In light of those cases providing legal support for the injunction here, as well as AAP's factual showings, General Uthmeier has not made the required "strong showings" that he is likely to succeed on the merits of the appeal or that the injunction will cause him irreparable harm while we consider his appeal on an expedited basis. See *Nken v. Holder*, 556 U.S. 418, 434 (2009).

## I

### A

The American Academy of Pediatrics is a non-partisan, non-profit organization incorporated and headquartered in Illinois. Founded in 1930, AAP contributes to the development of pediatric medicine through conducting research, providing educational materials, hosting events for medical professionals, and publishing *Pediatrics*, a peer-reviewed scientific journal. AAP also files amicus briefs, submits

comments in response to agency rulemaking, and issues policy statements on issues affecting pediatric health.

In 2018, AAP published a policy statement titled "Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents" in the *Pediatrics* journal. According to its abstract, the policy statement reviews concepts and challenges in the field of gender-affirming care, providing suggestions for pediatric providers that are "focused on promoting the health and positive development" of transgender youth. The policy statement contains an important disclaimer: "The guidance in this statement does not indicate an exclusive course of treatment or serve as a standard of medical care. Variations, taking into account individual circumstances, may be appropriate."

The policy statement provides an overview of various forms of gender-affirming care with an overall supportive tone. It notes that suppression of puberty comes with risks, noting that some research suggests it may have long-term effects on bone metabolism and fertility and observing that the current research is "limited and provides varied results." The statement favorably summarizes social affirmation, including adapting one's hairstyle, clothing, and pronouns. The statement also describes different types of surgical approaches. It observes that these changes are irreversible and typically are reserved for adults, but that surgery is "occasionally pursued during adolescence on a case-by-case basis."

AAP's policy statement concludes with several recommendations, four of which the district court highlighted as particularly relevant to this case: (1) "that youth who identify as [transgender] have access to comprehensive, gender-affirming, and developmentally appropriate health care that is

provided in a safe and inclusive space"; (2) "that insurance plans offer coverage for health care that is specific to the needs of youth who identify as [transgender], including coverage for medical, psychological, and, when indicated, surgical gender-affirming interventions"; (3) "that pediatricians have a role in advocating for policies and laws that protect youth who identify as [transgender] from discrimination and violence"; and (4) "that the medical field and federal government prioritize research that is dedicated to improving the quality of evidence-based care for youth who identify as [transgender]." AAP affirmed this policy statement in 2023. The statement is freely accessible online.

In early December 2025, General Uthmeier filed a lawsuit in a state court in Florida against AAP, the World Professional Association for Transgender Health (WPATH), and the Endocrine Society. His initial complaint alleged that AAP and its co-defendants violated the Florida Deceptive and Unfair Trade Practices Act by making "immoral, unethical, oppressive, and unscrupulous" representations, misleading consumers about the safety and reversibility of "sex intervention" treatments in order to advertise memberships, goods, and services.

The Florida complaint also alleged that the defendants violated Florida's RICO Act. The criminal enterprise purportedly began when defendant WPATH issued a publication in 1998 that did not specify an age minimum for puberty-blocking hormones, allegedly with no credible supporting evidence. Defendant Endocrine Society allegedly joined the criminal enterprise in 2009 by publishing a guideline adopting most of WPATH's recommendations, stating falsely that puberty blockers were "fully reversible."

General Uthmeier alleged that AAP joined the supposed criminal enterprise with its 2018 policy statement, described above, which adopted and cited elements of the WPATH and Endocrine Society reports. General Uthmeier alleged that the three organizations furthered their supposed criminal enterprise by submitting comments opposing a rule proposed by the Florida Agency for Health Care Administration that would exclude gender-affirming treatments from Medicaid coverage. Their later amicus briefs challenging the scientific basis for the rule, General Uthmeier alleged, were further evidence of their criminal enterprise based on a "formula" of "co-signing amicus briefs that cite each other's guidelines."

General Uthmeier sought declaratory and injunctive relief, as well as statutory penalties of $1 million against each defendant and an additional $10,000 for each allegedly false representation. Important for our analysis of personal jurisdiction and venue, he also asked the Florida state court to grant additional relief including "imposing reasonable restrictions upon Defendants' future activities," "[o]rdering the dissolution or reorganization of Defendants' enterprise," and "[o]rdering the forfeiture of Defendants' charters."

The day General Uthmeier filed the state complaint, he announced the enforcement action on X, formerly known as Twitter: "In 2023, @GovRonDeSantis signed legislation to ban so-called 'gender-affirming care' for kids. Now it's time for accountability! Today, my office sued @wpath, @AmerAcadPeds, and @TheEndoSociety for mutilating kids and misleading families." AAP alleges that two days later, General Uthmeier was a guest on a podcast where he discussed the enforcement action and said: "we want to hurt [AAP and its co-defendants] in their wallet," "we want them

to cough up millions," and that his lawsuit would "end" gender-affirming care "for once and for all."

**B**

Despite the publicity about the filing, General Uthmeier did not serve AAP and its co-defendants in the state enforcement action for more than three months after filing the complaint. He did so only after AAP filed this lawsuit in the Northern District of Illinois alleging that General Uthmeier had filed the state enforcement action to retaliate against AAP for its advocacy in favor of gender-affirming care and to suppress its speech in violation of the First Amendment. AAP sought injunctive relief under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908). See generally *Chiles v. Salazar*, 607 U.S. —, 146 S. Ct. 1010 (2026) (First Amendment protects speech on issues of gender-affirming care and prevents state from requiring therapists to adopt state's favored viewpoint).

