No. 26-2238

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| AMERICAN ACADEMY OF PEDIATRICS, | ) | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 1:26-cv-2401 |
| JAMES UTHMEIER, Attorney General of the State of Florida, in his official capacity, | ) | The Honorable MATTHEW F. KENNELLY, Judge Presiding. |
| Defendant-Appellant. | ) | |

**BRIEF OF AMICI CURIAE ILLINOIS, CALIFORNIA, COLORADO, DELAWARE, DISTRICT OF COLUMBIA, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, AND VIRGINIA IN SUPPORT OF PLAINTIFF-APPELLEE AND SEEKING AFFIRMANCE**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3312

Attorneys for the State of Illinois

**SARAH A. HUNGER**
Deputy Solicitor General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......... i

IDENTITY AND INTEREST OF AMICI CURIAE .......... 1

SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 3

I. Amici States Rely On AAP Guidance To Regulate The Practice Of Medicine And Protect The Health Of Our Residents. .......... 3

  A. Amici States regularly evaluate and rely on medical guidance and policy statements issued by professional medical organizations. .......... 3

  B. AAP's medical guidance and policy statements would be nearly impossible for Amici States to replicate. .......... 7

II. Uthmeier's Actions Set A Dangerous Precedent That Endangers Future Efforts To Ensure The Health And Well-Being Of Amici States' Residents. .......... 10

CONCLUSION .......... 13

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Arizona v. Kennedy*, No. 3:26-cv-01609 (N.D. Cal.) .......... 5

*Gonzales v. Carhart*, 550 U.S. 124 (2007) .......... 1

### Statutes

105 Ill. Comp. Stat. 5/22-105 .......... 6

210 Ill. Comp. Stat. 3/35 .......... 6

210 Ill. Comp. Stat 85/11.7 .......... 6

215 Ill. Comp. Stat. 5/356s .......... 6

225 Ill. Comp. Stat. 10/5.11 .......... 6

225 Ill. Comp. Stat. 10/7.01 .......... 6

305 Ill. Comp. Stat. 5/5-19 .......... 6

### Other Authorities

*American Academy of Pediatrics Mission and Strategic Plan*, Am. Acad. of Pediatrics .......... 4

*American College of Cardiology Comments on New Dietary Guidelines for Americans*, Am. Coll. Cardiology (Jan. 7, 2026) .......... 12

*Clinical Practice Guideline Manual*, Am. Acad. of Pediatrics .......... 4, 5

*Clinical Practice Guidelines We Can Trust*, Inst. of Med. (2011) .......... 4, 11

Jon Cohen, *The Trump administration says some approved childhood vaccines need better studies. Scientists disagree*, Science (Jan. 8, 2026) .......... 12

*Committees*, Am. Acad. of Pediatrics .......... 4

*Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, Policy Statement, Am. Acad. of Pediatrics .......... 6, 7

Jeffrey S. Flier, *Publishing Biomedical Research: a rapidly evolving ecosystem*, 66 Perspectives in Bio. & Med. 358 (2023)........................................................ 7

*From the Member Sections | How Do the 2025-2030 Dietary Guidelines Measure Up for CV Health?*, Am. Coll. Cardiology (Mar. 1, 2026)................. 12

*Governor Healey Announces Evidence-Based Childhood Immunization Schedule, Aligning with American Academy of Pediatrics* (Jan. 14, 2026)....................... 5

Megan Messerly, *Trump shares video highlighting discredited theory linking vaccines to autism*, Politico (Sept. 8, 2025) .................................................. 11

Steven Middendorp, *AAP Recommends Annual Mental Health Screenings for Children Following Illinois Executive Order*, The Highwire (Aug. 27, 2025) .. 6

M. Hassan Murah, *Clinical Practice Guidelines: A Primer on Development and Dissemination*, 92 Mayo Clinic Proceedings 3 (Mar. 2017).............................. 4

*New Dietary Guidelines Underscore Importance of Healthy Eating*, Am. Heart Ass'n (Jan. 7, 2026)........................................................................ 12

