**No. 26-2238**

**IN THE**
**United States Court of Appeals**
**FOR THE SEVENTH CIRCUIT**

---

**AMERICAN ACADEMY OF PEDIATRICS,**

*Plaintiff-Appellee,*

*v.*

**JAMES UTHMEIER, ATTORNEY GENERAL OF THE STATE OF FLORIDA, IN HIS OFFICIAL CAPACITY,**

*Defendant-Appellant.*

---

On appeal from the United States District Court for the Northern District of Illinois, No. 1:26-cv-02401 (Kennelly, J.)

---

# BRIEF OF *AMICI CURIAE* FORMER MEMBERS OF THE UNITED STATES CONGRESS, SENIOR GOVERNMENT ATTORNEYS, AND OTHER OFFICIALS IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

---

Charles D. Tobin
Chad R. Bowman
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006
(202) 661-2200

Chloe Nakaya
BALLARD SPAHR LLP
601 SW Second Ave., Suite 2100
Portland, Oregon 97204
(503) 778-2100

Taylor Washburn
BALLARD SPAHR LLP
1301 Second Ave., Suite 2800
Seattle, Washington 98101
(206) 223-7000

August 25, 2026

*Counsel for* Amici Curiae

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2238

Short Caption: American Academy of Pediatrics v. James Uthmeier Attorney General of the State of Florida

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amici Curiae Donald Ayer, Ty Cobb, Barbara Comstock, James C. Greenwood, Philip Lacovara, Trevor Potter, Paul Rosenzweig, Claudine Schneider , Joe Walsh

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Ballard Spahr LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: *s/ Charles Tobin* Date: 08/24/2026

Attorney's Printed Name: Charles Tobin

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** Y **No** ☐

Address: 1909 K St NW, Floor 12

Washington, DC 20006

Phone Number: (202) 661-2218 Fax Number: (202) 661-2299

E-Mail Address: TobinC@ballardspahr.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2238

Short Caption: American Academy of Pediatrics v. James Uthmeier Attorney General of the State of Florida

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amici Curiae Donald Ayer, Ty Cobb, Barbara Comstock, James C. Greenwood, Philip Lacovara, Trevor Potter, Paul Rosenzweig, Claudine Schneider , Joe Walsh

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Ballard Spahr LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: */s/ Chad R. Bowman* Date: 08/24/2026

Attorney's Printed Name: Chad R. Bowman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** Y **No** ☐

Address: 1909 K St NW, Floor 12

Washington, DC 20006

Phone Number: (202) 508-1120 Fax Number: (202) 661-2299

E-Mail Address: bowmanchad@ballardspahr.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2238

Short Caption: American Academy of Pediatrics v. James Uthmeier Attorney General of the State of Florida

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Amici Curiae Donald Ayer, Ty Cobb, Barbara Comstock, James C. Greenwood, Philip Lacovara, Trevor Potter, Paul Rosenzweig, Claudine Schneider , Joe Walsh

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Ballard Spahr LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: *s/ Taylor Washburn* Date: 08/24/2026

Attorney's Printed Name: Taylor Washburn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** Y **No** ☐

Address: 1301 2nd Ave #2800

Seattle, WA 98101

Phone Number: (206) 331-1457 Fax Number: (206) 223-7107

E-Mail Address: TobinC@ballardspahr.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2238

Short Caption: American Academy of Pediatrics v. James Uthmeier Attorney General of the State of Florida

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3): ______

Amici Curiae Donald Ayer, Ty Cobb, Barbara Comstock, James C. Greenwood, Philip Lacovara, Trevor Potter, Paul Rosenzweig, Claudine Schneider , Joe Walsh

