**No. 26-2238**

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

AMERICAN ACADEMY OF PEDIATRICS,

*Plaintiff-Appellee,*

v.

JAMES UTHMEIER,
Attorney General of the State of Florida,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
No. 1:26-cv-02401, Honorable Matthew F. Kennelly Presiding

# BRIEF OF *AMICUS CURIAE* FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF APPELLEE AND AFFIRMANCE

Ronnie London
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
Ronnie.london@fire.org
(215) 717-3473

*Counsel for* Amicus Curiae

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-2238

Short Caption: American Academy of Pediatrics v. James Uthmeier

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Foundation for Individual Rights and Expression

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Foundation for Individual Rights and Expression

(3) If the party, amicus or intervenor is a corporation:

i) Identify all its parent corporations, if any; and

None.

ii) list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None.

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

---

Attorney's Signature: /s/ Ronald G. London Date: August 24, 2026

Attorney's Printed Name: Ronald G. London

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☑ **No** ☐

Address: 700 Pennsylvania Ave. SE, Ste. 340

Washington, DC 20003

Phone Number: (215) 717-3473 Fax Number: N/A

E-Mail Address: ronnie.london@fire.org

## TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF *AMICUS CURIAE* .......... 1

SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 7

I. Groups Like AAP Targeted for Protected Speech are Entitled to a Federal Forum to Safeguard Their Rights From State Retaliation. .......... 7

A. Uthmeier's retaliatory proceeding directed at protected speech falls squarely within *Younger's* bad faith exception. .......... 7

1. *Younger*'s bad faith exception serves an important purpose. .......... 7

2. Bad faith permeated the state's enjoined litigation. .......... 11

B. The district court correctly held Uthmeier's litigation constitutes First Amendment retaliation. .......... 15

II. State Officials Are Increasingly Using Indirect Means to Accomplish What the First Amendment Forbids Them to Do Directly. .......... 18

A. State action targeting protected speech that officials disfavor has proliferated. .......... 19

B. Unconstitutional efforts to indirectly censor disfavored speech will inevitably chill others beyond the immediate targets. .......... 24

CONCLUSION .......... 27

# TABLE OF AUTHORITIES

## Cases

*ActBlue LLC v. Paxton*,
2026 WL 1694290 (D. Mass. 2026) ........................................ 13

*Am. Acad. of Pediatrics v. Uthmeier*,
178 F.4th 1113 (7th Cir. 2026) ........................................ 9, 13

*Am. Acad. of Pediatrics v. Uthmeier*,
2026 WL 1552734 (N.D. Ill. 2026) .............................. 3–4, 11–12, 14–17

*Bd. of Trs. of State Univ. of New York v. Fox*,
492 U.S. 469 (1989) ........................................ 12

*Collins v. Kendall Cnty.*,
807 F.2d 95 (7th Cir. 1986) ........................................ 11, 14

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976) ........................................ 7

*Cullen v. Fliegner*,
18 F.3d 96 (2d Cir. 1994)........................................ 9

*Exodus Refugee Immigr., Inc. v. Rokita*,
2026 WL 2249397 (S.D. Ind. Aug. 5, 2026) .............................. 16–17, 21

*First Choice Women's Res. Centers, Inc. v. Davenport*,
146 S. Ct. 1114 (2026) ........................................ 24–26

*Hartman v. Moore*,
547 U.S. 250 (2006) ........................................ 12

*Holleman v. Zatecky*,
951 F.3d 873 (7th Cir. 2020) ........................................ 15–16

*Jolt Initiative, Inc. v. Paxton*,
821 F. Supp. 3d 706 (W.D. Tex. 2026) ........................................ 10

*Jordan v. Jewel Food Stores, Inc.*,
743 F.3d 509 (7th Cir. 2014) ........................................ 12, 13

*Kugler v. Helfant*,
421 U.S. 117 (1975) ........................................................................ 9

*Lewellen v. Raff*,
843 F.2d 1103 (8th Cir. 1988) ............................................................ 9

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) ................................................... 20

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025)........................................................... 17

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ........................................................................... 22

*Netflix, Inc. v. Babin*,
88 F.4th 1080 (5th Cir. 2023) ......................................... 2, 8–11, 14, 17

*Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69 (2013) .............................................................................. 7

*Wilson v. Thompson*,
593 F.2d 1375 (5th Cir. 1979) ....................................................... 9, 15

*Younger v. Harris*,
401 U.S. 37 (1971) ............................................. 2, 4–5, 7–9, 15, 18, 26

**Other Authorities**

Ana Ceballos and Kirby Wilson,
*DeSantis administration investigating 'A Drag Queen Christmas' event in Broward*, Tampa Bay Times (Dec. 28, 2022) .......................... 20