AAP moved for a preliminary injunction. General Uthmeier moved to dismiss the federal lawsuit for lack of personal jurisdiction, improper venue, *Younger* abstention, and failure to state a claim. On the same day he filed his motion to dismiss, General Uthmeier filed an amended complaint in the Florida court. The amended complaint added an antitrust claim, alleging that the three defendants restrained trade or commerce by "employing biased standards-setting procedures designed to promote their members' 'gender-affirming' model of care." The amended complaint seeks an additional $1 million penalty for each alleged antitrust violation.

After holding a hearing and assessing the record, the district court denied General Uthmeier's motion to dismiss, granted AAP's motion for a preliminary injunction against

General Uthmeier's pursuing the Florida enforcement action against AAP pending further proceedings. The court acknowledged General Uthmeier's argument that his service of process on AAP in Illinois was likely insufficient on its own to establish personal jurisdiction. The district court concluded that the combination of service in Illinois, the chilling effect on AAP in Illinois, and General Uthmeier's stated intent to halt AAP's operations in Illinois and nationwide, including dissolving AAP and forfeiting its charter, was likely sufficient to establish personal jurisdiction in Illinois. The district court found that venue, too, was likely proper because the chilling effect of the enforcement action, as well as AAP's conduct and publications giving rise to the state enforcement action, occurred in the Northern District of Illinois.

The district court also found at this preliminary stage that AAP's suit appears likely to meet the *Younger* exception allowing injunctions against bad-faith litigation. Based on the facts before it, the court found that General Uthmeier appeared to have filed the enforcement action with no reasonable expectation of success. All three state-law claims require General Uthmeier to prove that AAP's activities are commercial. AAP is a nonprofit scientific organization that does not sell or provide gender-affirming care. In addition, the court found, several other factors supported an inference of bad faith: General Uthmeier's delay in prosecuting the enforcement action, the Florida complaint's inaccurate portrayal of AAP's stance on age limits and side effects of gender-affirming care, and General Uthmeier's inflammatory public comments.

The district court further found that AAP was likely to succeed on the merits of its First Amendment retaliation claim.

General Uthmeier had offered no arguments to rebut AAP's position that its scientific publications about gender-affirming care were protected by the First Amendment. Also, there was little doubt that AAP's protected speech was the impetus for the Florida enforcement action. The monetary and injunctive penalties threatened by the suit also appeared to be severe enough to deter future First Amendment activity. Irreparable harm is presumed in First Amendment violations. The district court also credited AAP's evidence that the enforcement action was chilling scientific discourse, undermining security and attendance at AAP's events, and burdening AAP employees with threats to their safety.

Consistent with the reasoning in *Younger*, the court found that raising a First Amendment defense in state court would likely not provide an adequate remedy for AAP because the right it sought to protect was the right not to be subjected to a bad-faith prosecution in the first place. See *Younger*, 401 U.S. at 48–49 (injunction would be justified where "defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights," and "substantial loss of or impairment of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination"), quoting *Dombrowski*, 380 U.S. at 485–86 (reversing denial of injunction against bad-faith prosecution); *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1097 n.51 (5th Cir. 2023) (affirming injunction against state-court prosecution for actions protected by First Amendment because criminal defendant sought to protect federal right not to be subjected to bad-faith prosecution, and that right could not be vindicated by undergoing prosecution).

General Uthmeier appealed the injunction. He moved for a stay pending appeal and an immediate administrative stay as to the district court's order to file a prompt status report detailing his compliance with the preliminary injunction. This court denied the motion for an immediate administrative stay. General Uthmeier then filed his status report in the district court showing that he had notified the Florida state court of the preliminary injunction. He described the injunction as "lawless" and "illicit" and told the state court that "[t]he injunction does not bind [it] in any way."

## II

When considering whether to stay an injunction pending appeal, this court applies a standard parallel to the preliminary injunction standard while keeping in mind "the district court's exercise of equitable discretion." *Illinois v. Trump*, 155 F.4th 929, 936 (7th Cir. 2025), quoting *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 14 F.4th 624, 628 (7th Cir. 2021). We take a "fresh look at the legal issues but review the district court's factual findings for clear error." *Id.* at 936–37. To justify a stay, the moving party must make a "strong showing that he is likely to succeed on the merits," and that he will be "irreparably injured" absent a stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). If he makes such a "strong showing," then this court considers the balance of harms and the public interest. The party requesting a stay bears the burden of showing it is justified. *Id*. at 433–34.

General Uthmeier argues he is likely to succeed on the merits for three reasons: the district court lacks personal

jurisdiction, venue is improper, and *Younger v. Harris* demands abstention. We address each in turn.

### A.  Personal Jurisdiction

First, General Uthmeier argues that he is likely to succeed on the merits because the Illinois district court lacks personal jurisdiction over him. He argues that the effects of the state enforcement action felt by AAP in Illinois are not contacts between himself and Illinois and that the fact that he served process on AAP in Illinois does not establish sufficient minimum contacts with the state.

General Uthmeier has not made the required strong showing that the district court lacks personal jurisdiction. Illinois's long-arm statute permits personal jurisdiction coextensive with the Due Process Clause of the Fourteenth Amendment. *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hou. Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). Thus, General Uthmeier is subject to personal jurisdiction in Illinois if he has "certain minimum contacts" with Illinois such that this lawsuit "does not offend 'traditional notions of fair play and substantial justice.'" *Id.*, quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).

The simple fact of injury in the forum is not enough by itself to establish jurisdiction, but it can be sufficient when a defendant's intentional conduct in a foreign state is "calculated to cause injury" to the plaintiff in the forum state. *Calder v. Jones*, 465 U.S. 783, 791 (1984). Under *Calder*, personal jurisdiction based on the location of a plaintiff's injury is appropriate when a defendant "expressly aims its actions at the state with the knowledge that they would cause harm to the plaintiff there." *Mobile Anesthesiologists*, 623 F.3d at 445.