*Perinatal Levels of Care Rewriting the Administrative Rules*, Ill. Dep't of Pub. Health ........................................................................................ 6

*Policy Statement Development Process*, Am. Acad. of Pediatrics............................ 4, 5

*Red Book Online 2024–2027,* Am. Acad. of Pediatrics (Apr. 2024)............................. 6

Sameer Vohra, *Director Vohra on 2026 Childhood Vaccine Guidance*, Ill. Dep't of Pub. Health (Feb. 6, 2026).......................................................... 5, 6

Will Weissert, *Dr. Trump? The president reprises his COVID era, this time sharing unproven medical advice on autism*, Associated Press (Sept. 22, 2025) .................................................................. 11

## IDENTITY AND INTEREST OF AMICI CURIAE

Illinois, California, Colorado, Delaware, District of Columbia, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, and Virginia ("Amici States") submit this brief in support of the American Academy of Pediatrics ("AAP") pursuant to Federal Rule of Appellate Procedure 29(a)(2).

Amici States have a substantial interest in the health, safety, and welfare of their communities, which includes regulating the practice of medicine. *See Gonzales v. Carhart*, 550 U.S. 124, 157 (2007) (States play "significant role . . . in regulating the medical profession"). As part of this regulatory role, Amici States work to ensure that safe and effective medical care is available within our borders and that practitioners are held to the high standards necessary to provide such care. In developing the standards and guidelines that govern the medical profession, state licensing boards and other regulatory bodies regularly refer to evidence-based recommendations and guidance that are grounded in the best interest of patients. In Amici States' experience, the materials offered by AAP satisfy these standards, and, in fact, have become indispensable to our regulatory efforts across wide-ranging medical disciplines. Amici States' interests are implicated by this case, which could affect the continued credibility and veracity of AAP guidance.

## SUMMARY OF ARGUMENT

In 2025, Uthmeier filed an enforcement action in Florida state court alleging that AAP violated state law by publishing a 2018 policy statement entitled Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents ("Policy Statement") and making similar statements about treatment for gender affirming care in other contexts. A3; A11-14. According to Uthmeier, AAP's statements, which he described as "immoral, unethical, oppressive, and unscrupulous," were made to advertise and promote goods and services. A9-10 (cleaned up); A15-16. In the context of this federal suit, which was brought in response to that enforcement action, Uthmeier has reiterated these accusations. *E.g.*, Fl. Br. 3-4 (claiming that AAP failed to conduct a "good faith assessment of the medical evidence surrounding pediatric gender dysphoria" in an attempt to "create the illusion of scientific consensus that the gender-affirming care offered by their members effectively treats pediatric gender dysphoria").

As AAP explains, none of these retaliatory accusations are substantiated. *E.g.*, AAP Br. 28-34. And if AAP were, in response, to take considerations other than evidence and patient interests into account in developing medical guidance, it would hamper Amici States' ability to rely on the guidance of organizations like AAP in setting standards of care. As detailed further below, Amici States rely on guidance and recommendation materials from these organizations to regulate the practice of medicine. And because these materials are not easily replicable, our institutions, medical professionals, and residents would be harmed if they were to

become unreliable. Moreover, while this particular case is about the provision of transgender youth healthcare, a reduction in the reliability of medical recommendations would have significant downstream effects on patient health and forward-looking research in other medical fields for years to come.

## ARGUMENT

### I. Amici States Rely On AAP Guidance To Regulate The Practice Of Medicine And Protect The Health Of Our Residents.

Amici States are dedicated to ensuring that the medical care provided within our borders is safe, effective, and evidence-based, and one of the ways we accomplish this goal is by reviewing and relying on recommendations by professional medical organizations like AAP. Amici States and our residents would be greatly harmed if we lost the ability to rely on AAP, a reputable and leading professional organization in the field of pediatric medicine.

#### A. Amici States regularly evaluate and rely on medical guidance and policy statements issued by professional medical organizations.