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Ballard Spahr LLP

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

N/A

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2: __N/A

---

Attorney's Signature: *s/Chloe Nakaya* Date: *08/24/2026*

Attorney's Printed Name: **Chloe Nakaya**

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** Y **No** ☐

Address: 601 SW 2nd Ave #2100
Portland, OR 97204

Phone Number: (503) 778-2108 Fax Number: (503) 778-2200

E-Mail Address: nakayac@ballardspahr.com

## IDENTITIES OF *AMICI CURIAE*

Donald Ayer, Former U.S. Deputy Attorney General

Ty Cobb, Former Special White House Counsel and Former Assistant U.S. Attorney

The Honorable Barbara Comstock, Former U.S. Representative (R)

The Honorable James C. Greenwood, Former U.S. Representative (R)

Philip Lacovara, Former Deputy Solicitor General of the United States and Counsel to the Watergate Special Prosecutor

Trevor Potter, Former Commissioner and Chairman of the Federal Election Commission

Paul Rosenzweig, Former Deputy Assistant Secretary for Policy in the Department of Homeland Security

The Honorable Claudine Schneider, Former U.S. Representative (R)

The Honorable Joe Walsh, Former U.S. Representative (R)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), counsel for *amici curiae* certify that (1) *amici* are natural persons and thus do not have any parent corporations; and (2) no publicly-held corporation holds 10 percent or more of the stock or of any ownership interest in *amici*.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTEREST OF *AMICI CURIAE* ........ 1

ARGUMENT ........ 3

I. FREE EXPRESSION IS ESSENTIAL TO DEMOCRATIC POLICYMAKING ........ 3

II. AAP'S STATEMENTS AND ADVOCACY ARE PROTECTED BY THE FIRST AMENDMENT ........ 8

A. Youth gender medicine is an issue of public concern ........ 9

B. The First Amendment protects speech by associations and corporations as well as individuals ........ 11

C. The First Amendment extends to litigation ........ 13

III. THE ATTORNEY GENERAL'S LAWSUIT IS UNCONSTITUTIONAL ........ 14

A. The First Amendment bars viewpoint discrimination ........ 14

B. The Attorney General's lawsuit is unlawful retaliation ........ 16

C. Government officials are free to speak, but they cannot use their offices to suppress the speech of others ........ 18

CONCLUSION ........ 22

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Backpage.com, LLC v. Dart*,
807 F.3d 229 (7th Cir. 2015) .......... 20

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) .......... 6

*Brown v. Kemp*,
86 F.4th 745 (2023) .......... 15

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) .......... 13, 14

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026) .......... 10, 11

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) .......... 11

*City of San Diego v. Roe*,
543 U.S. 77 (2004) .......... 10

*Connick v. Myers*,
461 U.S. 138 (1983) .......... 9

*Consol. Edison Co. v. Publ. Serv. Comm'n of N.Y.*,
447 U.S. 530 (1980) .......... 12

*Cooke v. Iowa Dep't of Health & Hum. Servs.*,
31 N.W.3d 368 (Iowa 2026) .......... 6

*Dun & Bradstreet v. Greenmoss Builders*,
472 U.S. 749 (1985) .......... 9

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) .......... 12, 13

*Garrison v. Louisiana*,
379 U.S. 64 (1964) .......... 3

*Gomez v. Randle*,
680 F.3d 859 (7th Cir. 2012) .......... 16, 17

*Hartman v. Moore*,
547 U.S. 250 (2006) .......... 16

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016) .......... 18

*Iancu v. Brunetti*,
588 U.S. 388 (2019) .......... 15

*Linmark Assocs., Inc. v. Willingboro*,
431 U.S. 85 (1977) .......... 20

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) .......... 19, 20

*N.Y. Times v. Sullivan*,
376 U.S. 254 (1964) .......... 7, 21

*NAACP v. Button*,
371 U.S. 415 (1963) .......... 13

*National Rifle Association v. Vullo*,
602 U.S. 175 (2024) .......... 15, 16

*Novoselsky v. Brown*,
822 F.3d 342 (7th Cir. 2016) .......... 13, 16, 17

*O.B. v. Norwood*,
838 F.3d 837 (7th Cir. 2016) .......... 6

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986) .......... 11, 12

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .......... 16

*Saxbe v. Wash. Post Co.*,
417 U.S. 843 (1974) .......... 12

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 9, 10

*Texas v. Johnson*,
491 U.S. 397 (1989) .......... 14, 15

*Thornhill v. Alabama*,
310 U.S. 88 (1940) .......... 12

*United States v. Skrmetti*,
605 U.S. 495 (2025) .......... 10

*VDARE Found. v. City of Colo. Springs*,
11 F.4th 1151 (10th Cir. 2021) .......... 19