Brad Holyman-Sigal (@bradholyman),
X (January 30, 2026, at 4:06 PM)....................................................... 23

Carl Campanile,
*Mamdani Urged by Manhattan Borough President to Pull Newsmax from NYC Taxicab Screens*, N.Y. Post (Jan. 30, 2026)....... 23

Foundation for Individual Rights and Expression,
*First Choice Women's Resource Centers, Inc. v. Davenport*................. 26

Kimberly Leonard,
*DeSantis strips Disney World of its self-governing power in Florida: 'There's a new sheriff in town'*, Business Insider (Feb. 27, 2023) .......... 19

Lucy Kafanov,
*7 Republican AGs write to Target, say Pride month campaigns could violate their state's child protection laws*, CNN (July 8, 2023) .......... 21

Matt Lavietes,
*DeSantis attempts to revoke Miami hotel's liquor license over drag show*, NBC News (Mar. 15, 2023) .......... 20

Press Release, Gov. Gavin Newsom, *"This is a Big Big Deal": Climate Leaders Praise California's Lawsuit to Hold Big Oil Accountable* (Sep. 18, 2023) .......... 24

Press Release, Off. of Att'y Gen. of Mo., *Attorney General Bailey Fights To Expose Big Tech Censorship of President Trump as AI Chatbots Produce Fake News* (July 9, 2025) .......... 21

Press Release, Off. of N.Y. State Att'y Gen., *Attorney General James Calls on Social Media Platforms to Provide Answers After Terrorist Attacks in Israel Spark Violent Threats Online* (Oct. 13, 2023) .......... 22

Press Release, Off. of the Att'y Gen. of Cal., *Attorney General Bonta Announces Investigation into Fossil Fuel and Petrochemical Industries for Role in Causing Global Plastics Pollution Crisis* (Apr. 28, 2022) .......... 23

Susan Milligan,
*DeSantis Takes On Disney With Taxpayers in the Middle*, U.S. News & World Rep. (Apr. 22, 2022) .......... 19

*Ways to Give*, American Academy of Pediatrics .......... 25

## INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression ("FIRE") is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended First Amendment rights nationwide without regard to the speakers' views through public advocacy, strategic litigation, and *amicus curiae* filings in cases implicating expressive rights. *See, e.g., Stanford Daily Publ'g Corp. v. Rubio*, 820 F. Supp. 3d 974 (N.D. Cal. 2026) (counsel); *Reges v. Cauce*, 162 F.4th 979 (9th Cir. 2025) (counsel); Brief for FIRE as *Amicus Curiae* supporting Appellant, *Tempel v. School District of Waukesha*, No. 25-2959 (7th Cir. Jan 15, 2026); Brief for FIRE, et al., as *Amici Curiae* supporting Appellants, *E.D. v. Noblesville School District*, 151 F.4th 907 (7th Cir. 2025) (No. 24-1608); Brief for FIRE, *et al.*, as *Amici Curiae* supporting Appellant, *Krasno v. Mnookin*, (7th Cir. 2025) (No. 22-3170).

---

[1] No counsel for a party authored this brief in whole or part. Further, no person, other than *amicus*, its members, or its counsel contributed money intended to fund preparing or submitting this brief.

FIRE's work includes protecting the right to be free from governmental retaliation for protected speech. *See, e.g.*, *Rosado v. Bondi*, 831 F. Supp. 3d 685 (N.D. Ill. 2026) (counsel); Brief for FIRE, *et al.*, as *Amici Curiae* supporting Appellees, *Los Angeles Press Club v. Noem*, 171 F.4th 1179 (9th Cir. 2026); Brief for FIRE as *Amicus Curiae* supporting Appellant, *Stokes v. Boyce*, No. 26-60184 (5th Cir. July 23, 2026). Particularly relevant here, FIRE strongly opposes bad faith prosecutions as a retaliatory tool. *See, e.g.*, Brief for FIRE as *Amicus Curiae* supporting Appellee, *Netflix, Inc. v. Babin*, 88 F.4th 1080 (5th Cir. 2023). *Cf.* Brief for FIRE *et al.*, as *Amici Curiae* supporting Plaintiff-Appellee, *Media Matters for Am. v. FTC,* No. 25-5302 (D.C. Cir. 2026); *NewsGaurd Techs., Inc. v. FTC*, No. 26-5138 (D.C. Cir. 2026) (counsel).