"Express aiming" requires some "evidence beyond the plaintiff's mere residence in the forum state." *Id.* at 447.

General Uthmeier maintains that exercising personal jurisdiction over an out-of-state attorney general is unprecedented overreach. But the Fifth and D.C. Circuits have each affirmed findings of personal jurisdiction over out-of-state attorneys general in analogous circumstances. General Uthmeier does not engage with those cases and identifies no contrary authority.

As the district court noted, *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), is particularly instructive. Defense Distributed, a Texas company that promotes popular access to firearms, produced and made accessible online information related to the 3D printing of firearms. *Id.* at 488. New Jersey Attorney General Grewal sent a cease-and-desist letter to Defense Distributed in Texas threatening legal action if it published its files online, and he brought a civil lawsuit against Defense Distributed in New Jersey. Defense Distributed filed suit in federal court in Texas alleging the attorney general's actions violated the First Amendment. *Id.* at 489. The Fifth Circuit determined that the attorney general had sufficient minimum contacts with Texas to subject him to the jurisdiction of Texas courts.

Notably, the Fifth Circuit reasoned that General Grewal purposefully directed conduct at Texas because, rather than "cabin his request by commanding the plaintiffs to stop publishing materials to New Jersey residents; he instead demands that the plaintiffs cease publication of their materials generally." *Id.* at 492. The Fifth Circuit also noted that General Grewal's conduct beyond sending the cease-and-desist letter confirmed his intent to "crush Defense Distributed's

operations and not simply limit the dissemination of digital files in New Jersey," citing his public comments threatening to "come after" "anyone who is contemplating making a printable gun." *Id.* Those facts closely track the situation here. General Uthmeier seeks to block AAP's speech nationwide and to dissolve it and cause its operations to cease.

The District of Columbia Circuit found personal jurisdiction in another similar action in *Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025), where a district court in the District of Columbia enjoined the Texas attorney general from pursuing an investigation of a reporter and a nonprofit media watchdog organization. They had published an article asserting that the owner of X.com was endorsing an antise-mitic conspiracy theory on its internet platform. *Id.* at 571. The D.C. Circuit rejected the Texas attorney general's attack on personal jurisdiction: "The point is that the censorship-based effects of the allegedly retaliatory investigation [have] con-nected [Texas Attorney General] Paxton to the District [of Co-lumbia], rather than to just Appellees." *Id.* at 578, citing *Defense Distributed*, 971 F.3d at 495–96.

As the circuit courts did in *Defense Distributed* and *Media Matters*, the district court here reasonably found that General Uthmeier's actions appear calculated to cause injury to AAP in Illinois. General Uthmeier has asked the Florida state court to impose "restrictions upon [AAP's] future activities" and even to order "the forfeiture of [AAP's] charter" in Illinois. Further, his amended state complaint identifies the "relevant market" of AAP's allegedly misleading advertisements as "the treatment of children and adolescents experiencing gen-der dysphoria in the United States" and notes that AAP and its co-defendants "have thousands of members across the

country and wield considerable power in the Relevant Market." This evidence, beyond AAP's presence in Illinois, supports the conclusion that General Uthmeier intends to "crush" AAP's operations in Illinois and to chill its speech there rather than simply to limit the dissemination of AAP policy reports in Florida. See *Defense Distributed*, 971 F.3d at 493. General Uthmeier has not shown a strong likelihood that these findings were clearly erroneous. See *Illinois v. Trump*, 155 F.4th at 936–37. And he does not otherwise distinguish the authority of the Fifth and D.C. Circuits in *Defense Distributed* and *Media Matters*, let alone show a strong likelihood of success on his challenge to personal jurisdiction at this preliminary stage.

### B. Venue

General Uthmeier next argues that venue is improper because AAP cannot show a substantial part of the events giving rise to its First Amendment claim occurred in the Northern District of Illinois. He has also failed to show a strong likelihood of success on this defense.

For venue to be proper, a "substantial" part of the events giving rise to the claim needs to occur in the venue, but not all parts. See 28 U.S.C. § 1391(b)(2). The location of the plaintiff's harm is not irrelevant in the venue analysis. Other circuits have considered the locus of injury a relevant factor in venue for tort actions. See, e.g., *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2001).

The fact that the allegedly retaliatory enforcement action is in a Florida state court is not the only event giving rise to the First Amendment claim. General Uthmeier served AAP in the Northern District of Illinois, but even more important, the intended "ensuing adverse effects" occurred there. See *Media*

*Matters*, 138 F.4th at 583 (venue proper in District of Columbia to enjoin bad-faith investigation in Texas). Further, the enforcement action is based on allegations concerning the development and strategy behind AAP's policy statement and legal filings, including accusing AAP of publishing policy reports to mislead consumers about the efficacy of gender-affirming treatments despite supposedly knowing that its recommendations were not backed by medical evidence. These allegations address discussions, knowledge, and publications based in the Northern District of Illinois. In sum, then, General Uthmeier has failed to make a strong showing that venue in Illinois is improper in this case.

### C. *Younger* Abstention

It is a well settled principle that federal courts have a "virtually unflagging obligation" to hear and decide cases within their jurisdiction. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). The *Younger* abstention doctrine established an important exception to this principle. *Younger v. Harris* 401 U.S. 37, 43 (1971). Under the *Younger* doctrine, federal courts refrain from issuing injunctions that would keep state courts from hearing state criminal cases, as well as civil proceedings akin to criminal cases and other civil cases that implicate a state's interest in enforcing the orders and judgments of its courts. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013).