In implementing licensing, disciplinary, and other healthcare-related policies and laws, Amici States look to the recommendations of medical and scientific experts and organizations. Relevant here, Amici States recognize AAP for its subject-matter expertise in pediatric healthcare. AAP publishes policy statements, reports, and clinical practice guidelines that are backed by rigorous research and provide up-to-date recommendations for the medical treatment of children and

adolescents.[1] To develop these policy statements, reports, and guidelines, AAP relies on committees, comprised of subject-matter experts, that review data and studies as they are released and use their expertise to develop and publish these materials.[2]

AAP's clinical practice guidelines in particular consist of "[c]ritically appraised, synthesized information" and have become necessary tools both for clinicians in their practice medicine as well as for Amici States as regulators of the practice of medicine.[3] AAP develops these guidelines using a rigorous and systematic review of the evidence and literature and in consultation with multidisciplinary teams of clinicians, researchers, and stakeholders with expertise on the issue.[4] The guidelines, which go through several rounds of review, are read by dozens of expert reviewers before publication.[5] AAP's guidelines are also transparent about the evidence they rely on and disclose both the quality of the

---

[1] *See Clinical Practice Guideline Manual*, Am. Acad. of Pediatrics, https://www.aap.org/en/advocacy/quality/clinical-practice-guideline-manual/; *see also American Academy of Pediatrics Mission and Strategic Plan*, Am. Acad. of Pediatrics, https://www.aap.org/en/about-the-aap/strategic-plan/. All websites last visited Aug. 24, 2026.

[2] *See Clinical Practice Guideline Manual*, *supra* note 1; *see also Committees*, Am. Acad. of Pediatrics, https://www.aap.org/en/get-involved/aap-committees/.

[3] *Clinical Practice Guidelines We Can Trust*, Inst. of Med., at 34 (2011) ("IOM Guidelines").

[4] *See* M. Hassan Murah, *Clinical Practice Guidelines: A Primer on Development and Dissemination*, 92 Mayo Clinic Proceedings 3, 423-33 (Mar. 2017).

[5] *Policy Statement Development Process*, Am. Acad. of Pediatrics, https://www.aap.org/en/policy/policy-statement-development-process/; *Clinical Practice Guideline Manual*, *supra* note 1.

evidence as well as the strength of the guidelines' recommendations.[6] AAP guidelines thus are designed to ensure that the delivery of all healthcare is safe, individualized, and centered around the patient.

Given AAP's longstanding reliability, Amici States frequently consult its policies and guidelines when faced with matters regarding clinical practice and public health for children. For example, in the wake of the Department of Health and Human Services' ("HHS") announcement of a dramatically altered childhood immunization schedule, Amici States Illinois and Massachusetts formally adopted AAP's Child and Adolescent Immunizations Schedule.[7] In doing so, the Illinois Department of Public Health ("IDPH") noted that HHS had not presented new scientific evidence to support the downgrade in vaccine recommendations and had bypassed accepted vaccine recommendation processes.[8] IDPH specifically determined that AAP's schedule was developed "based on rigorous scientific review and analysis" and filled an essential gap to protect children from vaccine-preventable illnesses in the absence of reliable guidelines from the federal

---

[6] *Policy Statement Development Process*, *supra* note 5; *Clinical Practice Guideline Manual*, *supra* note 1.

[7] *E.g.*, Sameer Vohra, *Director Vohra on 2026 Childhood Vaccine Guidance*, Ill. Dep't of Pub. Health (Feb. 6, 2026), https://dph.illinois.gov/resource-center/communications/director-letters/2026/letter-02062026.html; *Governor Healey Announces Evidence-Based Childhood Immunization Schedule, Aligning with American Academy of Pediatrics*, Mass.gov (Jan. 14, 2026), https://www.mass.gov/news/governor-healey-announces-evidence-based-childhood-immunization-schedule-aligning-with-american-academy-of-pediatrics.