*Whitney v. California*,
274 U.S. 357 (1927) .......... 19

*Wood v. Georgia*,
370 U.S. 375 (1962) .......... 19

*Woodruff v. Mason*,
542 F.3d 545 (7th Cir. 2008) .......... 13

**Statutes and Constitutional Provisions**

Fla. Const. art. II, § 8 .......... 4

Fla. Stat. § 456.52 .......... 17

U.S. Const. amend. I .......... *passim*

**Other Authorities**

Alexander Bickel, *Domesticated Civil Disobedience: The First Amendment, from Sullivan to The Pentagon Papers*, in The Morality of Consent (1975) .......... 6, 7

Alexander Meiklejohn, *The First Amendment is an Absolute*, 1961 Sup. Ct. Rev. 245 (1961) .......... 3, 4

Alexander Meikeljohn, *Free Speech and its Relation to Self-Government* (1948) .......... 4

Karl Popper, *The Open Society and Its Enemies* (1945) .......... 8

Karl Popper, *The Poverty of Historicism* (1955) .......... 8

## INTERESTS OF *AMICI CURIAE*[1]

*Amici* are a bipartisan group of former members of Congress, senior government attorneys, and prominent federal officials. Collectively, they have spent decades in public service. They represent different political parties, different regions of the country, and different policy preferences. But they all agree on this: Attorney General Uthmeier's Florida lawsuit against the American Academy of Pediatrics (AAP) is an unconstitutional attack on the First Amendment because it is intended to suppress and punish speech and advocacy on an issue of public concern.

As former public officials, *Amici* believe that the Attorney General's effort to silence AAP poses a grave threat to democracy because allowing such retaliatory lawsuits would deprive the public and public officials of data, analysis, and perspectives that could inform and shape policy. The policymaking process in a democratic system requires input from people and associations outside government—that is, from civil society. In order

[1] No counsel for a party authored this brief, in whole or in part. Further, no person other than *amici,* their counsel, and their members contributed money to fund preparation or submission of this brief. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (a)(4)(E).

for civil society groups like AAP to play this salutary role, they must have the freedom to disseminate information, communicate and associate with others, express opinions, and petition the government. All these activities are protected by the First Amendment. And all of them are threatened by the Attorney General's speech-stifling Florida lawsuit.

The purpose of this brief is to explain, based on *Amici*'s extensive experience in public service, the importance of the First Amendment for democratic policymaking. Legislators, executive officers, and other public officials rely on professional associations like AAP—as well as interest groups of every stripe—to collect and assess data, propose and evaluate policies, transmit the views of their members, and provide informed recommendations. Although government officials, including the Attorney General, are free to reject such input and to criticize organizations that provide it, they cannot monopolize public discourse by using the courts to chill the expression of disfavored views. Allowing the Attorney General's lawsuit against AAP to proceed would impoverish our national discussion of a topic of public concern and deprive public officials of information that may be relevant to their deliberations on the people's behalf.

## ARGUMENT

### I. FREE EXPRESSION IS ESSENTIAL TO DEMOCRATIC POLICYMAKING

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). Democratic policymaking requires that citizens and private associations have the basic freedom to openly communicate, disseminate information, and opine about matters of public concern. In authoritarian states, information and opinion flow in one direction: from the regime to its subjects. By contrast, our constitutional system recognizes that people and associations *outside* of government have knowledge, experience, and perspectives that can help government officials in crafting and executing policy. Within our system, the great aegis of democratic discourse is the First Amendment.