## SUMMARY OF ARGUMENT

Constitutional rights mean little if government officials can violate them without consequence. When state officials wield the law to punish disfavored speech, federal courts must vindicate Americans' First Amendment rights. The Supreme Court recognized this in *Younger v. Harris* when it took care to carve out bad-faith prosecutions from its abstention doctrine. 401 U.S. 37, 56 (1971). Reversing the decision below,

as Defendant-Appellant Florida Attorney General James Uthmeier seeks, would gut the Court's careful carve-out for bad faith from *Younger* abstention, and embolden state prosecutors nationwide to recast core expressive activities as regulable commercial conduct, chilling the speech of independent organizations and depriving Americans of their expertise.

This case illustrates that danger. Plaintiff-Appellee American Academy of Pediatrics ("AAP") is an independent nonprofit professional association that neither sells nor provides gender-affirming care or any other treatment. Rather, its members and committees seek to advance its mission through speech and other quintessentially expressive activity such as developing and publishing policy statements—the kinds of efforts the district court described as "look[ing] and read[ing] like an informational document, not an advertisement." *Am. Acad. of Pediatrics v. Uthmeier*, 2026 WL 1552734, at *19 (N.D. Ill. 2026). The AAP also conducts research, educates physicians, and advocates for policy positions on issues concerning children's health—all protected speech.

Attorney General Uthmeier made clear his intent to target AAP's protected advocacy, not consumer protection, antitrust, or RICO violations. The state's complaint in the Florida state-court proceeding

that the district court here preliminarily enjoined singles out AAP's speech opposing a rule proposed by the Florida Agency for Health Care Administration ("AHCA") that would exclude certain gender-affirming interventions from Medicaid coverage. Uthmeier even faulted the AAP for its "amicus briefs challenging the scientific basis for the AHCA rule" and tellingly branded the AAP's speech about transgender healthcare as "immoral" and purportedly misleading to consumers. *Id.* at *4–7.

After "initiat[ing] an unprecedented enforcement action against AAP, accompanied by provocative, public statements … he waited." *Id.* at *24. Only when AAP asserted its First Amendment rights did Uthmeier then file "an amended complaint adding an antitrust claim seeking substantial additional penalties." *Id.* The complaint, Uthmeier's concurrent public campaign against the AAP, and the prosecutorial cadence leave little doubt as to what prompted this lawsuit: the state's disagreement with AAP's views and its efforts to persuade policymakers to adopt them.

The court below was thus correct to enter a preliminary injunction rather than abstaining under *Younger*. AAP alleged with particularity the various ways in which Uthmeier brought state law claims in bad faith

to target AAP's protected speech regarding transgender healthcare. And the district court carefully weighed AAP's allegations before granting the preliminary injunction. It found Uthmeier filed the enforcement actions with no reasonable expectation of success, insofar as AAP's expression is not commercial as antitrust and consumer protection laws require, and that Uthmeier's delay in prosecuting the enforcement action coupled with his inflammatory public commentary manifested bad faith.

Those tactics exemplify *amicus* FIRE's serious concern that state officials are turning to the machinery of state law with alarming frequency to punish speakers for expressing disfavored viewpoints. The problem is both growing and bipartisan. It spans states seeking to censor drag shows or make AI less critical of the President to states strong-arming businesses into cutting ties with the NRA or conservative media organizations. In our divided political moment, the risk (and growing expectation) that elected officials will turn enforcement authority into ideological reprisal is acute and increasingly routine.

Americans' First Amendment rights cannot depend on which party controls the statehouse where they live or work. This Court must not allow *Younger* abstention to bar federal courthouse doors to Americans

seeking to vindicate their rights where state officials have weaponized the legal process to suppress protected expression.

Taken together, AAP's concrete allegations support only one reasonable inference: Uthmeier's charges were brought in bad faith to punish AAP's protected speech. The record and case law provide no basis to disturb the district court's preliminary injunction. The Court should accordingly affirm.

## ARGUMENT

### I. Groups Like AAP Targeted for Protected Speech are Entitled to a Federal Forum to Safeguard Their Rights From State Retaliation.

#### A. Uthmeier's retaliatory proceeding directed at protected speech falls squarely within *Younger's* bad faith exception.

Federal courts cannot stand aside while state officials manufacture proceedings to chill First Amendment activity. Uthmeier's campaign against the AAP is precisely the sort of bad-faith prosecution that cannot overcome a federal court's "virtually unflagging" obligation to adjudicate a case. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013). As *Sprint* explains, "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.* at 70. That is especially true here, where Florida brought pretextual claims and doubled down only after AAP invoked its First Amendment rights in federal court.