*Younger* abstention is grounded in concerns of federalism and comity. In our federal system of dual sovereigns, federal courts must respect the balance between state and federal judiciaries. We pay due respect to the legitimate interests that state governments have in enforcing their law in their own

institutions and in allowing their own courts to apply federal law. *Younger*, 401 U.S. at 43–45.

*Younger* itself recognized, however, that its limits on federal jurisdiction are not absolute. *Younger* abstention does not prevent a federal court from honoring its obligation to hear and decide cases when the pending state case involves "bad faith and harassment." *Id.* at 49; accord, *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611 (1975) ("*Younger*, and its civil counterpart which we apply today, do of course allow intervention in those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith …").

The Supreme Court did not find bad faith in *Younger* itself, but the Court described the exception in terms of its decision in *Dombrowski v. Pfister*, 380 U.S. 479 (1965); see generally 17A Moore's Federal Practice § 122.73[2] (2026) (describing bad-faith exception and *Younger*'s reliance on *Dombrowski*). The plaintiffs in *Dombrowski* were civil rights activists in Louisiana. They had been facing prosecution in state court for violating the Louisiana Subversive Activities and Communist Control Law and the Communist Propaganda Control Law. They sued in federal court to challenge the constitutionality of those statutes and to enjoin state officials from continuing to prosecute or threatening to prosecute them. 380 U.S. at 481–82.

A three-judge district court had dismissed the complaint, concluding that it should abstain from intervening in the state criminal proceedings. *Id.* at 482–83. The Supreme Court

reversed and held that an injunction was appropriate, with its precise terms to be determined on remand. *Id.* at 497–98.

*Dombrowski*'s logic, as described in *Younger*, had not deviated from "settled doctrines that have always confined very narrowly the availability of injunctive relief against state criminal prosecutions." *Younger*, 401 U.S. at 53. Unlike in earlier cases, the *Dombrowski* plaintiffs made "substantial allegations" and offered to prove several instances of bad faith and harassment. See *id*. at 47–48. They had been subject to raids and had their files and records seized pursuant to warrants later vacated for lack of probable cause. *Id.* at 48. Further, despite a state judge "quashing the warrants and suppressing the evidence seized," the prosecutor threatened to continue prosecution and held "public hearings" where "copies of the illegally seized documents were being used." *Id.*[1]

The bad-faith exception in *Younger* provides a critical safety valve for protecting federal rights while also respecting states and their courts. We have explained that "[t]he harm posed by bad faith prosecution is both immediate and great." *Collins v. Kendall County*, 807 F.2d 95, 98 (7th Cir. 1986). When state officials bring suits in bad faith or to harass, comity concerns are at their weakest. A state "does not have any legitimate interest in pursuing a bad faith prosecution brought to retaliate for or to deter the exercise of constitutionally protected rights. Perhaps the most important comity rationale

---

[1] *Younger* was careful to note that *Dombrowski* did not imply that "the federal courts may give equitable relief, without regard to any showing of bad faith or harassment, whenever a state statute is found … in violation of the First Amendment." *Younger*, 401 U.S. at 50. A "chilling effect" on First Amendment–protected speech is not enough on its own to justify enjoining a state proceeding. *See id.* at 51–52.

of *Younger* deference—that of respect for the State's legitimate pursuit of its substantive interests…—is therefore inapplicable." *Id.* at 98 n.5, quoting *Wilson v. Thompson*, 593 F.2d 1375, 1382–83 (5th Cir. 1979) (reversing denial of injunction; plaintiffs showed bad faith, so *Younger* abstention did not apply); accord, e.g., *Netflix, Inc.*, 88 F.4th at 1091 ("While states certainly have a legitimate interest in the enforcement of their criminal laws, they have no such interest when the enforcement of those laws is carried out in bad faith. … Comity … gives way once good faith does.").

Federal courts do not apply the bad-faith exception to *Younger* lightly, or often. A plaintiff must allege and ultimately prove specific facts to support an inference of bad faith. See *Collins*, 807 F.2d at 98. But the exception is a critical feature of the federalism balance struck in *Younger* doctrine.

The Supreme Court has framed the exception in both subjective and objective terms. In *Perez v. Ledesma*, the Court noted that the bad-faith exception is implicated when harassment or prosecution is undertaken "without hope of obtaining a valid conviction." 401 U.S. 82, 85 (1971). Several years later, in *Kugler v. Helfant*, the Court defined the exception in more objective terms, explaining that bad faith requires that state officials undertook a prosecution "without a reasonable expectation of obtaining a valid conviction." 421 U.S. 117, 126 n.6 (1975), citing *Perez*, 401 U.S. at 85. This court has described bad faith as the use of prosecutions "as instrumentalities for the suppression of speech" or prosecutions brought "with no expectation of convictions." *Collins*, 807 F.2d at 101, quoting

first *Sheridan v. Garrison*, 415 F.2d 699, 706 (5th Cir. 1969), then *Cameron v. Johnson*, 390 U.S. 611, 621 (1968).

The district court in this case discussed factors relevant to both subjective and objective bad faith on the part of General Uthmeier. Based on extensive factual findings, the court concluded that together the facts at this preliminary injunction stage of the case support an inference of bad faith. See *Collins*, 807 F.2d at 98.

General Uthmeier argues in his motion to stay, as he did in the district court, that the bad-faith exception applies only in circumstances of repeated prosecutions. He has not identified any substantial authority imposing such a multiple-prosecution requirement. *Younger* itself did not impose such a requirement. The Court wrote that the exception did not apply in *Younger* because the plaintiff did not suggest the prosecution was "brought in bad faith *or* [was] only one of a series of repeated prosecutions." 401 U.S. at 49 (emphasis added); see also *Fitzgerald v. Peek*, 636 F.2d 943, 944 (5th Cir. 1981) ("[T]he threat of multiple or repeated prosecutions is not necessary to establish bad faith prosecution."); *Wilson*, 593 F.2d at 1381 ("Nearly every Supreme Court case addressing the bad faith exception has described it in terms which indicate that it is not limited to situations of repeated or multiple prosecutions.").