[8] *Vohra*, *supra* note 7; *see also Arizona v. Kennedy*, No. 3:26-cv-01609 (N.D. Cal. Feb. 24, 2026).

government.[9] Illinois has also looked to AAP guidelines to inform its measles treatment protocol,[10] perinatal care hospital standards,[11] child and adolescent mental health screening policy,[12] and other regulations and statutes relating to the safety, treatment, and insurance coverage of pediatric medical care.[13]

Of particular relevance here, Amici States also consider AAP guidelines, clinical reports, and policy statements to ensure the provision of safe and effective transgender youth healthcare.[14] AAP's approach to developing guidance with

---

[9] *Vohra*, *supra* note 7.

[10] *See Red Book Online 2024–2027,* Am. Acad. of Pediatrics (Apr. 2024), https://publications.aap.org/redbook?autologincheck=redirected.

[11] *Perinatal Levels of Care Rewriting the Administrative Rules*, Ill. Dep't of Pub. Health, https://dph.illinois.gov/topics-services/life-stages-populations/maternal-child-family-health-services/perinatal-levels-of-care.html.

[12] 105 Ill. Comp. Stat. 5/22-105 (IDPH shall develop social and emotional screening program for youth taking into consideration AAP recommendations); Steven Middendorp, *AAP Recommends Annual Mental Health Screenings for Children Following Illinois Executive Order*, The Highwire (Aug. 27, 2025), https://thehighwire.com/news/aap-recommends-annual-mental-health-screenings-for-children-following-illinois-executive-order/.

[13] *See, e.g.*, 210 Ill. Comp. Stat 85/11.7 (requiring hospitals to provide free informational materials regarding sudden infant death syndrome as developed by AAP); 225 Ill. Comp. Stat. 10/7.01 (establishing licensure for newborn and infant childcare employees based on recommendations of AAP); 305 Ill. Comp. Stat. 5/5-19 (Early and Periodic Screening, Diagnosis and Treatment services provided under the Healthy Kids Program shall include anticipatory guidance as recommended by AAP); 225 Ill. Comp. Stat. 10/5.11 (instructing daycare centers to develop plans for anaphylactic shock based on AAP recommendations); 215 Ill. Comp. Stat. 5/356s (setting post-parturition care hospital coverage based on AAP guidelines and protocols); 210 Ill. Comp. Stat. 3/35 (adopting rules for birth centers based on several professional organization recommendations including AAP).

[14] *See Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, Policy Statement, Am. Acad. of Pediatrics, https://publications.aap.org/pediatrics/article/142/4/e20182162/37381/Ensuring-Comprehensive-Care-and-Support-for.

respect to transgender youth healthcare is no different from the examples just provided. Indeed, as with all of its guidance, and contrary to Uthmeier's assertions otherwise, *see, e.g.*, AT Br. 3-4, AAP employs a rigorous process involving experts in their specialty fields who study and review all available medical treatment options and peer-reviewed scientific studies to make thoroughly vetted recommendations regarding transgender youth healthcare, *see, e.g.*, A2-9. And the guidance itself is grounded in the premise that health care providers must practice evidence-based medicine.[15] Therefore, with AAP's evidence-based guidance and recommendations as a resource, Amici States and the healthcare providers whose practices we regulate can confidently deliver high-quality transgender healthcare to youth pursuant to stringent guidelines and based on the most current scientific evidence available.

### B. AAP's medical guidance and policy statements would be nearly impossible for Amici States to replicate.

Amici States and their residents would be harmed if they were deprived of the evidence-based, objective, and reliable resources developed by AAP and the vital health benefits of AAP's recommendations.

Amici States do not undertake our own critical appraisal of all scientific and medical research published each year. Indeed, every year, more than 30,000 scientific journals publish about 2 million biomedical research papers.[16] Instead,

---

[15] *Id.*

[16] Jeffrey S. Flier, *Publishing Biomedical Research: a rapidly evolving ecosystem*, 66 Perspectives in Bio. & Med. 358, 363 (2023), https://doi.org/10.1353/pbm.2023.a902032.