As the political theorist Alexander Meiklejohn explained, the First Amendment does more than simply safeguard an individual right to free expression. Vitally, it "protects the freedom of those activities of thought and communication by which we"—the people—"'govern.'" Alexander Meiklejohn, *The First Amendment is an Absolute*, 1961 Sup. Ct. Rev. 245,

255 (1961).[2] Thus, "[p]ublic discussion of public issues, together with the spreading of information and opinion bearing on those issues, must have a freedom unabridged by our agents"—that is, by elected representatives and other administrators of the public trust.[3] "Though they govern us, we, in a deeper sense, govern them." *Id.* at 257.

The United States is rich in human capital and knowledge. Most of our talent and expertise resides not in our elected representatives and government agencies but elsewhere—in our corporations, professional associations, universities, hospitals, civic and faith-based institutions, think tanks, activist groups, newsrooms, labor unions and trade groups, and other organizations. It is a great benefit to our public officials, and an essential feature of our history of open discourse, that institutions and groups remain free to circulate information and engage in advocacy about public issues without fear of reprisal. Freedom to exchange ideas fuels

---

[2] *See also* Alexander Meikeljohn, *Free Speech and its Relation to Self-Government* 88–89 (1948).

[3] *Amici*, with their decades of combined public service, believe deeply that "a public office is a public trust." As does the State of Florida: those words are enshrined directly in its Constitution. Fla. Const. art. II, § 8

the government's access to data and viewpoints that can and should inform and shape public policy, just as it provides all citizens with the opportunity to participate in the policymaking process.

While serving in government, *Amici* witnessed firsthand the vital role that organizations like AAP play in self-government. By definition, a professional association of physicians has knowledge and perspectives that do not exist in government. AAP represents not only the doctors who comprise its membership, but also the interests of patients, families, and the public. It has a broad, essential mission: to advance "physical, mental and social health and well-being for all infants, children, adolescents and young adults." ECF No. 58 at 5 (quoting AAP, *Mission & Strategic Plan*). As part of this mission, AAP publishes research, submits comments in response to regulation, and issues policy statements. *Id.* at 6. Public officials and judges rely on AAP to provide information relevant to their

deliberations, as illustrated by the fact that AAP publications are often cited on the floor of Congress[4] and in court opinions.[5]

None of this is to say, of course, that public officials must agree with or accept the views of any outside organization, including AAP.[6] Nor are AAP's positions and information immune from criticism or opprobrium—however harsh—from government officials. As discussed in Section III, below, elected officials like the Attorney General are free to express *their own* views about issues of public concern, and *Amici* recognize that our system of government—including the First Amendment—requires what can be an "unruly contest" in the exchange of ideas between members of the public and government officials. Alexander Bickel, *Domesticated Civil*

[4] *See, e.g.,* 165 Cong. Rec. H10294–95 (daily ed. Dec. 16, 2019) (safe-sleep recommendations); 147 Cong. Rec. S4422–25 (daily ed. May 7, 2021) (drug testing effectiveness on children); 162 Cong. Rec. S2402–03 (daily ed. Apr. 25, 2016) (poisoning statistics).

[5] *See, e.g., O.B. v. Norwood*, 838 F.3d 837, 841 (7th Cir. 2016); *Cooke v. Iowa Dep't of Health & Hum. Servs.*, 31 N.W.3d 368, 370 (Iowa 2026); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 853–54 (2011) (Breyer, J., dissenting).

[6] The kaleidoscopic diversity of viewpoints in the United States means it would be impossible for any politician to accept the views of every group that weighs in on any contested issue.

*Disobedience: The First Amendment, from Sullivan to The Pentagon Papers*, in The Morality of Consent 57, 87 (1975). As the Supreme Court unanimously reminded us decades ago, in language as vital today as then, public discourse in our great country rests on "the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964).