##### 1. *Younger*'s bad faith exception serves an important purpose.

*Younger* abstention is the "exception, not the rule." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). In *Younger*, the district court granted an injunction against a pending state prosecution in California and the Supreme Court reversed, holding there

are circumstances under which federal courts should abstain from "stay[ing] or enjoin[ing]" a parallel state proceeding. *Younger v. Harris*, 401 U.S. 37, 38–39 (1971). That is because federal courts must endeavor to "vindicate and protect federal rights … in ways that will not unduly interfere with the *legitimate* activities of the States." *Id*. at 44.[2]

But the Court was also careful to make clear that *Younger* does not require abstention where a state prosecution is brought in bad faith. In such cases, federal courts may and should grant equitable relief to vindicate Americans' constitutional rights. *Id*. at 49. Where a state prosecutor is "credibly accused of bad faith and has no reasonable hope of obtaining a valid conviction against the defendant, comity-infused deference gives way, and a federal court may exercise its equitable power to enjoin the prosecution." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1085 (5th Cir. 2023). Because *Younger* abstention instructs courts to depart from its ordinary obligation to exercise jurisdiction over constitutional claims, courts must apply it with rigor and vigilantly examine allegations that state officials are acting in bad faith.

[2] Unless noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

The district court's faithful application of the bad-faith exception to *Younger* abstention here underscores both the exception's necessity and federal courts' duty to invoke it wherever essential to safeguard Americans' constitutional rights. As a panel of this Court correctly recognized, "The bad-faith exception in *Younger* provides a critical safety valve for protecting federal rights while also respecting states and their courts." *Am. Acad. of Pediatrics v. Uthmeier*, 178 F.4th 1113, 1123 (7th Cir. 2026), reh'g en banc granted, opinion vacated, 180 F.4th 1022 (7th Cir. 2026).

The facts weighed by the district court here mirror the array of facts that courts have long treated as indicia of bad faith historically. For example, in *Wilson v. Thompson*, the Fifth Circuit held that multiple state prosecutions are not required for a showing of bad faith. 593 F.2d 1375, 1381 (5th Cir. 1979). In *Lewellen v. Raff*, the Eighth Circuit held that bad faith "generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." 843 F.2d 1103, 1109 (8th Cir. 1988) (quoting *Kugler v. Helfant*, 421 U.S. 117, 126 n. 6 (1975)); *see also Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994) (same). And in *Netflix v. Babin*—perhaps the closest and most recent

analogue to Uthmeier's bad faith litigation, reflecting the same pattern of retaliatory escalation—the court found bad faith where the prosecution pursued litigation without a "remote chance" of obtaining a conviction and multiplied the charges only after the plaintiff asserted its constitutional rights. 88 F.4th at 1095; *cf. Jolt Initiative, Inc. v. Paxton*, 821 F. Supp. 3d 706, 720 (W.D. Tex. 2026) (holding that "upp[ing] the ante by using a multiplicity of enforcement tools on an accelerated timeline … even without finding any new evidence to suggest wrongdoing … are convincing indicia of Defendant's bad faith.")

In *Netflix,* a Texas state prosecutor charged the company under a state statute prohibiting advertising and promoting child pornography, based on Netflix's streaming of the film *Cuties*, despite its obvious lack of content constituting child pornography. *See Netflix,* 88 F.4th at 1093–96. But both the chronology of the prosecution and the apparent weakness of Texas's claims revealed the retaliatory character of the state action. After issuing a press release touting the novel prosecution, Babin let the case sit idle making no efforts to "move the case along." *Netflix*, 88 F.4th at 1092. The "lull … abruptly ended after Netflix petitioned [the federal courts] for relief." *Id.* Only then did Babin respond with "a burst of

prosecutorial alacrity" culminating in the multiplication of the original indictment into four and pursuing charges that the district court found lacked any hope of obtaining conviction—circumstances the Fifth Circuit affirmed as sufficient to establish bad faith. *Id.* at 1092–96.

#### 2. Bad faith permeated the state's enjoined litigation.

Consistent with the Fifth Circuit's approach in *Netflix*, the district court here assessed the facts to find a "mosaic of bad faith, however persuasive … [the state's] arguments were individually." *Am. Acad. of Pediatrics*, 2026 WL 1552734 at *24 (quoting *Netflix*, 88 F.4th at 1096). Evaluating the strength of the state's complaint, Uthmeier's inflammatory public commentary that in context went "beyond the commonplace stridency of prosecutorial press releases" and his delay prosecuting followed by renewed vigor only after AAP asserted its First Amendment rights, *id.* at 23, the court rightly concluded the cadence of the litigation paired with "more direct evidence of Uthmeier's subjective motives put together a mosaic of specific facts that support an inference of bad faith." *Id.* at *25 (citing *Collins v. Kendall Cnty.*, 807 F.2d 95, 98 (7th Cir. 1986)). And "the addition of an antitrust claim seeking significant additional penalties (and seemingly without merit)" only

after—*and because*—"AAP asserted its First Amendment rights" reinforced the court's inference of bad faith. *Id.*

But perhaps the most egregious sign of Uthmeier's bad faith is the objective weakness in the state's complaint. As the district court noted, "presence or absence of probable cause—is highly valuable circumstantial evidence that can reinforce or undercut other evidence of a retaliatory motive." *Am. Acad. of Pediatrics*, 2026 WL 1552734 at *18 (quoting *Hartman v. Moore*, 547 U.S. 250, 261 (2006)). And it found all three of Uthmeier's claims to be "as weak as they come," especially insofar as they "require AAP's support of gender-affirming care to be somehow commercial in nature." *Id.* at *18–19.