General Uthmeier also argues that the district court was wrong to consider the merits of the Florida enforcement action's claims in its bad-faith analysis. He asserts that, regardless, he has a reasonable expectation of obtaining a judgment on his claims under the FDUTPA, Florida RICO Act, and Florida antitrust laws. We disagree.

The objective framing of the bad-faith inquiry in *Kugler* at least invites and probably requires some consideration of the likelihood of success on the underlying state claims. See 421 U.S. at 126 n.6. Even a purely subjective test would invite consideration of the merits as circumstantial evidence of the state actor's good or bad faith. Consideration of the merits features prominently in many cases addressing the exception. E.g., *Netflix, Inc.*, 88 F.4th at 1094–95 (affirming preliminary injunction against state prosecution, and concluding that bad-faith exception applied in part because "presumably," as to the merits, "there are none"); *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 83–84, 88 (5th Cir. 1992) (affirming preliminary injunction; bad-faith exception applied, in part because city seized video and computer equipment even though all officials "were fully aware" of recent court decision narrowing relevant statute's construction); see also *Collins*, 807 F.2d at 101 (holding that district court did not err in applying *Younger* abstention when defendants had "successfully prosecuted the plaintiffs on three obscenity charges"). But see *Fitzgerald*, 636 F.2d at 945 (a prosecution "brought for the purposes of harassment and retaliation … will justify an injunction regardless of whether valid convictions conceivably could be obtained").

At this preliminary stage, the merits of the Florida claims against AAP appear weak. The district court found that General Uthmeier's theory—that AAP's policy statements were commercial in nature, a prerequisite for all three state claims—lacked any merit because AAP is a nonprofit that does not sell or provide any gender-affirming care, and because its policy statement resembled "scientific and medical advocacy, not a money-making scheme."

General Uthmeier now counters that the state claims are meritorious because, despite its nonprofit status, AAP is a "standards-setting" association that derives benefits from its standards, including influence and memberships. In doing so, he relies on *Wilk v. American Medical Ass'n*, 895 F.2d 352, 357–58 (7th Cir. 1990), where this court explained that the AMA's "standards-setting" speech implicated antitrust laws based on its labeling of chiropractors as an "unscientific cult" and instruction to its members that it was unethical for medical practitioners to associate with chiropractors. *Id.* at 356. This speech prevented physicians from referring patients to chiropractors and therefore imposed higher costs on chiropractors by forcing them to pay for their own x-ray equipment and preventing medical physicians from teaching chiropractors. *Id.* at 360. AAP's policy statement in *Pediatrics*, surveying the field of gender-affirming care, and its comments and amicus briefs opposing regulation of gender-affirming care, do not appear to have a similar boycotting effect that implicates antitrust principles. At the very least, General Uthmeier has not made a strong showing that the district court erred in its assessment, which is what would be required to obtain a stay pending appeal.

General Uthmeier asserts that AAP's statements are "false." He argues they were published in the conduct of "trade or commerce" because AAP intends to induce purchase of puberty blockers, surgeries, and "social transitioning" services from its members. This argument does not refute the district court's findings that the AAP does not sell gender-affirming care and that its policy statements appear to discuss scientific research and advocacy debate, "not a money-making scheme." Accord, *Endocrine Soc'y v. Federal Trade Comm'n*, No. 26-512, 2026 WL 1257289 (D.D.C. May 7,

2026) (granting preliminary injunction against FTC's civil investigative demands on First Amendment grounds; "clinical guidance, education, and policy advocacy clearly fall on the 'ideas' rather than 'products' side of the line"); accord, *Chiles v. Salazar*, 607 U.S. —, 146 S. Ct. 1010, 1029 (2026) (state may not censor speech on gender-affirming care based on viewpoint). Moreover, the alleged intended commercial inducement of gender-affirming care would not even materialize in the state of Florida. Since May 2023, it has been a crime to provide gender-affirming care to minors in Florida.

The district court found that other facts also contributed to the finding of bad faith at this preliminary stage. The court observed that General Uthmeier's complaint in state court made misleading allegations, including that AAP knew scientific evidence did not support lowering age minimums for gender-affirming surgery yet deliberately provided no age minimum in its policy statement. On the contrary, the district court found, the evidence instead showed that AAP had not omitted a specific age minimum to *encourage* surgery for minors. AAP had instead tried to *avoid* broadly approving of surgeries for minors. AAP had noted that surgery is generally acceptable only for adults and should be available to minors only on a case-by-case basis.

The district court found that General Uthmeier's three-month delay in pursuing the state enforcement action, despite his public statements about the lawsuit in the interim, also contributed to a finding of bad faith. So, too, did General Uthmeier's public comments opposing gender-affirming care and vowing to hold AAP accountable for "mutilating children." The district court acted within its discretion in drawing "unfavorable inference[s]" based on this conduct, and we see no

clear error in its factual findings. See *Netflix, Inc.*, 88 F.4th at 1092 (relying on similar delay to support application of bad-faith exception to *Younger*).

The bad-faith exception to *Younger* is difficult to establish, but as noted, it provides an important safety valve for protecting federal rights. Other circuits have applied it in circumstances comparable to this case. See, e.g., *Netflix, Inc.*, 88 F.4th 1080, 1095–96; *Nobby Lobby*, 970 F.2d 82, 88; *Lewellen v. Raff*, 843 F.2d 1103, 1112–13 (8th Cir. 1988); *Krahm v. Graham*, 461 F.2d 703, 707–08 (9th Cir. 1972); *Rowe v. Griffin*, 676 F.2d 524, 529 (11th Cir. 1982).