Amici States consider and review the recommendations of professional medical organizations like AAP that are established, in part, to serve that function. And as noted above in the context of vaccines, *supra* pp. 5-6, when the recommendations of these organizations meet Amici States' rigorous standards for high-quality healthcare, Amici States may adopt them in whole or in part. In many instances, Amici States incorporate these recommendations directly into state laws and regulations, as also explained, *supra* pp. 5-6.

Patients and providers in Amici States also consider policies and recommendations from medical organizations like AAP to engage in evidence-based medical decision making. Practicing clinicians make complex treatment decisions based on a wide range of factors, including by assessing the strength of the available scientific evidence that supports certain treatments as well as recommendations from subject matter experts. Requiring individual clinicians in Amici States to stay abreast of the countless new developments in scientific and medical research would be a fruitless task: "an internist would have to read 33 articles 365 days a year to stay up to date" in their field.[17] Given the need to also critically analyze each individual article or paper, "[t]he two situations combined . . . place clinicians at an increasing risk of drowning in doubtful data."[18]

Guidance and policy statements, such as those published by AAP, thus play a crucial role in ensuring that practicing clinicians and state regulators can evaluate

[17] IOM Guidelines, *supra* note 3, at 34.

[18] *Id.* (internal quotations omitted).

and synthesize the best available evidence for treating a variety of medical conditions, incorporating practical knowledge provided by subject matter experts as well as weighing other relevant factors, all in service of forming clinical recommendations for treatment and public health guidance. Because the recommendations are thoroughly reviewed and standardized, they reduce unnecessary uncertainty in medical decision making and in doing so improve healthcare quality and safety and patient outcomes.

Uthmeier's decision to target AAP for its Policy Statement risks undermining the accuracy of professional guidance on transgender youth healthcare and the thoroughness of the process that reputable organizations like AAP use to develop their recommendations and guidelines, which may negatively impact the practice of pediatric medicine across the country. Specifically, the ability of medical organizations like AAP to create unbiased, evidence-based recommendations on which the Amici States rely would be severely undermined if States could target and threaten them with investigation for making those recommendations. Less frequently updated guidance—or no new guidelines at all—would also mean less guidance for clinicians, potentially leading to decreased public understanding or lower awareness of evidence supporting emerging treatments, poorly informed clinical judgment, worse individual patient outcomes, and a decline of overall public health.

Furthermore, Amici States would be less able to trust that any recommendations made by AAP and other professional organizations are reliable

when those recommendations are made in the shadow of enforcement actions fueled by political pressure and improper influence. In addition to the time and resources Amici States will spend to assure residents and providers that certain healthcare supported by AAP remains clinically recommended as well as safe and effective, Amici States will be hard-pressed to fill the void left by these professional organizations that will be impeded in their efforts to provide reliable guidance.

## II. Uthmeier's Actions Set A Dangerous Precedent That Endangers Future Efforts To Ensure The Health And Well-Being Of Amici States' Residents.

As described above, Amici States rely on medical organizations like AAP to inform statewide standards to ensure that our residents can receive safe, high-quality, effective healthcare. But if state attorneys general use the threat of enforcement action as a cudgel against reputable medical organizations when they disagree with an organization's recommendations or priorities, everyone would suffer: The organizations would find themselves forced to consider the political ramifications of their guidance, impeding their ability to make recommendations based solely on their expert review and understanding of the evidence. States would be less able to rely on that guidance to set medical standards in the best interests of their residents. And individuals who seek out medically appropriate, critical care may find themselves unable to access it not because it is unsafe or ineffective, but solely because certain political actors disfavor it.

What's more, these possible consequences could snowball over time; efforts to influence or control the recommendations of medical organizations today threaten to restrict the research and scientific developments supported by those organizations,

in turn hampering Amici States' ability to deliver life-saving treatments to our populations tomorrow. Indeed, while Uthmeier's inappropriate efforts to intimidate AAP arise from his disapproval of transgender youth healthcare, the powers he invokes here are not so cabined and could lead to a misuse of authority and threaten the evidence-based development of healthcare guidelines and policies in a broad array of fields.