But while officials and the public share the same First Amendment freedom of expression, there is a crucial difference between an official using his or her "bully pulpit" to participate in public debate versus using the courts to suppress others' opposing views. The former is vital to the democratic process and is protected by the First Amendment. *See infra* Section III. The latter, by contrast, is a dire threat to self-governance because it closes an avenue by which private citizens and groups transmit their views and knowledge, and prevents them from advocating for their own interests and those of their members or stakeholders.

Governments that enforce orthodoxy and uniformity in expression and opinion deprive themselves of the benefits of a vibrant civil society and of information critical to making effective public policy. "It is easy to centralize power," Karl Popper observed, "but impossible to centralize all that knowledge which is distributed over so many individual minds, and whose centralization would be necessary for wise wielding of centralized power." One great advantage of open societies is that they expose leaders and legislators to facts and views beyond their ken. "The more you gain in power [over expression and thought]," Popper argued, "the more you must lose in knowledge."[7]

## II. AAP'S STATEMENTS AND ADVOCACY ARE PROTECTED BY THE FIRST AMENDMENT

AAP has contributed to public discourse about care for transgender and gender non-conforming youth by issuing policy statements, engaging in advocacy, and participating in litigation. ECF No. 58 at 6–9; N.D. Ill. ECF No. 35 (Mem. Op. and Order) at 1–7, 10–13 (summarizing 2018 AAP

[7] Karl Popper, *The Poverty of Historicism* 89–90 (1955); *see also* Karl Popper, *The Open Society and Its Enemies* (1945) (arguing that liberal democracy facilitates incremental, "piecemeal" improvements in policy).

policy statement and Attorney General's allegations).[8] For the reasons explained in AAP's response brief (ECF No. 57), and below,[9] each of these forms of expression is protected by the First Amendment.

**A. Youth gender medicine is an issue of public concern.**

"[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)); *see also Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 758–59 (1985) (speech on "matters of public concern" is "at the heart of the First Amendment's protection"). Speech addresses a matter of public interest when it concerns "any matter of political, social, or other concern to the community," *Snyder*, 562 U.S. at 453 (quoting *Connick*, 461 U.S. at 146), or addresses "a

---

[8] The district court's memorandum opinion and order can also be found at ECF No. 48-2 (App. Vol. 2, 418–75).

[9] The Attorney General's initial brief argues that AAP's expression is not protected because it is either misleading commercial speech or "conduct" in restraint of trade. ECF No. 47 at 38–44. AAP effectively disposes of these arguments in its response. ECF No. 58 at 57–65, *see also* Mem. Op. at 42 (Attorney General's commercial speech theory is "as weak as they come"). *Amici* thus focus on principles not addressed in the parties' briefs.

subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public," *id.* (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004)).

It is beyond dispute that provision of medical care to all people, including transgender and gender-diverse youth, is a public issue, and that speech on this topic is entitled to special protection. *Amici* could cite hundreds of news articles and opinion pieces discussing this issue from a range of perspectives,[10] but it is enough to point to the Attorney General's own statements, as well as the Supreme Court's decisions in *United States v. Skrmetti*, 605 U.S. 495 (2025), which considered whether Tennessee's ban on certain treatments for gender dysphoria in minors violated the Fourteenth Amendment, and *Chiles v. Salazar*, 146 S. Ct. 1010 (2026), striking down a Colorado ban on "conversion therapy" for minors on First Amendment grounds.

---

[10] To give but a small sample of this coverage, *see, e.g.*, Andrea Long Chu, *Freedom of Sex,* N.Y. Mag. (Mar. 11, 2024); Emily Witt, *A Trans Teen in an Anti-Trans State*, The New Yorker (Oct. 9, 2023); Emily Bazelon, *The Battle Over Gender Therapy,* The N.Y. Times Mag. (June 15, 2022); Jesse Singal, *When Children Say They're Trans*, The Atlantic (July/Aug. 2018).