The weakness is obvious. Commercial speech is "speech that proposes a commercial transaction." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014) (citing *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 482 (1989)). Yet the AAP is a nonprofit organization that does not sell its guidance or any form of gender-affirming care. It takes considerable analytical gymnastics to turn a nonprofit's policy research and recommendations into an offer to transact. And as the district court recognized, AAP's plainly

noncommercial speech must be afforded constitutional protection. *Jordan*, 743 F.3d 509, 515–16.

Courts in other circuits have taken a similar approach. In *ActBlue LLC v. Paxton*, the district court found bad faith where Attorney General Paxton served prominent Democratic fundraising platform, ActBlue, a civil investigative demand ("CID") premised on the characterization of ActBlue's platform "as a product whose attributes have been misrepresented to consumers." 2026 WL 1694290, at *4 (D. Mass. 2026), *appeal docketed*, No. 26-1713 (1st Cir. 2026). The court in that case similarly found Paxton's framing of ActBlue's speech as commercial "does not withstand any close scrutiny," noting that ActBlue's "facilitat[ion] [of] political donations" is protected speech. *Id.*

Even this Court's panel dissent conceded Florida's characterization of the AAP's speech as commercial is a "tall order," before urging they are the sort of allegations that should have warranted to discovery. *Am. Acad. of Pediatrics*, 178 F.4th at 1131, reh'g en banc granted, opinion vacated, 180 F.4th 1022 (7th Cir. 2026). The problem with that approach, however, is that the harms posed by bad faith prosecutions are grave and immediate. Simply defending against state proceedings would not offer

an adequate remedy because it would not ensure protection of the plaintiff's federal constitutional rights. *See Collins,* 807 F.2d at 98. Where state prosecutors are "credibly accused of bad faith" and lack "reasonable hope of obtaining a valid conviction … comity-infused deference gives way, and a federal court may exercise its equitable power to enjoin the prosecution." *Netflix*, 88 F.4th at 1085. Holding otherwise would turn federalism on its head.

When states set in motion the machinery of prosecution without any reasonable prospect of success, judicial deference does not advance federalism; it undermines the Constitution's primacy. Uthmeier weaponized state litigation against AAP in retaliation for its protected speech. *See Am. Acad. of Pediatrics*, 2026 WL 1552734, at *25. In *Netflix*, the Fifth Circuit rightly acknowledged that "the district court was best positioned to make the largely credibility-based determination of bad faith." *Netflix*, 88 F.4th at 1085. The same is true here. Nothing in the record suggests that the district court's findings were clearly erroneous, and its decision should be affirmed.

### B. The district court correctly held Uthmeier's litigation constitutes First Amendment retaliation.

The district court correctly held Uthmeier's bad faith litigation constitutes First Amendment retaliation. Because AAP alleges the state-court action itself was brought to punish protected speech, the *Younger* bad-faith inquiry "merges with … the First Amendment retaliation claim." *Am. Acad. of Pediatrics,* 2026 WL 1552734, at *14 (citing *Wilson*, 593 F.2d at 1384–85, 1385 n.17). And as establishing bad faith under *Younger* requires more than a First Amendment retaliation claim requires, in succeeding in showing bad faith, AAP also "establish[ed] a likelihood of success on the merits of [its] First Amendment retaliation claim." *Id.* at *17. In any event, even analyzed alone, Uthmeier's punitive enforcement case—initiated without reasonable expectation of success on the merits—independently meets the standard for First Amendment retaliation.

First Amendment retaliation lies when plaintiff's speech protected by the First Amendment precipitated a retaliatory government action which would "deter a person of ordinary firmness from continuing to engage in protected activity." *Holleman v. Zatecky*, 951 F.3d 873, 880 (7th

Cir. 2020). The first two elements are readily satisfied here. For the same reasons discussed above—and given the AAP's role as a nonprofit organization engaged primarily in research, policy guidelines, and advocacy—Uthmeier offered no plausible explanation why the First Amendment would not protect AAP's speech. Second, causation is likewise clear: "[T]here is little dispute that AAP's speech was the but-for cause of the state court lawsuit, and even if AAP must further establish a subjective retaliatory motive, it has sufficiently done so through its showing of bad faith." *Am. Acad. of Pediatrics*, 2026 WL 1552734, at *25.