The federalism and comity foundations of *Younger* call for restraint, not a wholesale prohibition on federal protection of federal rights. See 401 U.S. at 44 ("The concept [of federalism] does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. … What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments."). Federal courts are permitted and even required to intervene when a state official wields state power out of bad faith or a desire to harass—when federalism and comity concerns are at their low ebb. See *Younger*, 401 U.S. at 48–49, quoting *Dombrowski*, 380 U.S. at 485–86; *Collins*, 807 F.2d at 101 (acknowledging that bad-faith exception could have applied if there had been evidence of a "concerted publicity campaign aimed at putting the plaintiffs out of business for exercising their first amendment rights").

Based on the available record at this preliminary stage of this case, the district court did not clearly err in finding that AAP has presented a rare case of a state official acting in bad

faith to use his powers to silence protected speech. General Uthmeier has not made a strong showing that the district court erred in applying the bad-faith exception to *Younger*.

### D.  Equitable Factors

To justify a stay of the preliminary injunction pending appeal, General Uthmeier would also need to show that he would face irreparable harm while this appeal is pending. He has not met this burden. He asserts: "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury," quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). We do not disagree with the general point, but it is not enough to carry the day here, given both the facts of General Uthmeier's Florida action and the evidence of more concrete harm to AAP's First Amendment rights.

First, assuming the purpose of the Florida enforcement action is to prevent AAP from advertising the provision of gender-affirming care to Florida pediatricians and families, it will have no immediate effect in Florida. Florida law has made it a crime to provide gender-affirming care to minors since May 2023. General Uthmeier asserts an interest in holding AAP accountable for earlier alleged violations of the FDUTPA, Florida antitrust law, and the Florida RICO Act, before passage of the criminal ban. We do no irreparable harm to that retrospective interest by leaving the preliminary injunction in place while we consider this appeal on an expedited basis.

General Uthmeier's own delay in prosecuting the state enforcement action further undercuts any argument that he would suffer irreparable harm absent a stay. He did not serve AAP and its co-defendants in the state enforcement action

until after AAP filed this federal lawsuit, about three months after he filed his complaint and publicly announced the state enforcement action. He points out that such a delay was permissible under the Florida Rules of Civil Procedure. We assume that's correct, but the months'-long delay shows a lack of urgency that is inconsistent with the current claim of irreparable harm. That reasoning applies generally when a party seeks emergency injunctive relief. See *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (noting that a "delay in pursuing" an action "may raise questions regarding the plaintiff's claim that he or she will face irreparable harm.")

Because General Uthmeier has not made a strong showing of either a reasonable likelihood of success on the merits or irreparable harm, we touch only briefly on the balance of equities and public interest. At this stage, the balance of harms favors AAP. The harm General Uthmeier may experience from a delay in pursuing the state enforcement action does not outweigh the First Amendment harm to AAP if the allegedly unconstitutional enforcement action is allowed to proceed while we consider this appeal. AAP has, at this preliminary stage, made a convincing showing that Uthmeier's enforcement action is retaliation for exercise of its First Amendment rights. See *Chiles*, 607 U.S. at —, 146 S. Ct. at 1024–25 (First Amendment does not permit state to ban free expression, including on subjects of sexual orientation and gender identity, under guise of regulating medicine). AAP has a strong interest in not being subjected to retaliatory enforcement actions from state officials who disagree with its research and advocacy. The public interest—the interests of those not before the court—also does not require a stay pending this appeal. We see no harm to third parties from staying

Florida's prosecution of its case against AAP in Florida while we consider this appeal.

## III

We emphasize that our conclusions are preliminary and based on our review of the record before the district court. Our conclusions on these issues may differ after full briefing and argument. But at this stage, General Uthmeier has not made the required "strong showing" of likelihood of success on the merits and irreparable harm. See *Nken v. Holder*, 556 U.S. 418, 434 (2009). We therefore DENY the motion for a stay pending appeal. An expedited briefing schedule will issue separately.

SCUDDER, *Circuit Judge*, dissenting. Today's decision inflicts a grievous blow to federalism. The *Younger* abstention doctrine generally requires federal courts to refrain from exercising jurisdiction when doing so would interfere with a state court proceeding. But the majority today invokes a narrow exception—not applied by the Supreme Court since 1965—to permit a federal court in Illinois to enjoin the Florida Attorney General from enforcing Florida law in a Florida state court. The decision licenses federal intrusion and casts a vote of no confidence in the Florida judiciary. In my respectful view, we should grant the motion to stay the injunction pending appeal.

## I

### A

This story begins in state court. In December 2025, Florida Attorney General James Uthmeier sued the American Academy of Pediatrics and two other medical organizations in a Florida circuit court, alleging that they "initiated a coordinated campaign to develop 'clinical guidelines' recommending sex intervention for pediatric gender dysphoria" to "convince patients, insurance companies, regulators, and judges" that there is "credible evidence that sex interventions alleviate pediatric gender dysphoria." According to Uthmeier, gender-affirming "drugs and surgeries are extremely profitable for [the defendants] and their members." The Academy published its relevant guidelines in 2018, stating among other things that certain puberty blockers have been used since the 1980s and are "reversible." This seemed to contradict the Florida Department of Health's later guidance that puberty blockers may cause "long-term, irreversible effects."