There are, in fact, numerous examples of political actors advancing healthcare policies and positions that sit at odds with the recommendations of leading medical organizations. For instance, President Trump has urged pregnant women not to use Tylenol because of unproven links to autism, conflicting with longstanding recommendations from the American College of Obstetricians and Gynecologists stating that the medication is safe during pregnancy.[19] Similarly, the federal administration has repeatedly made statements supporting the discredited theory linking vaccines and autism,[20] and has reduced the recommended schedule of childhood vaccines from 17 to 11 vaccinations despite widespread scientific consensus that the vaccines in question were effective and had been subjected to

[19] Will Weissert, *Dr. Trump? The president reprises his COVID era, this time sharing unproven medical advice on autism*, Associated Press (Sept. 22, 2025), https://apnews.com/article/trump-doctor-vaccines-autism-tylenol-covid-disinfectants-22f5bcfe2fd3c18fdd412419941541f8.

[20] *See, e.g.*, Megan Messerly, *Trump shares video highlighting discredited theory linking vaccines to autism*, Politico (Sept. 8, 2025), https://www.politico.com/news/2025/09/08/trump-shares-video-highlighting-discredited-theory-linking-vaccines-to-autism-00551311.

rigorous standards.[21] Finally, in its updates to dietary guidelines earlier this year, the federal administration recommended consumption of high-fat animal products and whole-fat dairy products, such as red meat and whole milk. The administration did so despite science-based recommendations from the American Heart Association and the American College of Cardiology that encourage limited consumption of these products, which are linked to increased cardiovascular risk.[22]

All told, if Uthmeier's actions are approved by this court—and, as he hopes to accomplish, he succeeds in using the burden of being subject to an enforcement action to shape the decision making of medical organizations like AAP—there would be little to stop Uthmeier or other similarly situated actors from misusing their authority to influence the content of other guidance and recommendations issued by AAP and other organizations.

---

[21] Jon Cohen, *The Trump administration says some approved childhood vaccines need better studies. Scientists disagree*, Science (Jan. 8, 2026), https://www.science.org/content/article/trump-administration-says-some-approved-childhood-vaccines-need-better-studies; *see also supra*, Section I.B (discussing HHS's revised vaccine schedule and Illinois's decision to turn to AAP vaccine guidelines).

[22] *American College of Cardiology Comments on New Dietary Guidelines for Americans*, Am. Coll. Cardiology (Jan. 7, 2026), https://www.acc.org/about-acc/press-releases/2026/01/07/22/59/american-college-of-cardiology-comments-on-new-dietary-guidelines; *From the Member Sections | How Do the 2025-2030 Dietary Guidelines Measure Up for CV Health?*, Am. Coll. Cardiology (Mar. 1, 2026), https://www.acc.org/latest-in-cardiology/articles/2026/03/01/01/from-the-member-sections-dietary-guidelines; *New Dietary Guidelines Underscore Importance of Healthy Eating*, Am. Heart Ass'n (Jan. 7, 2026), https://newsroom.heart.org/news/releases-20260107-6915862.

## CONCLUSION

The preliminary injunction should be affirmed.

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
115 South LaSalle Street
Chicago, Illinois 60601
(312) 814-5202 (office)
(312) 771-3885 (cell)
Sarah.Hunger@ilag.gov

August 25, 2026

ROB BONTA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General,*
*State of Colorado*
1300 Broadway
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street NW, Suite 8100
Washington, DC 20001

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
1 Ashburton Place
Boston, Massachusetts 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. MLK Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

JENNIFER DAVENPORT
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, RI 02903

JAY JONES
*Attorney General*
*Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations set forth in Circuit Rule 29 because it contains 2,826 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirement of Rules 32(a)(4), 32(a)(5), and 32(a)(6) because the brief is double-spaced and has been prepared in a proportionally spaced typeface (12-point Century Schoolbook) using Microsoft Word.

/s/ Sarah A. Hunger
SARAH A. HUNGER

August 25, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2026, I electronically filed the foregoing Brief of Amici Curiae Illinois et al. with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
SARAH A. HUNGER