As lawmakers in the states and the federal government consider policy relating to this public issue, it is important that they have access to the broadest possible range of information and views. This includes the perspectives of those who have recommended gender-affirming care, like AAP, as well as those who oppose it.[11] Any government effort to restrict speech or debate on this topic is anathema to the First Amendment.

### B. The First Amendment protects speech by associations and corporations as well as individuals.

At various times, the government has sought to distinguish speech by "natural persons" from that by associations and corporations, arguing that the latter should not enjoy the same robust constitutional protection accorded to the former. The Supreme Court has consistently rejected this argument, for reasons that are instructive here. *See, e.g., Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 343 (2010); *Pac. Gas & Elec. Co.*

[11] As AAP observes, in reference to the *Salazar* ruling, "[i]t simply cannot be that Colorado violates the First Amendment by seeking to suppress conversion-therapy speech while Florida is permitted to retaliate against speech that is critical of conversion therapy." ECF No. 58 at 64.

*v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986); *Consol. Edison Co. v. Publ. Serv. Comm'n of N.Y.*, 447 U.S. 530, 533–35 (1980).

Echoing Professor Meiklejohn, the Supreme Court has noted that "[t]he constitutional guarantee of free speech 'serves significant societal interests' wholly apart from the speaker's interest in self-expression"—including the public's right to *receive* information. *Pac. Gas & Elec.*, 475 U.S. at 8 (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978) and citing *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940) and *Saxbe v. Wash. Post Co.*, 417 U.S. 843, 863–64 (1974) (Powell, J., dissenting)). These interests would be frustrated if courts distinguished between speech by individuals, on the one hand, and entities or groups, on the other, giving less protection to the latter. "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Id.* (quoting *Bellotti,* 435 U.S. at 783).

AAP, no less than any individual, has a First Amendment right to speak on public issues. Indeed, the contributions of groups like AAP to

the discourse about public policy are "indispensable to decisionmaking in a democracy." *Bellotti*, 435 U.S. at 777.

### C. The First Amendment extends to litigation.

While the primary focus of the Attorney General's Florida lawsuit is the AAP's 2018 policy statement, it also attacks AAP for its alleged role in litigation brought by gender dysphoric minors and their parents—most notably, its submission of *amicus* briefs. Mem. Op. at 2, 12 (citing the Attorney General's Florida complaint and pleadings). Make no mistake: filing briefs and participating in litigation is protected expression.

"The First Amendment right to petition the government 'extends to the courts in general and applies to litigation in particular.'" *Novoselsky v. Brown*, 822 F.3d 342, 355 (7th Cir. 2016) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). "This is so at least in part because litigation may be a form of political expression essential for vindicating the interests of minority groups"—a rationale that applies in cases filed by transgender and gender-diverse youth. *Id.* (citing *NAACP v. Button*, 371 U.S. 415, 429–30 (1963)). To the extent that AAP has participated in any lawsuits, whether as a party or as an *amicus curiae,* its right to "use

the channels and procedures of … [the] courts to advocate [for its] causes and points of view" is constitutionally protected. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972).

## III. The Attorney General's Lawsuit is Unconstitutional

While the Attorney General's Florida lawsuit against AAP purports to enforce the state's Deceptive and Unfair Trade Practices, RICO, and Antitrust Acts, and claims that AAP engaged in misleading advertising, this is clearly pretextual. In reality, the Florida lawsuit arises from the Attorney General's disagreement with AAP on issues of medical care and public policy. The Attorney General is free to disagree with AAP on these issues and others. What he *cannot* do is what he has done in the Florida lawsuit—assert baseless, pretextual claims in retaliation for AAP's First Amendment-protected expression.