The third prong is equally straightforward. As the district court easily (and correctly) concluded: "The state lawsuit in this case, which threatens substantial monetary penalties, readily qualifies on this element." *Am. Acad. of Pediatrics*, 2026 WL 1552734, at *14. This mirrors the recent conclusion in *Exodus Refugee Immigration, Inc. v. Rokita* that "public and inflammatory press releases, have chilled" the protected activities of staff and clients of the plaintiff refugee and immigrant services organization, and "would likely deter a person of ordinary firmness, including [] … potential clients, donors, and … community partners, from expressing their First Amendment rights." 2026 WL

2249397, at *22 (S.D. Ind. Aug. 5, 2026). *See* also *Media Matters for Am. v. Paxton*, 138 F.4th 563, 569, 579 (D.C. Cir. 2025) (affirming the district court's preliminary injunction where the "government[s] campaign of retaliation" included press releases and interviews declaring the target a "radical" organization and encouraging other attorneys general to launch parallel investigations).

As is the case with all retaliatory litigation, the process is the punishment. And here, after initiating unprecedented litigation against the AAP and releasing "provocative, public statements," Uthmeier chose to sit on his hands and wait, for no other reason, the district court found, than "he is permitted to do so by the state rules of civil procedure." *Am. Acad. of Pediatrics*, 2026 WL 1552734, at *24. Then, as in *Netflix*, shortly after the AAP asserted its First Amendment rights, there was a "burst of prosecutorial alacrity" resulting in "an amended complaint adding an antitrust claim seeking substantial additional penalties." *Id.* Were this Court to disturb the preliminary injunction entered below, it would only allow Florida to drag out its unconstitutional punishment of AAP.

## II. State Officials Are Increasingly Using Indirect Means to Accomplish What the First Amendment Forbids Them to Do Directly.

Uthmeier's bad faith litigation against AAP for its protected speech is not an outlier in today's political climate. State attorneys general are increasingly willing (and increasingly expected) to use legal process to accomplish indirectly what the First Amendment forbids them from doing directly: targeting speech they oppose. Federal courts must do their part to halt this trend here and wherever else *Younger* permits.

In FIRE's experience, this growing appetite for suppressing disfavored speech is not confined to one party or state. And it is made especially urgent by the tendency of state-led indirect attacks on speech in response to majoritarian pressure and demands. In today's fractious political landscape, loud and organized constituencies in red and blue states alike increasingly urge state officials to investigate and prosecute political opponents or disfavored speakers for any available infraction and under any pretense. This reality underscores the federal courts' essential role in vindicating the constitutional rights of those facing bad-faith exercises of state authority, including the mounting of litigation.

### A. State action targeting protected speech that officials disfavor has proliferated.

Indirect suppression of protected speech has assumed various forms in recent years. State officials seeking end-runs around the First Amendment have used a variety of creative means. But the intended outcome is always the same: punishing an organization or business based on government disapproval of its views.

The state of Florida is no stranger to these efforts. In March of 2022, on the heels of public criticism from Disney over legislation regarding sexual identity and gender, Florida Governor Ron DeSantis reminded the company that "[i]f Disney wants to pick a fight, the chose the wrong guy,"[3] before indirectly, but blatantly, retaliating by challenging Disney's tax status while gloating there was "a new sheriff in town."[4] Later that year, the same "sheriff" took aim at a Christmas-themed drag performance in

---

[3] Susan Milligan, *DeSantis Takes On Disney With Taxpayers in the Middle*, U.S. News & World Rep. (Apr. 22, 2022), https://www.usnews.com/news/the-report/articles/2022-04-22/desantis-takes-on-disney-with-taxpayers-in-the-middle.

[4] Kimberly Leonard, *DeSantis strips Disney World of its self-governing power in Florida: 'There's a new sheriff in town'*, Business Insider (Feb. 27, 2023), https://www.businessinsider.com/ron-desantis-control-disney-world-special-district-dont-say-gay-2023-2.

the state,[5] exploring options to shut it down and threatening to fine or revoke the liquor licenses of the host hotel.[6]

Other states have likewise engaged in increased indirect censorship. For example, responding to calls from President Trump's then senior advisor Stephen Miller, who tweeted negatively about Media Matters, Missouri's and Texas's Attorneys General launched onerous civil investigations into the company—that is, until the federal court in the District of Columbia preliminarily enjoined both AGs on grounds the proceedings likely amounted to First Amendment retaliation. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 111–12 (D.D.C. 2025), *dismissed,* No. 25-5302, 2026 WL 1354245 (D.C. Cir. May 4, 2026). Missouri's Attorney General similarly issued demands to large-language-model chatbots inquiring why they produce answers disproportionately

[5] Ana Ceballos and Kirby Wilson, *DeSantis administration investigating 'A Drag Queen Christmas' event in Broward*, Tampa Bay Times (Dec. 28, 2022), https://www.tampabay.com/news/florida-politics/2022/12/28/desantis-administration-investigating-drag-queen-christmas-event-broward.