Uthmeier claimed that the Academy and its co-defendants violated Florida law in two ways. First, he claimed that they engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce," in violation of the Florida Deceptive and Unfair Trade Practices Act. See Fla. Stat. § 501.204(1); see also *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (suggesting that "deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment" (cleaned up)). Second, he claimed that the defendants participated in an "enterprise through a pattern of racketeering activity," or at least conspired to do so, in violation of the Florida RICO Act. See Fla. Stat. § 895.03(3)–(4). In his view, their allegedly misleading advertisements constituted racketeering activity. See *id.* § 895.02(8)(a)(36) (defining "[r]acketeering activity" to include crimes listed in Chapter 817 of the Florida Statutes); *id.* § 817.41(1) (prohibiting misleading advertisements).

B

The Academy turned to federal court for relief. On March 4, 2026, it sued Uthmeier in the Northern District of Illinois, alleging that he brought the state court case to retaliate against its protected speech, in violation of the First Amendment. It also moved for a preliminary injunction, asking the district court to order Uthmeier to stop pursuing his enforcement action in Florida.

As the federal court considered the motion, the state court proceedings continued. On March 16, 2026, Uthmeier amended his complaint in Florida to add a third claim. Building on his initial complaint, he alleged that the Academy and its co-defendants "contracted, combined, and conspired in

restraint of trade or commerce," in violation of the Florida Antitrust Act. See Fla. Stat. § 542.18. More specifically, he claimed that their guidelines were "the result of panel stacking, failure to manage conflicts of interest, and other procedural biases designed to promote the sex interventions offered by [the defendants'] members and to ignore evidence supporting" contrary views.

In May 2026, the Academy moved to dismiss the amended state court complaint, raising the same First Amendment retaliation defense. That motion remains pending before the Florida court.

A month later, in June 2026, the district court in Illinois granted the Academy's motion for a preliminary injunction. It issued an order preventing Uthmeier "from pursuing [his] Enforcement Action against" the Academy and "from taking further unlawful action interfering with or retaliating against [the Academy's] exercise of its First Amendment rights, such as pursuing a substantially similar enforcement action in violation of [the Academy's] First Amendment rights."

Uthmeier now asks us to stay the preliminary injunction pending appeal.

## II

### A

"In deciding whether to stay an injunction pending appeal, we apply a standard that parallels the preliminary injunction standard but also keeps in mind the district court's exercise of equitable discretion." *Illinois v. Trump*, 155 F.4th 929, 936 (7th Cir. 2025) (cleaned up). "Thus, a party seeking a stay must show (1) a likelihood of success on the merits, and (2) a threat of irreparable harm absent a stay." *Id.* "If the

moving party makes such a showing, this court must consider (3) the balance of harms, primarily in terms of the balance of risks of irreparable harm in case of a judicial error, as well as (4) the public interest." *Id.* (cleaned up) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

B

Attorney General Uthmeier is likely to succeed on appeal because of insurmountable jurisdictional barriers. He contends that the district court lacked personal jurisdiction, that venue was improper, and that the district court should have abstained from exercising its jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971). The first two issues present substantial questions worthy of further consideration. But the *Younger* issue is open and shut in his favor. Cf. *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431, 436 (2007) (identifying *Younger* abstention as one of several "threshold grounds" warranting dismissal even before a district court determines it has "subject-matter or personal jurisdiction").

*Younger* abstention roots itself "in the traditional principles of equity, comity, and federalism." *SKS & Assocs. v. Dart*, 619 F.3d 674, 678 (7th Cir. 2010). The doctrine "ordinarily requires federal courts to refrain from exercising jurisdiction over federal constitutional claims that seek to interfere with or interrupt ongoing state proceedings." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1071 (7th Cir. 2018). It is "designed to allow the State an opportunity to 'set its own house in order' when the federal issue is already before a state tribunal." *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 479–80 (1977). The Supreme Court has described the doctrine as giving effect to the principle of "Our Federalism" at the

cornerstone of our constitutional structure. *Younger*, 401 U.S. at 44.

But *Younger* abstention is not absolute. The Supreme Court has recognized a "narrow" exception when "the state proceeding is motivated by a desire to harass or is conducted in bad faith." *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611 (1975); see also *Younger*, 401 U.S. at 49–50 (similar). "'[B]ad faith' in this context generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975).

Indeed, the bad-faith exception is so narrow that "[t]here is no case since *Younger* was decided in which the [Supreme] Court has" applied it. 17B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4255 (3d ed. 2026). *Younger* itself described the exception by reference to *Dombrowski v. Pfister*, 380 U.S. 479 (1965), where federal plaintiffs claimed that police raided their offices and seized their files pursuant to warrants "that were later summarily vacated by a state judge for lack of probable cause," only for state officials to continue threatening prosecution despite "the state court order quashing the warrants and suppressing the evidence seized." *Younger*, 401 U.S. at 48. *Dombrowski* "held that an injunction against the enforcement of certain state criminal statutes could properly issue under the circumstances presented in that case." *Younger*, 401 U.S. at 47.

Today's majority opinion incorrectly extends the bad-faith exception to the Academy's lawsuit. Like the district court, the majority concludes that Attorney General Uthmeier cannot reasonably expect to prevail in a Florida court because his state law claims are very weak on the merits. But very weak claims are not uncommon. *Younger*'s exception requires much

more: the Attorney General's claims must be "so facially meritless as to connote bad faith." *Yelp Inc. v. Paxton*, 137 F.4th 944, 953 (9th Cir. 2025); see also *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1095 (5th Cir. 2023) ("[T]here was never any remote chance of Babin obtaining a valid child-pornography conviction against Netflix for a scene involving an adult.").