### A. The First Amendment bars viewpoint discrimination.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society"—or, in this case, an individual public official—"finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414

(1989). Put bluntly, "viewpoint discrimination is poison to a free society." *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring); *see also Brown v. Kemp*, 86 F.4th 745, 778–83 (2023).[12]

The Supreme Court issued an emphatic condemnation of viewpoint discrimination in *National Rifle Association v. Vullo*, 602 U.S. 175 (2024), in which the NRA challenged threats by New York's Department of Financial Services to initiate enforcement actions against insurers that refused to dissociate from the NRA and similar gun-promotion groups. The NRA argued these threats were meant to coerce insurers into taking action to punish or suppress the NRA's political speech. *Id.* at 180–85.

The Supreme Court ruled unanimously for the NRA, holding it had plausibly alleged that the Superintendent of the Department of Financial Services violated the First Amendment. The Court focused on an alleged

[12] The district court concluded that it was unnecessary to address AAP's viewpoint discrimination claim because AAP has established likelihood of success on its retaliation claim. Mem. Op. at 56 n.8. Still, the First Amendment's prohibition of viewpoint discrimination applies in any case where the state targets the expression of particular views.

meeting between the Superintendent and insurance executives in which the Superintendent suggested she would be less interested in pursuing technical infractions if an insurer severed its ties with the NRA, as well as guidance letters in which she "encouraged" insurers to manage the "risks[] that may arise from their dealings with the NRA or similar gun promotion organizations." *Id.* at 184, 192–94. Although the Court made clear the Superintendent was free to "share her views freely and criticize particular beliefs," it concluded that her statements and letters contained thinly-veiled threats to "use the power of the State to punish or suppress disfavored expression"—an unconstitutional abuse of her public office. *Id.* at 188 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995)).

**B. The Attorney General's lawsuit is unlawful retaliation.**

When an individual or group engages in protected expression, and a public official disapproves, the First Amendment prohibits that official from subjecting the speaker to retaliatory actions. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). To state a retaliation claim, a plaintiff must allege that (1) they "engaged in activity protected by the First Amendment"; (2)

they "suffered a deprivation that would likely deter First Amendment activity"; and (3) their protected activity "was at least a motivating factor for the retaliatory action." *Novoselsky*, 822 F.3d at 354 (quoting *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012)); *see also* Mem. Op. at 31–32 (discussing elements of retaliation claim in the context of the bad-faith analysis relevant to *Younger* abstention).

As AAP observes in its response, the Attorney General's initial brief does not address the second and third of these factors (a deprivation and causation), conceding each for purposes of this appeal. ECF No. 58 at 57–58. *Amici* thus underscore two considerations that should inform this Court's analysis of the first factor: (1) the Attorney General's retaliatory motive; and (2) the harm that such retaliation inflicts on public discourse.

*First*, it is already illegal in Florida to provide minors with gender-affirming care. *See* Fla. Stat. § 456.52. This clearly refutes the Attorney General's claim that his lawsuit is intended to protect Florida consumers from misleading commercial speech about such care, *see* ECF No. 47 at 39–43, and demonstrates that his true goal is to punish and suppress AAP's protected speech and advocacy.

*Second*, the impact of a retaliatory action may extend far beyond its immediate target. *Heffernan v. City of Paterson*, 578 U.S. 266, 273 (2016) (retaliation against one speaker "tells the others that they engage in protected activity at their peril"). Not just AAP but *anyone* who knows about the Florida lawsuit now understands that to publicly disagree with the Attorney General about gender-affirming care is to risk being hit with a meritless suit or other retaliatory action. More broadly, if the Attorney General's lawsuit against AAP is allowed to proceed, this could embolden officials in other states—including those with different views about youth gender medicine—to pursue similar actions. This would seriously chill public discourse about a contested issue and deprive the public and public officials of knowledge that should inform public policy.