[6] Matt Lavietes, *DeSantis attempts to revoke Miami hotel's liquor license over drag show*, NBC News (Mar. 15, 2023), https://www.nbcnews.com/nbc-out/out-politics-and-policy/desantis-attempts-revoke-miami-hotels-liquor-license-drag-show-rcna75077.

disfavoring President Trump.[7] And attorneys general from Arkansas, Idaho, Indiana, Kentucky, Mississippi, Missouri, and South Carolina wrote national retailer Target to "warn" it about selling pro-LGBTQ attire and donating to an advocacy organization for LGBTQ students.[8]

Just this month, a federal court rebuffed Indiana's above-noted efforts to chill the speech and association of Exodus after it shared information about a planned ICE operation in its town. The court held that a burdensome CID Indiana issued to Exodus—especially coupled with "public and inflammatory" anti-immigration press releases—was retaliatory and likely to "deter a person of ordinary firmness, including Exodus's current and potential clients, donors, and Exodus's community partners, from expressing their First Amendment rights." *Exodus Refugee Immigr., Inc.*, 2026 WL 2249397, at *22.

---

[7] Press Release, Off. of Att'y Gen. of Mo., *Attorney General Bailey Fights To Expose Big Tech Censorship of President Trump as AI Chatbots Produce Fake News* (July 9, 2025), https://ago.mo.gov/attorney-general-bailey-fights-to-expose-big-tech-censorship-of-president-trump-as-ai-chatbots-produce-fake-news/.

[8] Lucy Kafanov, *7 Republican AGs write to Target, say Pride month campaigns could violate their state's child protection laws*, CNN (July 8, 2023), https://www.cnn.com/2023/07/08/business/target-attorneys-general-pride-month/index.html.

And this illiberal wind does not blow from just one direction. Priorities may diverge sharply across the political aisle, but the impulse to censor opposing views does not.

In 2024, the superintendent of the New York State Department of Financial Services tried to strong-arm companies into cutting business ties with the National Rifle Association—an effort that the Supreme Court unanimously identified as unconstitutional "jawboning." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024). And even as that was unfolding, New York's Attorney General targeted what she viewed as offensive social media posts and demanded the platforms publishing them tell her how they plan to address them.[9] Nor are such efforts limited to the state level. Just this year, Manhattan's borough President demanded that the city's Mayor "summarily suspend" the NYC Taxi and Limousine Commission's partnership with Curb after the company signed a contract with conservative outlet Newsmax to provide one-

[9] Press Release, Off. of N.Y. State Att'y Gen., *Attorney General James Calls on Social Media Platforms to Provide Answers After Terrorist Attacks in Israel Spark Violent Threats Online* (Oct. 13, 2023), https://ag.ny.gov/press-release/2023/attorney-general-james-calls-social-media-platforms-provide-answers-after.

minute news updates for in-taxi screens,[10] on grounds that "[a]ny news source that defends ICE shouldn't be in New York City taxi cabs."[11]

California has similarly sought to indirectly suppress disfavored speech, announcing investigations into what its Attorney General characterized as the fossil fuel industries' "campaign of deception" and role in climate change. Much like the case here, California's blustering press releases place blame on corporations and trade groups, not for any products they sell, but for their alleged role in "deceiving the public" by "perpetuating myths around recycling."[12] There too, the political pressure

---

10 Carl Campanile, *Mamdani Urged by Manhattan Borough President to Pull Newsmax from NYC Taxicab Screens*, N.Y. Post (Jan. 30, 2026), https://nypost.com/2026/01/30/us-news/mamdani-urged-by-manhattan-borough-president-to-pull-newsmax-from-nyc-taxi-cab-screens/.

11 Brad Holyman-Sigal (@bradholyman), X (January 30, 2026, at 4:06 PM), https://x.com/bradhoylman/status/2017373796768903231.

12 Press Release, Off. of the Att'y Gen. of Cal., *Attorney General Bonta Announces Investigation into Fossil Fuel and Petrochemical Industries for Role in Causing Global Plastics Pollution Crisis* (Apr. 28, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-investigation-fossil-fuel-and-petrochemical.

sought to "hold the fossil fuel and petrochemical industries accountable" for noncommercial speech.[13]

### B. Unconstitutional efforts to indirectly censor disfavored speech will inevitably chill others beyond the immediate targets.