Uthmeier's claims are not so plainly lacking merit that we should infer bad faith. According to the majority, all three claims require proving that the Academy's 2018 guidelines are somehow commercial in nature, which it sees as a tall order given the Academy is a nonprofit. But the Florida Deceptive and Unfair Trade Practices Act expressly applies to nonprofits. See Fla. Stat. § 501.203(8) ("'Trade or commerce' shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity."). The Florida Antitrust Act likewise seems to apply to nonprofits. See *id.* § 542.16 (instructing that Florida Statute § 542.18 should "be liberally construed" to "complement the body of federal law prohibiting restraints of trade or commerce in order to foster effective competition"); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 576 (1982) ("[I]t is beyond debate that nonprofit organizations can be held liable under the antitrust laws.").

As the district court recounted, Uthmeier provides two theories for why the 2018 guidelines may be commercial. He first contends that the Academy issued the guidelines to make more people want to join its organization, thereby increasing its income from membership dues. He also alleges that the Academy published the guidelines recommending gender-affirming care so that its members who provide that type of care, including the authors of the guidelines, could make

more money because of increased demand. Cf. *Am. Soc'y of Mech. Eng'rs*, 456 U.S. at 573–74 ("ASME contends that it should not be held liable unless its agents act with an intent to benefit the Society …. [But] whether they act in part to benefit ASME or solely to benefit themselves or their employers, ASME's agents can have the same anticompetitive effects on the marketplace.").

The majority views these theories as so implausible and beyond the pale that they must reflect bad faith on the part of the Florida Attorney General. The district court thought the same thing, reaching that conclusion without a single citation to Florida case law. But these are just the sort of allegations routinely evaluated in ordinary motion-to-dismiss practice or ultimately proved through discovery.

The majority also points to Uthmeier's litigation conduct as evidence of bad faith. It highlights that he waited three months to serve process. The district court also observed that he amended his complaint to add the state antitrust claim only after the Academy filed its federal lawsuit. No doubt "a burst of prosecutorial alacrity" after a state defendant asserts its First Amendment rights may cut in favor of finding bad faith. *Netflix, Inc.*, 88 F.4th at 1092. But that is not enough on its own, especially where, as here, the state official's behavior falls within the bounds of the state's procedural rules.

The majority additionally highlights Uthmeier's incendiary public statements. With respect to gender-affirming care, for example, he promised to "aggressively fight this radical ideology anytime it threatens women, kids, and our Florida way of life." And when he announced his enforcement action, he accused the Academy of "mutilating kids and misleading families." The majority blesses the district court's finding that

these statements reveal that Uthmeier's personal convictions drove his enforcement action. But that does not mean that he sued the Academy "without a reasonable expectation of obtaining" a favorable judgment. *Kugler*, 421 U.S. at 126 n.6. The Florida Constitution establishes the Florida Attorney General as the state's chief legal officer. See Fla. Const. art. IV, § 4(b); see also Fla. Stat. § 16.01 (outlining the duties of the office). A federal court finding he has enforced Florida law in bad faith is very serious constitutional business.

Finally, the majority suggests that we must engage with *Defense Distributed v. Grewal*, 971 F.3d 485 (5th Cir. 2020), and *Media Matters for America v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025). But those cases do not purport to apply *Younger*'s bad-faith exception. Indeed, neither decision even mentions *Younger*. Perhaps that is why the majority similarly says nothing about these two decisions in the *Younger* portion of its own opinion.

C

The remaining stay factors favor Uthmeier as well. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). The balance of harms and the public interest tell the same story. If we stay the district court's injunction, the Academy will still be able to vindicate its First Amendment rights in Florida court. But if we decline to stay the injunction, the Attorney General will be unable to pursue his state law claims against the Academy in Florida state court all because a federal court in Illinois found the merits of his claims unpersuasive, threatening entrenched principles of federalism and comity.

## III

"The Framers split the atom of sovereignty." *Saenz v. Roe*, 526 U.S. 489, 504 n.17 (1999). "It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other." *Id. Younger* gives effect to this principle. But today's decision expands an eye-of-the-needle doctrinal exception into a broad license for federal court intrusion into matters pending—and belonging—in state court. The Florida courts are fully capable of ruling on the Academy's pending motion to dismiss and swiftly resolving the Attorney General's claims.

Make no mistake about the legal magnitude of what is at stake here. A federal court in Illinois has enjoined a state's chief legal officer from proceeding in state court, all because it doubts the merits of his state law claims. The implications are grave. It is hard to see why future state defendants will not turn to federal court whenever they think a state complaint warrants dismissal and a public comment suggests "bad faith." This decision expands the narrowest of exceptions into a gap in "Our Federalism" that invites abuse. *Younger*, 401 U.S. at 44. We are a long way from the quashed warrants and threats of repeated prosecutions in *Dombrowski*—the one and only time the Supreme Court has ever found bad faith. Cf. Erwin Chemerinsky, *Federal Jurisdiction* § 13.5 (7th ed. 2016) (explaining that "commentators have observed that the universe of bad-faith harassment claims that can be established is virtually empty" and concluding that "the bad-faith prosecutions exception appears limited to facts such as those present in *Dombrowski*" (cleaned up)).

To be sure, maybe the Florida Attorney General's enforcement action lacks merit. Perhaps it even violates the First

Amendment. But those decisions belong to the Florida courts. Even if the Academy is right, that would not permit a federal court to enjoin the Florida state court proceeding. See *Yelp Inc.*, 137 F.4th at 954 (unanimous opinion by Bress, J.) ("Simply because a state court defendant may advance a retaliation-based defense to a state court lawsuit does not mean it has established bad faith sufficient for a federal court to enjoin a state court action."). The Academy has raised its First Amendment defense in state court. And "[m]inimal respect for the state processes … precludes any presumption that the state courts will not safeguard federal constitutional rights." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) (cleaned up). We have no basis whatsoever to doubt that the Academy would get a fair hearing in the Florida courts.

I respectfully dissent.