### C. Government officials are free to speak, but they cannot use their offices to suppress the speech of others.

It is critical to emphasize that *Amici,* as former public officials, do not begrudge the Attorney General his own right to speak about gender-affirming care. He is entitled to use the platform of his public office—the so-called "bully pulpit"—to express his own opinions and advance his own policy goals. The First Amendment guarantees his freedom to do so. *See*

*Wood v. Georgia*, 370 U.S. 375, 395 (1962) ("The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance."). He is also free to criticize AAP for its expressed views, and to persuade others to do the same.[13] That is an entirely appropriate way to engage in the political process consistent with the First Amendment. As Justice Brandeis observed nearly 100 years ago, "[t]o courageous, self-reliant men, with confidence in the power of free and fearless reasoning applied through the processes of popular government . . . the remedy to be applied [to speech they disagree with] is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring). This "counterspeech" principle is firmly embedded in constitutional law. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 586 (2001) (Thomas, J., concurring in part) (if the government is concerned about "a message with which it disagrees," it is able "to counteract that message with 'more

[13] *See, e.g., VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1170–72 (10th Cir. 2021) (mayor's statement condemning "hate speech" did not infringe the First Amendment rights of the group he denounced).

speech, not enforced silence'"); *Linmark Assocs., Inc. v. Willingboro*, 431 U.S. 85, 97 (1977).

Those who have held positions of significant public trust, as *Amici* have, understand how and when a public officeholder properly employs the megaphone of their office to pursue their political and policy goals. Most importantly, *Amici* understand, as the Founders did, that debates over public policy are to be welcomed, not feared, and that spirited debate is the lifeblood of a healthy democratic process.

But when a public official's words and actions devolve into actual, retaliatory harm targeting an ideological opponent, democracy suffers. At that point, the public trust has been broken—and judicial intervention is essential. In *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), this Court discussed at length the distinction between an official's right to express his opinions and his authority to threaten retaliatory actions against speech he dislikes—the difference, that is, between "government expression and intimidation." 807 F.3d at 230. The latter, this Court held, is strictly forbidden, "[f]or where would such official bullying end, were it permitted to begin?" *Id.* at 235; *see also id.* at 230–31, 234–38.

*Amici*, when they held public office, understood this distinction between the expression of ideas and the suppression of speech. They also knew that the First Amendment prohibited them from using the power of their position to single out their political opponents for government-sanctioned punishment. *Amici* believe society benefits when associations like AAP are free to disseminate information and engage in advocacy on matters of public concern. And they are deeply proud of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270.

The Attorney General's Florida lawsuit against AAP runs afoul of this fundamental principle of life in a democratic society. He has abused the power of his office to violate this core principle enshrined in the First Amendment, undermining the constitutional protection that is accorded to disapproved and dissenting views. Regardless of what they think about youth gender medicine and gender-affirming care, all Americans should be concerned by the Attorney General's unbounded assertion of coercive power to silence dialogue and disagreement. *Amici*, who know intimately the responsibilities and powers of public office, as well as the importance

to public officials of hearing and learning from civil society groups of all kinds, certainly are concerned.

## CONCLUSION

Public officials depend on the ability of civil society groups like AAP to speak freely about matters of public concern—a right that is protected by the First Amendment. Because Attorney General Uthmeier's Florida lawsuit is clearly designed to suppress AAP's protected speech and deter AAP and others from expressing views with which the Attorney General disagrees, the Court should affirm the ruling of the district court below.

August 25, 2026

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin
Chad R. Bowman
1909 K Street NW, 12th Floor
Washington, DC 20006
(202) 661-2200

Taylor Washburn
1301 Second Ave., Suite 2800
Seattle, Washington 98101
(206) 223-7000

Chloe Nakaya
601 SW Second Ave., Suite 2100
Portland, Oregon 97204
(503) 778-2100

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit stated in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 3,703 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in Microsoft Word using a 14-point proportionally spaced typeface, Century Schoolbook.

DATED this 25th day of August, 2026.

*/s/ Charles D. Tobin*
Charles D. Tobin

*Counsel for* Amici Curiae

**CERTIFICATE OF SERVICE**

I certify that on August 25, 2026, the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit using the Court's CM/ECF system, which will send a notification to the attorneys of record in this matter.

*/s/ Charles D. Tobin*
Charles D. Tobin

*Counsel for* Amici Curiae