Using state power to censor speech with no reasonable likelihood of success on the merits—as Uthmeier has here—can not only bring a given organization to heel but also acts as a warning to similarly situated organizations (and their donors). Earlier this year, the Supreme Court unanimously rejected New Jersey's attempt to target a nonprofit pro-life organization and its donors with precisely this kind of indirect state censorship through a broad investigative subpoena. *See generally First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114 (2026). The subpoena sought extensive documentation and data, including detailed donor information, which New Jersey claimed it would use to contact donors to "determine if they had been misled" in violation of the state's Consumer Fraud Act. *Id.* at 1120. In holding First Choice established injury-in-fact for standing, the Court noted the state's

---

[13] Press Release, Gov. Gavin Newsom, *"This is a Big Big Deal": Climate Leaders Praise California's Lawsuit to Hold Big Oil Accountable* (Sep. 18, 2023), https://www.gov.ca.gov/2023/09.

demands were "enough to discourage reasonable individuals from associating with a group" and to "discourage groups from expressing dissident views." *Id.* at 1130.

In many ways, *First Choice* provides an analogue for the types of organizational harms at stake here. AAP is a nonprofit organization whose work depends on voluntary support of members and philanthropic donors to fund and carry out its research and initiatives.[14] For AAP too, the "risk of loss of donors" would "greatly jeopardize[] its ability to carry out its … mission." *Id.* By subjecting AAP to a public opinion campaign alongside sham litigation based on its advocacy—including its publicly expressed positions against Florida AHCA rulemaking—Uthmeier has created substantial risk donors and similarly positioned organizations will simply avoid association with an entity the state has placed in its crosshairs, potentially motivating it to "cease or modify protected First Amendment advocacy the government disfavors." *Id.*

Before the Supreme Court's decision in *First Choice*, FIRE warned that states were increasingly resorting to "procedural maneuvers to keep

[14] *Ways to Give*, American Academy of Pediatrics, https://www.aap.org/en/ways-to-give/ (last updated Feb. 2, 2026).

federal courts from stepping in" and that "getting clever with the form" cannot be allowed to "insulate the state from judicial scrutiny."[15] FIRE cautioned that such tactics would be "just as effective" in New Jersey targeting anti-abortion advocacy as they would be in "the hands of a Florida AG."[16] The Supreme Court agreed with FIRE and its fellow *amici* that where officials "across the political spectrum" abuse state power this way it reasonably gives "targets a very good reason to clam up and give[s] the target organization's members and supporters a very good reason to abandon the cause." *First Choice,* 146 S. Ct. at 1125–26 (quoting brief by FIRE et al., as *Amici Curiae* for Petitioner). Uthmeier's pursuit of AAP under punitive litigation is an example of the increasingly aggressive tactics that disfavored speakers can expect from their state officials, especially if federal courts cite *Younger* abstention to shrink from their role of upholding First Amendment free-speech rights.

---

[15] Foundation for Individual Rights and Expression, *First Choice Women's Resource Centers, Inc. v. Davenport*, https://www.fire.org/cases/first-choice-womens-resource-centers-inc-v-davenport (last visited Aug. 20, 2026).

[16] *Id.*

State attorneys general on the left and right have proven their willingness to use state power to indirectly suppress dissent. But the First Amendment does not tolerate censorship merely because it proceeds indirectly or because it cloaks itself in flimsy state law claims. Attorney General Uthmeier accordingly cannot constitutionally censor the AAP by edict, nor can he do it by ham-fisted attempts to stretch consumer protection and antitrust laws beyond recognition to reach the same result. The district court properly enjoined his effort to do so.

## CONCLUSION

Attorney General Uthmeier's retaliation against the AAP violates the First Amendment. Left unchecked, government officials on the left and right will be emboldened to do the same, leaving Americans' constitutional rights subject to the political majorities of their state. The district court was correct to stem the tide of indirect censorship by issuing a preliminary injunction in this case. This Court should therefore affirm the decision below.

Dated: August 25, 2026

/s/ *Ronnie London*
Ronnie London
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
ronnie.london@fire.org
(215) 717-3473

*Counsel for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMIT**

This document complies with the word limit stated in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 4,568 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. 32(a)(6), because it has been prepared in Microsoft Word using a 14-point proportionally spaced typeface, Century Schoolbook.

Dated: August 25, 2026

/s/ *Ronnie London*
Ronnie London
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION

*Counsel for* Amicus Curiae

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 25, 2026, the foregoing Brief of *Amicus Curiae* Foundation for Individual Rights and Expression in Support of Appellee and Affirmance was filed with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit using the Court's CM/ECF system. The undersigned further certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: August 25, 2026

/s/ *Ronnie London*

Ronnie London
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

*Counsel for* Amicus Curiae