**No. 26-2238**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

**AMERICAN ACADEMY OF PEDIATRICS**,
*Plaintiff-Appellee*,

v.

**JAMES UTHEMEIER, ATTORNEY GENERAL OF THE STATE OF FLORIDA**, in his official capacity,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Illinois, Case No. 26-cv-2401

# APPELLANT'S REPLY BRIEF

JAMES UTHMEIER
*Attorney General*

RYAN D. NEWMAN
*Chief Deputy Attorney General*

JASON HILBORN
*Deputy Attorney General*
*Civil Division*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
david.dewhirst@myfloridalegal.com

DAVID M.S. DEWHIRST
*Solicitor General*

JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*

SAMUEL F. ELLIOTT
*Deputy Solicitor General*

VINCENT LI
*Deputy Solicitor General*

*Counsel for Florida Attorney General James Uthmeier*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i
TABLE OF AUTHORITIES ..... ii
INTRODUCTION ..... 1
ARGUMENT ..... 3
I. *Younger* Demands Abstention. ..... 4
A. The multiple prosecutions rule is consistent with *Younger*'s doctrinal framework; *Wilson* is not. ..... 5
B. Even under a "mosaic" regime, the district court's inference of bad faith is untenable. ..... 9
II. The District Court Lacks Personal Jurisdiction. ..... 14
III. Venue Is Improper. ..... 17
CONCLUSION ..... 18
CERTIFICATE OF COMPLIANCE ..... 19
CERTIFICATE OF SERVICE ..... 20

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Lab'ys v. Mead Johnson & Co.*,
971 F.2d 6 (7th Cir. 1992) ... 3

*Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*,
751 F.3d 796 (7th Cir. 2014) ... 15

*Ariel Invs., LLC v. Ariel Cap. Advisors LLC*,
881 F.3d 520, 523 (7th Cir. 2018) ... 16

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
571 U.S. 49 (2013) ... 17

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021) ... 3

*Cauley v. Wilson*,
754 F.2d 769 (7th Cir. 1985) ... 2

*Doe v. Lee*,
No. 3:21-CV-00809, 2022 WL 1164228 (M.D. Tenn. Apr. 19, 2022) ... 7

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) ... 4, 6

*Frost v. Nessel*,
712 F. Supp. 3d 1008 (W.D. Mich. 2024) ... 7

*Huffman v. Pursue, Ltd.*,
420 U.S. 592 (1975) ... 6, 8, 9

*John Crane, Inc. v. Shein Law Ctr., Ltd.*,
891 F.3d 692 (7th Cir. 2018) ... 15

*Joseph v. Liberty Nat. Bank*,
873 So. 2d 384 (Fla. 5th DCA 2004) ... 13

*Ken–N.K., Inc. v. Vernon Twp.*,
18 F. App'x 319 (6th Cir. 2001) ... 7

*Lloyd v. Doherty*,
No. 18-3552, 2018 WL 6584288 (6th Cir. Nov. 27, 2018) ... 4, 7

*Marlow v. Winston & Strawn*,
19 F.3d 300 (7th Cir. 1994) ... 2

*Metcalf Gifts, L.L.C. v. City of Overland Park*,
No. 94-1297-JWL, 1994 WL 608604 (D. Kan. Oct. 6, 1994) .................................... 7

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982) .................................................................................. 6

*Perez v. Ledesma*,
401 U.S. 82 (1971) .............................................................................. 4, 10

*Rainey v. Perkins Twp. Bd. of Trs.*,
No. 3:22-CV-42, 2024 WL 3361771 (N.D. Ohio July 10, 2024) ............................... 7

*Safe Haven Sober Houses, LLC v. City of Bos.*,
517 F. Supp. 2d 557 (D. Mass. 2007) .......................................................... 7

*Smith v. Hightower*,
693 F.2d 359 (5th Cir. 1982) ........................................................................ 9

*Starr v. Fed. Aviation Admin.*,
589 F.2d 307 (7th Cir. 1978) ...................................................................... 14

*Startzell v. City of Philadelphia*,
No. CIV.A. 04-5547, 2004 WL 2884210 (E.D. Pa. Dec. 10, 2004) ........................... 8

*Steffel v. Thompson*,
415 U.S. 452 (1974) .................................................................................. 6

*Tindall v. Wayne Cnty. Friend of Ct.*,
269 F.3d 533 (6th Cir. 2001) ........................................................................ 7

*Trainor v. Hernandez*,
431 U.S. 434 (1977) ........................................................................... 6, 8, 9

*Vance v. Indian Hammock Hunt & Riding Club, Ltd.*,
403 So. 2d 1367 (Fla. 4th DCA 1981) .......................................................... 13

*Vericker v. Powell*,
406 So. 3d 939 (Fla. 2025) ......................................................................... 11

*Walden v. Fiore*,
571 U.S. 277 (2014) .................................................................................. 15

*Wilson v. Thompson*,
593 F.2d 1375 (5th Cir. 1979) .................................................................. 4, 8

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ...................................................................................... 3

*Younger v. Harris*,
401 U.S. 37 (1971) ........................................................................ 5, 6, 8, 9

**Statutes**

28 U.S.C. § 1391(b)(2) .......... 17

Fla. Stat. § 768.295 .......... 11

Fla. Stat. § 895.03 .......... 16

Fla. Stat. § 895.05 .......... 16

**Treatises**

Erwin Chemerinsky, Federal Jurisdiction § 13.4 (6th ed. 2012). .......... 7

**INTRODUCTION**

Plaintiff-Appellee American Academy of Pediatrics (AAP) violated Florida law by rigging its standards-setting process and disseminating knowingly false representations about the provision of "gender-affirming care" to minors. *See* App. 75, 229.[1] Instead of defending its actions in Florida state court, AAP fled to the Northern District of Illinois, where it obtained an injunction preventing the Attorney General from continuing to pursue his enforcement action against AAP ("the Enforcement Action"). App. 417, 485.

The district court's ruling was wrong from the day it was issued given the three "insurmountable jurisdictional barriers" undermining AAP's requested relief. *See* CA7-ECF No. 20 at 30 (Scudder, J., dissenting). First, *Younger* abstention exists to prevent precisely what the district court did here—hijacking an ongoing state court proceeding. Second, the district court never had personal jurisdiction over Florida's Attorney General. And third, under the best reading of 28 U.S.C. § 1391(b)(2), the Northern District of Illinois is an improper venue. *See* CA7-ECF No. 47 ("Init. Br.") at 12–37.

Intervening events have further undermined AAP's already indefensible claims. The district court's invocation of *Younger*'s bad faith exception rested on the cursory conclusion that the Enforcement Action is "*objectively weak*" and

[1] Citations to "App." refer to the separate appendix submitted with the Attorney General's initial brief. Citations to "Reply App." refer to the appendix attached to this reply brief.

"fail[ed] to plead facts that are necessary for [its] claims to succeed." CA7-ECF No. 58 ("Ans. Br.") at 15 (emphasis added); App. 469–70, 472.

The Florida state court has now proven that incorrect. On August 21, 2026, the Florida state court issued an order denying AAP's motion to dismiss under Florida's anti-SLAPP statute. Whereas the district court here declined to abstain under *Younger* based on its view that AAP's advocacy for gender-affirming care lacked a "financial motive," App. 458, the Florida state court correctly recognized an obvious "economic motivation . . . for [AAP's] alleged false and misleading representations: to enrich [its] members by inducing demand for gender-affirming care." Order Denying Motion for Dismissal Pursuant to Fla. Stat. § 768.295, *Off. of the Att'y Gen. v. World Prof. Ass'n for Transgender Health et al.*, No. 2025-CA-002660, DIN No. 104 at 15 (Fla. 19th Jud. Cir. Ct. Aug. 21, 2026) (attached as Exhibit 1 of the Reply Appendix). The Florida state court held that, accepting the facts alleged by the Amended Complaint as true, the Enforcement Action targets unprotected conduct and false and misleading commercial speech. *Id.* at 10–15.

The problems with the district court's order only continue to grow. Even now, the district court seeks—after this Court and the Florida state court checked its novel views—to sweep this matter under the rug.[2] But this issue warrants clarification

---

[2] On August 24, 2024, the federal district court granted dismissal without prejudice, ignoring this Court's "general rule" that it is appropriate to condition voluntary dismissal on plaintiff's payment of defendant's attorney's fees for work product that cannot be used in subsequent litigation. NDIL-ECF No. 65; *Marlow v. Winston & Strawn*, 19 F.3d 300, 306 (7th Cir. 1994); *see also Cauley v. Wilson*, 754 F.2d 769, 772 (7th Cir. 1985) ("The purpose of awarding attorneys' fees on a voluntary dismissal

from this circuit. The district court's injunction was inexcusably wrong, and it will happen again unless this Court definitively puts a stop to it. Federalism isn't some academic abstraction. It is a weight-bearing pillar in our constitutional order. *Younger* abstention recognizes federalism's importance, and safeguards it by imposing a disciplined restraint on federal courts—a restraint this Court has historically exercised. This Court should proceed to a decision and, for the reasons outlined in the initial brief and below, vacate the preliminary injunction order.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must demonstrate some likelihood of succeeding on the merits. *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). "If the moving party cannot establish . . . th[is] prerequisite[], a court's inquiry is over and the injunction must be denied." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). AAP has no likelihood of succeeding on the merits due to three "insurmountable jurisdictional barriers": the *Younger* abstention doctrine, lack of personal jurisdiction, and improper venue. CA7-ECF No. 20 at 30 (Scudder, J., dissenting). AAP's answer brief offers no solutions to these procedural problems.

without prejudice is to compensate the defendant for the unnecessary expense that the litigation has caused."). The district court *sua sponte* asked this Court to remand the case, NDIL-ECF No. 65, and AAP immediately moved to dismiss this appeal as moot. CA7-ECF No. 64. The Attorney General opposes those requests. Given this Court's order, *see* CA7-ECF No. 65, he will soon file a response in opposition to AAP's motion to dismiss.

## I. *Younger* Demands Abstention.

The *Younger* abstention doctrine prohibits federal courts from enjoining criminal prosecutions and analogous civil enforcement actions pending in state court. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). Under *Younger*'s bad-faith exception, a federal court may enjoin a state prosecution brought "without hope of obtaining a valid conviction." *Perez v. Ledesma*, 401 U.S. 82, 85 (1971). The Supreme Court has applied the exception just once, in a case involving successive prosecution in the face of state-court failure. *Dombrowski v. Pfister*, 380 U.S. 479, 488 (1965).

Courts and scholars therefore conclude that the bad-faith exception is confined "one specific set of facts: where state officials initiate repeated prosecutions to harass an individual or deter his conduct." *Lloyd v. Doherty*, No. 18-3552, 2018 WL 6584288, at *4 (6th Cir. Nov. 27, 2018). Seventh Circuit precedent is consistent with this "multiple prosecutions rule." This Court has consistently interpreted the bad-faith exception through the lens of *Dombrowski*. Indeed, this Court has *never* applied the exception. And though some courts, beginning with the Fifth Circuit's decision in *Wilson v. Thompson*, 593 F.2d 1375, 1381 (5th Cir. 1979), have rejected the multiple prosecutions rule, this Court hasn't. And for good reason: *Wilson* and its progeny are irreconcilable with *Younger*'s commentary on comity and equity—the doctrinal pillars of the *Younger* abstention doctrine.

But even if this Court were to change course and utilize a "mosaic" approach to the bad-faith exception, the Attorney General would still win. The district court's analysis turns on the idea that the Enforcement Action's claims are objectively

meritless because AAP has no commercial motive to mislead consumers about gender-affirming care. But as the state court recently held, the Amended Complaint pleads an obvious commercial motive for AAP's false and misleading statements: to enrich its members who prescribe or perform gender-affirming interventions for minors. Reply App. 13–15. Moreover, the suggestion that the Attorney General has presented a distorted depiction of AAP's guidelines and statements is, itself, premised on a distorted depiction of the Attorney General's Amended Complaint. Whatever test this Court chooses to apply, the facts here do not support a finding of bad faith.

### A. The multiple prosecutions rule is consistent with *Younger*'s doctrinal framework; *Wilson* is not.

AAP suggests that the Attorney General invented the multiple prosecutions rule from whole cloth. Ans. Br. 23 (suggesting that the Attorney General has "extrapolate[ed] a general prospective rule from the specific facts of a particular case"). He didn't.

*Younger* abstention rests on two doctrinal pillars: comity and equity. *Younger v. Harris*, 401 U.S. 37, 43–44 (1971). *Younger* described comity as "a proper respect for state functions" and "a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44. The Court later elaborated that "to restrain a state proceeding that afforded an adequate vehicle for vindicating the federal plaintiff's constitutional rights 'would entail an unseemly failure to give effect to the principle that state courts have the solemn responsibility equally with the federal courts' to safeguard constitutional rights" and would "'reflec(t) negatively upon the

state court's ability' to do so." *Trainor v. Hernandez*, 431 U.S. 434, 442–43 (1977) (quoting *Steffel v. Thompson*, 415 U.S. 452, 460–62 (1974)). *Younger* abstention therefore promotes comity by allowing a State to not only "effectuat[e] its substantive policies, but also" to "continu[e] to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies." *Id.* (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)); *see also Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) ("Minimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights." (emphasis removed)).

As for equity, a showing of irreparable injury is "the traditional prerequisite to obtaining an injunction." *Younger*, 401 U.S. at 46. But "[c]ertain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Id.* "Instead, the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.*

The *Dombrowski* exception fits cleanly within this doctrinal framework. There, a Louisiana prosecutor initiated prosecutions that had already been rejected by Louisiana courts. *Dombrowski*, 380 U.S. at 488. Under those peculiar circumstances, federal-court abstention would not have promoted comity or equity. Abstention would not have promoted comity because the Louisiana courts had already resolved the parties' claims and defenses. Abstention would not have promoted equity,

either: because the prosecutor wasn't abiding by the state courts' rulings, continued defense in state court would not have redressed the defendant's injury.

Sixty-one years later, *Dombrowski* remains the Supreme Court's sole application of the bad-faith exception. Erwin Chemerinsky's treatise on federal jurisdiction therefore concludes that "the bad-faith prosecutions exception appears limited to facts such as those present in *Dombrowski*: repeated prosecutions initiated by state officials solely for the purpose of harassment." Erwin Chemerinsky, Federal Jurisdiction § 13.4 (6th ed. 2012).

The multiple prosecutions rule is the law in the Sixth Circuit. *See Ken–N.K., Inc. v. Vernon Twp.*, 18 F. App'x 319, 324 n.2 (6th Cir. 2001); *Tindall v. Wayne Cnty. Friend of Ct.*, 269 F.3d 533, 540 (6th Cir. 2001) (bad faith exception does not apply "[w]here there exists the possibility of raising and correcting constitutional claims in state courts"); *Lloyd*, 2018 WL 6584288, at *4; *Rainey v. Perkins Twp. Bd. of Trs.*, No. 3:22-CV-42, 2024 WL 3361771, at *2 (N.D. Ohio July 10, 2024); *Doe v. Lee*, No. 3:21-CV-00809, 2022 WL 1164228, at *8 (M.D. Tenn. Apr. 19, 2022); *Frost v. Nessel*, 712 F. Supp. 3d 1008, 1016 (W.D. Mich. 2024). District courts outside the Sixth Circuit also apply the multiple prosecutions rule. *See, e.g., Safe Haven Sober Houses, LLC v. City of Bos.*, 517 F. Supp. 2d 557, 563 (D. Mass. 2007); *Metcalf Gifts, L.L.C. v. City of Overland Park*, No. 94-1297-JWL, 1994 WL 608604, at *5 (D. Kan. Oct. 6, 1994); *Startzell v. City of Philadelphia*, No. CIV.A. 04-5547, 2004 WL 2884210, at *3 (E.D. Pa. Dec. 10, 2004) ("A finding of bad faith requires more than just a single arrest or incident.").

It is true that the Fifth Circuit rejected the multiple prosecutions rule in *Wilson*. 593 F.2d at 1381. But *Wilson* is irreconcilable with *Younger*'s doctrinal framework. *Wilson* determined that *Younger*'s comity principle was "inapplicable" because a State "does not have any legitimate interest in pursuing a bad faith prosecution brought to retaliate for or to deter the exercise of constitutionally protected rights." *Id.* at 1383. But *Younger* abstention exists so that a State may not only "effectuat[e] its substantive policies, but also . . . perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies." *Trainor*, 431 U.S. at 443 (quoting *Huffman*, 420 U.S. at 604). *Wilson* completely ignores the latter interest: states' prerogative to adjudicate federal constitutional defenses in state court proceedings. *Id.*

*Wilson* also flunks *Younger*'s equity principle. In response to the unequivocal holding that "having to defend against a single criminal prosecution" is not irreparable harm, *Younger*, 401 U.S. at 46, *Wilson* creates an ad hoc carve out: retaliatory prosecution under a constitutional law causes irreparable harm; nonretaliatory prosecution under an unconstitutional law does not. *Wilson*, 593 F.2d at 1382–83. That is a distinction without a legally significant difference. Whether a defendant's exercise of constitutional rights is chilled by an unconstitutional law or by a retaliatory prosecution, the injury is the same. State courts are no less capable of remedying harm caused by unconstitutional prosecutions than harm caused by unconstitutional laws.

In short, the multiple prosecutions rule is consistent with *Younger*'s analysis of comity and equity. *Wilson* is not. Indeed, the Fifth Circuit has walked *Wilson* back based on its "concern[]" that the decision was causing district courts to "allow the bad faith or retaliatory prosecution exception to the *Younger* doctrine to swallow the rule of that case." *Smith v. Hightower*, 693 F.2d 359, 375 (5th Cir. 1982).

Here, abstention would advance both policies behind *Younger* abstention. Abstention would promote comity by allowing Florida to not only "effectuat[e] its substantive policies" but also "perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies." *Trainor*, 431 U.S. at 443 (quoting *Huffman*, 420 U.S. at 604). Abstention would also honor "basic doctrine of equity jurisprudence" because AAP has an adequate remedy at law: raising its constitutional defenses in state court. *Younger*, 401 U.S. at 43. On the other hand, the district court's injunction "licenses federal intrusion and casts a vote of no confidence in the Florida judiciary," CA7-ECF No. 20 at 27 (Scudder, J., dissenting), and flouts *Younger*'s plain-as-day holding that "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Younger*, 401 U.S. at 46. The multiple prosecutions rule, not AAP's alternative, accords with *Younger* and this Court's applications of *Younger*.

### B. Even under a "mosaic" regime, the district court's inference of bad faith is untenable.

AAP urges this Court to reject the multiple prosecutions rule in favor of an amorphous "mosaic" approach, to use the district court's euphemism. Doing so,

however, ignores the important constitutional considerations addressed above and would inevitably raise line-drawing problems concerning what qualifies as evidence of bad faith and how much weight various types of evidence should be afforded.

But even under an open-ended "mosaic" approach, AAP's "evidence" is woefully insufficient to support an inference of bad faith. According to the district court, the Enforcement Action is so objectively meritless that the Attorney General must *subjectively* believe that the action lacks any hope of success.[3] That determination turned primarily on the district court's conclusion that "[a]ll of the state claims require AAP's support of gender-affirming care to be somehow commercial in nature," but AAP's advocacy lacked "any financial motivate" because "AAP is a non-profit, and it does not sell any forms of gender-affirming care." App. 456, 458. Far from "carefully reasoned," Ans. Br. 11, the district court's analysis of the Enforcement Action's state-law claims failed to cite a single state-court decision.

The Florida state court, on the other hand, recently issued an opinion rejecting AAP's no-commercial-motive argument, complete with citations to Florida law and caselaw. After this Court stayed the preliminary injunction, AAP moved to dismiss the Enforcement Action under Florida's anti-SLAPP statute. AAP Mot., *Off. of the Att'y Gen. v. World Prof. Ass'n for Transgender Health et al.*, No. 2025-CA-002660, DIN No. 97 (Fla. 19th Jud. Cir. Ct. July 28, 2026) ("Anti-SLAPP Mot."). To prevail,

---

[3] The district court also pointed to the Attorney General's criticism of gender-affirming care and his decision to amend the complaint prior to service as evidence of bad faith. App. 468–73. Neither the criticism nor the post-amendment service in any way suggests that the Attorney General subjectively believes that the Enforcement Action is utterly "without hope" of success. *Perez*, 401 U.S. at 85; Init. Br. 30–33.

AAP needed to show that the Enforcement Action "is 'without merit' and brought 'primarily because' [AAP] exercised protected speech or conduct." *Vericker v. Powell*, 406 So. 3d 939, 945 (Fla. 2025) (quoting Fla. Stat. § 768.295(3)). To that end, AAP argued that "[b]ecause [it] neither sells gender-affirming care nor derives transaction-based revenue from the content of the Policy Statement," it lacked an "economic motivation to mislead consumers." Anti-SLAPP Mot. 8–9.

On August 21, 2026, the Florida state court dismissed AAP's anti-SLAPP motion. The Florida state court found that the "panel stacking" and other biased standards-setting procedures targeted by the Attorney General's antitrust claim are unprotected commercial conduct, not protected speech. Reply App. 2. Regarding the FDUTPA and Florida RICO Act claims, the Florida state court observed that "the Attorney General alleges that Defendants [AAP, WPATH, and Endocrine Society] have a commercial incentive to mislead consumers about gender-affirming care" because "[their] members—including many individuals who authored the Guidelines—are in the business of prescribing or performing gender-affirming care." Reply App. 13–14. Taking that allegation as true for purposes of the motion to dismiss, the Court found that "the alleged false and misleading representations that form the linchpin of the Attorney General's FDUTPA and civil RICO claims bear the hallmarks of commercial speech." Reply App. 14. In particular, "an economic motivation exists for the alleged false and misleading representations: to enrich Defendants' members by inducing demand for gender-affirming care." Reply App. 15.

AAP's answer brief also continues to accuse the Attorney General of presenting a "distorted" depiction of its representations about gender-affirming care for minors. Ans. Br. 27, 37, 41, 45. But distortion is AAP's department. For instance, AAP continues to falsely claim that the Amended Complaint "asserts that AAP in its 2018 Policy Statement represented that puberty blockers are 'fully reversible.' AA.265 ¶113." *Id.* at 38. As detailed in the initial brief, the Amended Complaint includes no such allegation. Init. Br. 25–26.[4] The paragraph of the Amended Complaint cited by the answer brief, ¶113, states:

> 113. Disinterested systematic reviews—the gold standard in evidence-based medicine—have determined that there is no credible evidence that puberty blockers are "fully reversible" or that sex interventions lead to positive mental health outcomes for children or adolescents. Thus, guidelines containing these representations cannot be accurately characterized as "evidence-based."

Neither that paragraph nor any other in the Amended Complaint alleges that AAP's 2018 Policy Statement contains the phrase "fully reversible." The Attorney General concedes nothing. *Contra* Ans. Br. 38. Rather, it is AAP that now concedes that it *does* describe puberty blockers as "fully reversible" in other publications, *see* Ans. Br. 33, contrary to the district court's broad finding that "AAP does not represent that puberty blockers are fully reversible." App. 464.[5]

---

[4] Contrary to AAP's assertion that the Attorney General is "adhering to his counter-factual account of AAP's speech without ever acknowledging or explaining his repeated inaccuracies," Ans. Br. 8 n.3, the initial brief devotes an entire subsection to dispelling AAP's and the district court's mischaracterizations of the Amended Complaint. Init. Br. 25–30.

[5] AAP points out that these publications are not identified by the Amended complaint. Ans. Br. 30. But the Amended Complaint alleges that AAP made the

AAP also apparently concedes that its Policy Statement includes minimum "stages of development" for breast and genital surgeries, not minimum ages, Ans. Br. 38—exactly as alleged by the original complaint. App. 34. And while AAP maintains that it opposed the minimum ages proposed by WPATH's original Standards of Care Version 8 (SOC-8) because it thought such minimums were too permissive, Ans. Br. 39, the Amended Complaint alleges the opposite. App. 289–90. AAP's assertion that the district court did not resolve that disputed fact in AAP's favor is astonishing. Ans. Br. 40–41; *see also* App. 461–64.

The Amended Complaint's characterization of AAP's statements about gender-affirming care isn't "dishonest"; it is AAP's characterization of the Amended Complaint that bends the truth. AAP lied its way into an Enforcement Action; this Court should not allow AAP to lie its way out.

* * *

In sum, the district court's bad-faith determination is premised on (1) an erroneous interpretation of Florida law that has been dispelled by a Florida court; (2) the clearly erroneous factual findings that the Amended Complaint alleges that

---

deceptive reversibility claim "through many mediums, including [its] websites, publications, and public statements, and through [its] members." App. 318. AAP further criticizes the Attorney General for failing "to plead with particularity his misrepresentation claims, which sound in fraud." Ans. Br. 30. That heightened pleading standard applies only when a plaintiff seeks damages. *See State v. Am. Tobacco Co.*, 1996 WL 788371, at *1 (Fla. 15th Cir. Ct. Dec. 13, 1996); *Joseph v. Liberty Nat. Bank*, 873 So. 2d 384, 388 (Fla. 5th DCA 2004); *Vance v. Indian Hammock Hunt & Riding Club, Ltd.*, 403 So. 2d 1367, 1370 (Fla. 4th DCA 1981). The Enforcement Action seeks statutory penalties and injunctive relief, not damages. Therefore, the heightened pleading standard for general fraud claims does not apply.

the Policy Statement describes puberty blockers as "fully reversible," that AAP does not describe puberty blockers as "fully reversible" in other publications, that the Policy Statement and systematic reviews largely overlap with respect to puberty blockers, and that the Policy Statement includes minimum ages for breast and genital surgeries; and (3) an improper factual finding about why AAP opposed the age minimums in the original SOC-8.

District courts are to presume good faith on the part of government officials acting in their official capacity. *Starr v. Fed. Aviation Admin.*, 589 F.2d 307, 315 (7th Cir. 1978). Overcoming that presumption requires "well-nigh irrefragable proof." *Id.* Here, however, the district court drew every imaginable inference against the Attorney General. Even then, the "mosaic" cobbled together by AAP and the district court looks nothing like a subjective belief that the Enforcement Action is utterly without merit—especially in light of the Attorney General's recent victory in state court.

## II. The District Court Lacks Personal Jurisdiction.

The Attorney General did not create sufficient "minimum contacts" with Illinois for him to be subject to specific personal jurisdiction there. AAP can only point to two potential contacts that the Attorney General has with Illinois: (1) that the Attorney General served AAP with the Amended Complaint in Illinois, and (2) that AAP allegedly felt the effects of the Attorney General's Florida enforcement in Illinois. The first is insufficient because of well-reasoned Seventh Circuit precedent recognizing that service of pleadings, discovery, and other litigation communications in Illinois that are "incidental to litigation proceeding [elsewhere]," are not

minimum contacts. *John Crane, Inc. v. Shein Law Ctr., Ltd.,* 891 F.3d 692, 696 (7th Cir. 2018). The second is insufficient because of blackletter law that the minimum contacts analysis turns on contacts that the Attorney General "himself creates with the forum" *not* the contacts that AAP has with the forum. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800–01 (7th Cir. 2014).

AAP's invitation to "look no further than . . . *Calder*," Ans. Br. 46, is convenient given that the Supreme Court limited *Calder* to its facts in *Walden v. Fiore*, 571 U.S. 277 (2014). *Walden* explained that *Calder*'s effects test was "largely a function of the nature of the libel tort," which "actually occur[s]" where the libel is published. 571 U.S. 287–88. *Walden* clarified that outside the unique context of libel, a defendant's knowledge of a plaintiff's "strong forum connections," and the plaintiff's actual suffering of "foreseeable harm" in a forum does not make sufficient minimum contacts. *Id.* at 289. So AAP's claim that "fe[eling] harm in Illinois," Ans. Br. 49, is sufficient for personal jurisdiction would "impermissibly allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Walden*, 571 U.S. at 289.[6] To accept AAP's characterization of *Calder* and *Walden* would allow *Calder* to swallow *Walden*, when *Walden*, in fact, cabins *Calder*.

AAP's fallback is that "this case involves what was missing in *Ariel Investments* and *Walden*" because the Attorney General "seeks through his enforcement

[6] AAP's reliance on *In re Sheehan* case is puzzling. *See* Ans. Br. 50. Citing *Walden*, *In re Sheehan* held that "the fact that the defendants could have foreseen that their conduct would effect [the plaintiff] in Illinois was insufficient to establish personal jurisdiction." 48 F.4th 513, 525 (7th Cir. 2022).

action to cause specific and concrete harm in Illinois by seeking judicial relief to silence AAP and order the organization's dissolution." Ans. Br. 50–51. But that is just another way of saying that the Attorney General created minimum contacts with Illinois by causing harm felt in Illinois—the exact argument that *Ariel Investments* and *Walden* reject. *Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, 881 F.3d 520, 523 (7th Cir. 2018).

To be clear, the Attorney General isn't asking Florida courts to "order [AAP's] dissolution." Ans. Br. 51. That's another falsehood. Florida law authorizes Florida circuit courts to "[o]rder[] the dissolution or reorganization of any enterprise." Fla. Stat. § 895.05(1)(c). The Amended Complaint requests dissolution of an *enterprise*—namely, AAP, WPATH, and Endocrine Society's enterprise to promote gender-affirming care through "misleading advertising," as defined by Section 817.40(5), Florida Statutes. App. 325 (requesting the Court, "[p]ursuant to Section 895.05(1), [to] issue any additional injunctive relief it finds necessary, including . . . [o]rdering the dissolution or reorganization of Defendants' enterprise"). AAP is not itself the enterprise. Rather, it is a "person . . . associated with [the] enterprise." Fla. Stat. § 895.03(3); *see also* App. 320. Indeed, the Amended Complaint alleges that AAP "joined WPATH and Endocrine Society's . . . enterprise" by publishing the Policy Statement. App. 246. The assertion that the Enforcement Action seeks AAP's dissolution is another attempt to mislead this Court about the contents of the Amended Complaint.

The district court lacked personal jurisdiction over the Attorney General.

### III. Venue Is Improper.

AAP claims that venue is proper because its alleged injury in the Northern District of Illinois is a "substantial part of the events or omissions giving rise to [its] claim[s]," 28 U.S.C. § 1391(b)(2), but that is not correct. "[T]he purpose of statutorily specified venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63 n.7 (2013) (quoting *Leroy v. Great Western United Corp.*, 443 U.S. 173, 185 (1979)). But if the place of a plaintiff's injury is a proper venue under § 1391(b)(2), then the venue statute would ordinarily give *plaintiffs* a home-field advantage. *See Ford-Reyes v. Progressive Funeral Home*, 418 F. Supp. 3d 286, 291 (N.D. Ill. 2019) ("[I]t takes only a moment's thought to realize that if economic harm to a plaintiff were really enough to satisfy Section 1391([b])(2), nei-ther of the other alternatives – Section 1391([b])(1) and ([b])(3) – would ever have to be looked at, for a plaintiff could *always* bring suit at its home base on the premise that it has suffered harm there." (quoting *Financial Mgmt. Servs., Inc. v. Coburn Supply Co.*, 2003 WL 255232, at *2 (N.D. Ill. 2003)).[7] Stretching § 1391(b)(2) to cover the district where the plaintiff experienced injury, as AAP proposes, would contravene Congress's unmistakable purpose in enacting the venue statute.

---

[7] Rather than grappling with the logic of these decisions, AAP merely attempts to distinguish them on the basis that they involved economic harm instead of chilled speech. Ans. Br. 56.

## CONCLUSION

Due to the *Younger* abstention doctrine, lack of personal jurisdiction, and improper venue, AAP cannot demonstrate any likelihood of succeeding on the merits. This Court should issue a decision that addresses the district court's pernicious errors and vacates the preliminary injunction order.

August 26, 2026

Respectfully submitted,

/s/ David M.S. Dewhirst

JAMES UTHMEIER
*Attorney General*

RYAN D. NEWMAN
*Chief Deputy Attorney General*

JASON HILBORN
*Deputy Attorney General for Civil Division*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
david.dewhirst@myfloridalegal.com

DAVID M.S. DEWHIRST
*Solicitor General*

JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*

SAMUEL F. ELLIOTT
*Deputy Solicitor General*

VINCENT LI
*Deputy Solicitor General*

*Counsel for Attorney General James Uthmeier*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 4,671 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and Seventh Circuit Rule 32(b)-(c) because it was prepared using 12-point, proportionally spaced Century Schoolbook typeface.

/s/ David M.S. Dewhirst
Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished by electronic service through the CM/ECF Portal on August 26, 2026, to all counsel of record.

/s/ David M.S. Dewhirst
Solicitor General

**No. 26-2238**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

**AMERICAN ACADEMY OF PEDIATRICS**,
*Plaintiff-Appellee*,

v.

**JAMES UTHEMEIER, ATTORNEY GENERAL OF THE STATE OF FLORIDA**, in his official capacity,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Illinois, Case No. 26-cv-2401

# APPENDIX TO APPELLANT'S REPLY BRIEF

JAMES UTHMEIER
*Attorney General*

RYAN D. NEWMAN
*Chief Deputy Attorney General*

JASON HILBORN
*Deputy Attorney General*
*Civil Division*

OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
david.dewhirst@myfloridalegal.com

DAVID M.S. DEWHIRST
*Solicitor General*

JASON J. MUEHLHOFF
*Chief Deputy Solicitor General*

SAMUEL F. ELLIOTT
*Deputy Solicitor General*

VINCENT LI
*Deputy Solicitor General*

*Counsel for Florida Attorney General James Uthmeier*

**Index**

**Page #**

Order Denying Motion for Dismissal Pursuant to Fla. Stat. § 768.295, *Off. of the Att'y Gen. v. World Prof. Ass'n for Transgender Health et al.*, No. 2025-CA-002660, DIN No. 104 (Fla. 19th Jud. Cir. Ct. Aug. 21, 2026) (Exhibit 1) .......................................... 1

# Exhibit 1

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**IN AND FOR ST. LUCIE COUNTY, FLORIDA**

**CASE NO:** 56-2025-CA-2660

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA, DEPARTMENT OF
LEGAL AFFAIRS

Plaintiff,

v.

WORLD PROFESSIONAL ASSOCIATION
FOR TRANSGENDER HEALTH, INC., THE
ENDOCRINE SOCIETY, and AMERICAN
ACADEMY OF PEDIATRICS,

Defendants.
_____________________________________/

**ORDER DENYING MOTION FOR DISMISSAL PURSUANT TO FLA. STAT. § 768.295 FILED BY DEFENDANTS WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, INC. AND THE ENDOCRINE SOCIETY, AND MOTION FOR DISMISSAL PURSUANT TO FLA. STAT. § 768.295 FILED BY DEFENDANT AMERICAN ACADEMY OF PEDIATRICS**

**THIS CAUSE** came before the Court for a hearing on August 4, 2026, on the Motion for Dismissal Pursuant to Fla. Stat. § 768.295 filed by Defendants World Professional Association for Transgender Health, Inc. and The Endocrine Society, and Motion for Dismissal Pursuant to Fla. Stat. § 768.295 filed by Defendant American Academy of Pediatrics. The Court, having reviewed the record, considered the arguments of counsel, and being otherwise duly advised in the premises, hereby orders as follows:

## PROCEDURAL BACKGROUND

On December 9, 2025, the Office of the Attorney General, State of Florida, Department of Legal Affairs ("Attorney General") filed a two-count Complaint against the World Professional Association for Transgender Health, Inc. ("WPATH"), The Endocrine Society

("Endocrine Society"), and the American Academy of Pediatrics ("AAP") (collectively "Defendants"), asserting causes of action for: Count One – violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); and Count Two – violations of the Florida RICO Act.

On March 4, 2026, AAP sued the Attorney General in the Northern District of Illinois. AAP alleged that the Attorney General brought the instant action for the express purpose of retaliating against its protected speech, in violation of the First Amendment.

On March 16, 2026, the Attorney General filed a three-count Amended Complaint against WPATH, Endocrine Society, and AAP, asserting causes of action for: Count One – violations of the Florida Antitrust Act; Count Two – violations of FDUTPA; and Count Three – violations of the Florida RICO Act.

In summary, the Attorney General alleges that Defendants initiated a coordinated campaign to develop "clinical guidelines" recommending sex interventions for pediatric gender dysphoria to "convince patients, parents, insurance companies, and judges" that there is "credible evidence that sex interventions alleviate pediatric gender dysphoria." Am. Compl. at ¶¶ 1-10. The Attorney General further alleges that gender-affirming drugs and surgeries are extremely profitable for Defendants and their members. *Id.* at ¶¶ 6-7. The Attorney General contends Defendants violated Florida law in three ways.

First, the Attorney General claims Defendants contracted, combined, and conspired in restraint of trade or commerce, in violation of the Florida Antitrust Act. *Id.* at ¶¶ 276-84; *see also* Fla. Stat. § 542.18 ("Every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful."). The Attorney General claims Defendants' guidelines were "the result of panel stacking, failure to manage conflicts of interest, and other procedural biases

designed to promote the sex interventions offered by Defendants' members and to ignore evidence supporting" contrary views. *Id*. at ¶ 280. The Attorney General alleges that Defendants "were actively involved in the creation of one another's guidelines and consistently cross-referenced" them to manufacture the illusion of an evidentiary consensus. *Id*. at ¶ 284. The relevant market, according to the Attorney General, "is the treatment of children and adolescents experiencing gender dysphoria in the United States[.]" *Id*. at ¶ 28.

Second, the Attorney General claims Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce, in violation of FDUTPA. *Id*. at ¶¶ 285-96; *see also* Fla. Stat. § 501.204(1) ("Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."). The Attorney General alleges that Defendants made "deceptive and misleading representations and omissions about the safety, reversibility, and efficacy of sex interventions in Florida and St. Lucie County in particular through many mediums, including their websites, publications and public statements, and through their members." *Id*. at ¶ 294. More specifically, the Attorney General alleges "Defendants continue to deceptively and misleadingly advertise that: (1) there is credible evidence that sex interventions mitigate gender dysphoria and suicidality, (2) puberty blockers are fully reversible, and (3) their guidelines are 'evidence-based' and methodologically sound." *Id*. According to the Attorney General, these deceptive and misleading representations are "likely to mislead a consumer acting reasonably in the circumstances to believe that sex intervention drugs are safer, more reversible, or more effective than they truly are, to their detriment." *Id*. at ¶ 295.

Third, the Attorney General claims Defendants "conducted and participated, and conspired to conduct and participate, in an enterprise through a pattern of racketeering activity,"

in violation of the Florida RICO Act. *Id*. at ¶¶ 299-313; *see also* Fla. Stat. § 895.03(3)-(4) ("It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt . . . [or] "to conspire or endeavor to [do so]."). The Attorney General alleges that "Defendants' claims regarding the methodical rigor of their clinical guidelines and the safety, reversibility, and efficacy of sex interventions are false and misleading." *Id*. at ¶ 309. The Attorney General contends that Defendants' false and misleading advertisements constitute racketeering activity, as it is a first-degree misdemeanor under Florida law to make or disseminate or cause to be made or disseminated before the general public any misleading advertisement. *Id*. at ¶ 304, 311.

By way of relief, the Attorney General seeks, among other things, a declaration from the Court that Defendants' speech and conduct as alleged in the Amended Complaint are unlawful, an injunction prohibiting "Defendants from continuing to publish false, deceptive, or misleading advertisements regarding the safety, reversibility, or efficacy of pediatric sex interventions," a civil penalty of $1,000,000 for each violation of Florida's Antitrust Act, a civil penalty of $1,000,000 against each Defendant for each violation of Florida's RICO Act, and a $10,000 statutory penalty for each FDUTPA violation. The Attorney General seeks "trial by jury on all issues so triable."

On May 6, 2026, WPATH, Endocrine Society, and AAP filed separate motions to dismiss the Amended Complaint, arguing that the Court lacks personal jurisdiction over them and that each count of the Amended Complaint fails as a matter of law.

Defendants' motions to dismiss based on lack of personal jurisdiction and failure to state a cause of action remain pending.

On June 8, 2026, the federal court in Illinois issued a preliminary injunction enjoining the Attorney General from pursuing the instant action. The Attorney General appealed the preliminary injunction and moved for a stay pending the Seventh Circuit's consideration of his appeal. The Seventh Circuit ultimately stayed enforcement of the preliminary injunction pending its resolution of the Attorney General's appeal. *See American Academy of Pediatrics v. Uthmeier*, 180 F.4th 1022 (7th Cir. 2026).

On June 24, 2026, WPATH and Endocrine Society filed a Motion for Dismissal Pursuant to Fla. Stat. § 768.295, in which they seek dismissal of the Amended Complaint pursuant to Florida Statute Section 768.295, which prohibits Strategic Lawsuits Against Public Participation ("SLAPP"). Specifically, Defendants contend the Attorney General brought this action primarily because they expressed constitutionally protected medical opinions about "gender-affirming care" for minors.

On July 28, 2026, AAP filed a Substantive Joinder and Motion for Dismissal Pursuant to Fla. Stat. § 768.295, in which it seeks the same relief WPATH and Endocrine Society seek in their Motion for Dismissal Pursuant to Fla. Stat. § 768.295.

**STANDARD OF REVIEW**

A motion to dismiss based on Section 768.295 is analyzed under the same standard as a motion to dismiss for failure to state a cause of action. *Lam v. Univision Commc'ns, Inc.,* 329 So. 3d 190, 193-98 (Fla. 3d DCA 2021).[1] "The trial court cannot go beyond the four corners of the

[1] The Court recognizes the Second District Court of Appeal has determined that Section 768.295 creates a burden shifting paradigm that requires a plaintiff to demonstrate his claims are not "primarily" based on First Amendment rights in connection with a public issue and not "without merit" after a defendant sets forth a prima facie case that Section 768.295 applies. *See Gundel v. AV Homes, Inc.,* 264 So. 3d 304, 314 (Fla. 2d DCA 2019) ("[A] motion to dismiss based on the Anti-SLAPP statute requires the trial court to do more than accept as true the factual allegations in the four corners of the complaint and draw all reasonable inferences therefrom in favor of the

complaint in deciding the merits of a motion to dismiss. When confronted with a motion to dismiss, the court is required to take the allegations of the complaint as true and to decide only questions of law." *Donovan v. Florida Peninsula Ins. Co.,* 147 So. 3d 566, 568 (Fla. 4th DCA 2014) (citation modified); *see also Zabriskie v. First Protective Ins. Co.,* 413 So. 3d 958, 959-60 (Fla. 5th DCA 2025) ("When evaluating the adequacy of the pleading of the complaint, an appellate court must take the factual allegations in the complaint as true and draw all reasonable inferences in favor of the pleader, limiting its gaze solely upon the complaint and its attachments.") (citation modified; emphasis added). Simply put, "[t]he purpose of a motion to dismiss is to test the legal sufficiency of [the] complaint, *not to determine factual issues*." *Rhiner v. Koyama,* 327 So. 3d 314, 316 (Fla. 4th DCA 2021) (citation modified; emphasis added).

Defendants bear the burden of establishing the Amended Complaint violates Section 768.295. *See, e.g., Vericker v. Powell,* 406 So. 3d 939, 945 (Fla. 2025) ("To prevail on an Anti-SLAPP claim, a defendant must show that the plaintiff's lawsuit is 'without merit' and brought 'primarily because' the defendant exercised protected speech or conduct.").

**ANALYSIS**

The Florida constitution designates the Attorney General as the State's "chief legal officer." Art. IV, § 4(b), Fla. Const. As the Florida Supreme Court noted long ago:

---

claimant. . . . Placing the initial burden on the SLAPP defendant to set forth a prima facie case that the Anti-SLAPP statute applies and then shifting the burden to the claimant to demonstrate that the claims are not 'primarily' based on First Amendment rights in connection with a public issue and not 'without merit' serves the purpose of the statute and conforms with the procedures employed in considering other statutorily-based motions to dismiss[.]"). The Court discerns nothing in the text of Section 768.295 that imposes a heightened burden on a plaintiff when responding to a motion to dismiss based on Section 768.295. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 93 (2012) ("Nothing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*). That is, a matter not covered is to be treated as not covered."). Accordingly, the Court will follow the Third District Court of Appeal's lead in *Lam*.

> The Attorney-General is the attorney and legal guardian of the people, or of the crown, according to the form of government. His duties pertain to the Executive Department of the State, and it is his duty to use means most effectual to the enforcement of the laws, and the protection of the people, whenever directed by the proper authority, or when occasion arises. . . . The office of the Attorney-General is a public trust. It is a legal presumption that he will do his duty, that he will act with strict impartiality. In this confidence he has been endowed with a large discretion, not only in cases like this, but in other matters of public concern.

*State v. Love,* 126 So. 374, 376 (Fla. 1930) (citation modified).

By way of the instant motion, Defendants invite the Court to prohibit the Attorney General from enforcing the statutory violations alleged in the Amended Complaint under the rubric of Section 768.295. The Court respectfully declines that invitation. Dismissal of the Amended Complaint is a weight Section 768.295 simply cannot bear.

Section 768.295 provides, in relevant part, as follows:

> A person or governmental entity in this state may not file or cause to be filed, through its employees or agents, any lawsuit, cause of action, claim, cross-claim, or counterclaim against another person or entity *without merit and primarily because such person or entity has exercised the constitutional right of free speech in connection with a public issue*, or right to peacefully assemble, to instruct representatives of government, or to petition for redress of grievances before the various governmental entities of this state, as protected by the First Amendment to the United States Constitution and s. 5, Art. I of the State Constitution.

Fla. Stat. § 768.295(3) (emphasis added).[2]

"Section 768.295 was enacted to protect participation in matters of public concern and to provide an expeditious remedy, including mandatory attorney's fees, when a party is subjected to retaliatory litigation." *Klayman v. Portfolio Media, Inc.,* 2026 WL 1238507, at *3 (Fla. 4th DCA May 6, 2026).

---

[2] Protections afforded to "freedom of expression" under the Florida Constitution are "the same" as under the First Amendment to the United States Constitution. *Dep't of Educ. v. Lewis,* 416 So. 2d 455, 461 (Fla. 1982).

Section 768.295 further provides that:

> A person or entity sued by a governmental entity or another person in violation of this section has a right to an expeditious resolution of a claim that the suit is in violation of this section. *A person or entity may move the court for an order dismissing the action or granting final judgment in favor of that person or entity. The person or entity may file a motion for summary judgment, together with supplemental affidavits, seeking a determination that the claimant's or governmental entity's lawsuit has been brought in violation of this section*. The claimant or governmental entity shall thereafter file a response and any supplemental affidavits. As soon as practicable, the court shall set a hearing on the motion, which shall be held at the earliest possible time after the filing of the claimant's or governmental entity's response. . . . The court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section.

Fla. Stat. § 768.295(4) (emphasis added).[3]

Section 768.295 defines "[f]ree speech in connection with public issues" as "any written or oral statement that is *protected under applicable law* and is made before a governmental entity in connection with an issue under consideration or review by a governmental entity, or is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a) (emphasis added). "'Governmental entity' or 'government entity' means the state, including the executive, legislative, and the judicial branches of government and the independent establishments of the state, counties, municipalities, corporations primarily acting as instrumentalities of the state, counties, or municipalities, districts, authorities, boards, commissions, or any agencies thereof." Fla. Stat. § 768.295(2)(b).

A claim is without merit under Section 768.295(3) if it fails to state a viable cause of action under Florida law. *See, e.g., Bongino v. Daily Beast Co.,* LLC, 477 F. Supp. 3d 1310,

---

[3] Defendants seek an order from the Court dismissing this action. Section 768.295 also permits a defendant to file a motion for summary final judgment, together with supplemental affidavits, seeking a determination that a lawsuit has been brought in violation of this Section 768.295.

1323 (S.D. Fla. 2020) ("Section 768.295 does not require the plaintiff to establish a probability that he will prevail on the claim asserted in the complaint. Nor does Florida's statute contemplate a substantive, evidentiary determination of the plaintiff's probability of prevailing on his claim. At bottom, Florida's statute is a garden variety fee shifting provision, which the Florida legislature enacted to accomplish a fundamental state policy—deterring SLAPP suits.") (citation modified).

Without question, the purpose of Section 768.295 is to discourage lawsuits aimed at speech the First Amendment protects. *See, e.g., WPB Residents for Integrity in Gov't, Inc. v. Materio,* 284 So. 3d 555, 558 (Fla. 4th DCA 2019) ("The expressed public policy is that people and governmental entities not engage in SLAPP suits because such actions are inconsistent with the right of persons to exercise . . . constitutional rights of free speech in connection with public issues.") (citation modified). The first question in any First Amendment case is whether the speech at issue is protected. If the answer is no, the fact that government action seeks to regulate pure speech is no longer relevant. *See Counterman v. Colorado,* 600 U.S. 66, 73 (2023) ("From 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in a few limited areas.") (citation modified). For example, "[s]peech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected." *United States v. Hansen,* 599 U.S. 762, 783 (2023). False or misleading commercial speech fares no better. *The Florida Bar v. Gold,* 937 So. 2d 652, 656 (Fla. 2006) ("[A] state may ban false, deceptive, or misleading commercial speech without infringing on First Amendment right.").

Against this backdrop, the Court turns to the allegations of the Amended Complaint.

**1. Count One – Violations of Florida's Antitrust Act.**

The genesis of the Attorney General's antitrust claim is that Defendants conspired to restrain trade in Florida by entrusting their standards on pediatric gender dysphoria to providers of gender-affirming care without adequate procedural safeguards. Am. Compl. at ¶¶ 276-84. Nonprofit organizations, such as Defendants, can be held accountable under the Florida Antitrust Act for restraining trade by entrusting their standards to conflicted market participants without adequate procedural safeguards. *See Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 571 (1982) ("[A] standard-setting organization like [the American Society of Mechanical Engineers "ASME"] can be rife with opportunities for anticompetitive activity. Many of ASME's officials are associated with members of the industries regulated by ASME's codes. Although, undoubtedly, most serve ASME without concern for the interests of their corporate employers, some may well view their positions with ASME, at least in part, as an opportunity to benefit their employers. When the great influence of ASME's reputation is placed at their disposal, the less altruistic of ASME's agents have an opportunity to harm their employers' competitors through manipulation of ASME's codes."); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 509-10 (1988) ("[W]e hold that at least where, as here, an economically interested party exercises decision-making authority in formulating a product standard for a private association that comprises market participants, that party enjoys no [First Amendment] immunity from any antitrust liability flowing from the effect the standard has of its own force in the marketplace."); *Wilk v. Am. Med. Ass'n,* 895 F.2d 352 (7th Cir. 1990) (holding that American Medical Association unreasonably restrained trade in violation of § 1 of

the Sherman Act by publishing a biased policy statement on the treatment of musculoskeletal issues).[4]

The Court finds that the Attorney General's antitrust claim targets alleged anticompetitive commercial conduct, as opposed to protected speech. As such, Defendants have failed to establish that the Attorney General's antitrust claim was brought "primarily because [they] exercised [their] constitutional right of free speech in connection with a public issue."

**2. Counts Two and Three – Violations of FDUTPA and Florida's civil RICO Act.**

The Attorney General concedes his FDUTPA and civil RICO claims target Defendants' speech.[5] The Attorney General, however, submits that to the extent the instant action seeks to regulate Defendants' speech, it only reaches so far as Defendants' alleged false and misleading commercial speech. To that end, the First Amendment does not protect false or misleading commercial speech. *See, e.g., Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 563 (1980) ("The First Amendment's concern for commercial speech is based on the informational function of advertising. Consequently, there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public.").

---

[4] When construing the Florida Antitrust Act, Florida courts routinely look to federal law for guidance. *See* Fla. Stat. § 542.16 ("The Legislature declares it to be the purpose of this part to complement the body of federal law prohibiting restraints of trade or commerce in order to foster effective competition. It is the intent of the Legislature that this part be liberally construed to accomplish its beneficial purpose.").

[5] There is no dispute that the speech at issue in the Amended Complaint falls within a medium covered by the statute, that is, it was "made before a governmental entity in connection with an issue under consideration or review by a governmental entity, or . . . in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." Fla. Stat. § 768.295(2)(a); *see also Mishiyev v. Davis,* 402 So. 3d 443, 448-49 (Fla. 2d DCA 2025) ("Free speech made in connection with public issues, in pertinent part, merely requires a showing that the public speech is contained in or was made in connection with one of the listed media formats or other similar modes for widely disseminating protected First Amendment speech.") (citation modified).

Thus, the inquiry turns on whether the allegations of the Attorney General's FDUTPA and civil RICO claims fall under the umbrella of false or misleading commercial speech.[6]

To determine whether speech is commercial, courts apply the test established by *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60 (1983). "[R]elevant considerations include whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *Jordan v. Jewel Food Stores, Inc.,* 743 F.3d 509, 517 (7th Cir. 2014) (citation modified; applying *Bolger*). "This is just a general framework, however; no one factor is sufficient, and *Bolger* strongly implied that all are not necessary." *Id*. Instead, *Bolger* simply provided courts with "guideposts for classifying speech that contains both commercial and noncommercial elements." *Id*.

"The commercial-speech category is not limited to speech that directly or indirectly proposes a commercial transaction." *Id*. "Commercial speech encompasses not merely direct invitations to trade, but also communications designed to advance business interests[.]" *Kleiner v. First Nat. Bank of Atlanta,* 751 F.2d 1193, 1204 n.22 (11th Cir. 1985). For example, *Bolger* held that although certain informational pamphlets discussing the desirability and availability of prophylactics in general did not expressly propose a commercial transaction, they were nonetheless properly classified as commercial speech. *Bolger,* 463 U.S. at 62-67. The *Bolger* test applies to medical literature. *See generally*, *Edward Lewis Tobinick, MD v. Novella,* 848 F.3d 935 (11th Cir. 2017) (applying the *Bolger* factors to medical literature to determine that blog posts at issue were not commercial speech).

---

[6] At the hearing held in this matter, the Attorney General conceded that Defendants' amicus briefs and responses to rules promulgated by Florida's health agencies do not constitute actionable deceptive representations to consumers for purposes of his FDUTPA claim or misleading advertisements for purposes of his civil RICO claim. The Court accepts that concession and finds that the Attorney General did not bring this action "primarily because" Defendants filed amicus briefs or responded to agency rulemaking.

In *Novella* the plaintiff, Dr. Tobinick, provided treatment for various conditions through the perispinal administration of the drug etanercept. *Id*. at 940. The defendant, Dr. Novella, was a neurologist who also served as the executive editor of a medical blog. *Id*. Dr. Novella published a pair of blog posts concluding that Dr. Tobinick's use of etanercept was not supported by credible medical evidence. *Id*. Dr. Novella represented that "Dr. Tobinick's retrospective case studies [were] not probative medical evidence" and that "there ha[d] been no double-blind placebo-controlled clinical trials of the treatment provided by [Dr. Tobinick]." *Id*. at 941. Dr. Tobinick sued Dr. Novella under the Lanham Act, arguing that his comments constituted false and misleading commercial speech. *Id*. at 949–50. Dr. Novella argued that the blog posts were medical opinions rather than commercial speech. *Id*.

The Eleventh Circuit found that the blog posts could "not reasonably be construed as [advertisements]" because their only mention of Dr. Novella's practice "clarifie[d] . . . that he primarily treats headaches, thereby distancing the types of medical services he provides from the services marketed by Dr. Tobinick." *Id*. at 951. The second *Bolger* factor also favored Dr. Novella because the blog posts "d[id] not discuss any products for sale by Dr. Novella, and, as discussed, only briefly mention his practice for context." *Id*. Finally, the court determined that Dr. Tobinick failed to "demonstrate[ ] economic motivation sufficient to transform Dr. Novella's speech into commercial speech." *Id*. Simply put: the blog posts were not commercial speech because Dr. Novella had no commercial incentive to mislead consumers about the perispinal administration of etanercept.

By contrast, the Attorney General alleges that Defendants have a commercial incentive to mislead consumers about gender-affirming care, and that Defendants' members—including many individuals who authored the Guidelines—are in the business of prescribing or performing

gender-affirming care. Am. Compl. at ¶¶166–78, 209–31. The Attorney General contends that Defendants made "deceptive and misleading representations and omissions about the safety, reversibility, and efficacy of sex interventions in Florida and St. Lucie County in particular through many mediums, including their websites, publications and public statements, and through their members." *Id.* at ¶ 294. More specifically, the Attorney General alleges that Defendants deceptively and misleadingly advertised that: "(1) there is credible evidence that sex interventions mitigate gender dysphoria and suicidality, (2) puberty blockers are fully reversible, and (3) their guidelines are 'evidence-based' and methodologically sound." *Id.* According to the Attorney General, these deceptive and misleading representations are "likely to mislead a consumer acting reasonably in the circumstances to believe that sex intervention drugs are safer, more reversible, or more effective than they truly are, to their detriment." *Id.* at ¶ 295. The Attorney General further alleges that Defendants' false and misleading representations were intended to and did drive membership sales, and economically benefited Defendants' members by generating demand for gender-affirming care. *Id.* at ¶¶ 9, 235, 239-40, 253-54, 262-63, 269, 274-75.

Taking these allegations as true, as the Court must at this stage of the litigation, the Court finds that the alleged false and misleading representations that form the linchpin of the Attorney General's FDUTPA and civil RICO claims bear the hallmarks of commercial speech under the *Bolger* test. First, they constitute advertisements insofar as they promote gender-affirming care. *See Incarcerated Ent., LLC v. Warner Bros. Pictures,* 261 F. Supp. 3d 1220, 1228 (M.D. Fla. 2017) (holding that "movie trailers, social media posts, and promotional interviews" with a movie's director, screenwriter, and stars were "advertisements" for purposes of the first *Bolger* factor because "the challenged statements were used for promotional purposes"). Second, the

alleged false and misleading representations reference specific products (puberty blockers and cross-sex hormones) and services (social transitioning and surgeries). Third, an economic motivation exists for the alleged false and misleading representations: to enrich Defendants' members by inducing demand for gender-affirming care.

To be clear, the Court is by no means suggesting that Defendants' alleged misrepresentations are in fact false and misleading; rather, the Court has simply accepted the allegations of the Amended Complaint as true and drawn all reasonable inferences in favor of the Attorney General, which it must when ruling on a motion to dismiss under Section 768.295.

In summary, the Court finds that Defendants' challenges to the Amended Complaint, as set forth in the instant motions, are ill-suited for judicial intervention at this stage of the proceedings. Defendants have failed to establish that the speech and conduct alleged in the Amended Complaint are shielded from executive action under Section 768.295. *Cf. Vericker,* 406 So. 3d at 945 ("A judicial determination that a speech-targeted lawsuit is 'without merit' may not be possible at the outset of a case and may require the development of a factual record."). The Attorney General seeks to hold Defendants accountable for what he perceives to be violations of Florida law. Whether or not the Attorney General can convince a fact-finder, whether that be a jury or the Court, that Defendants violated Florida's Antitrust Act, FDUTPA, and Florida's Civil RICO Act, remains for another day.

Given the Court's finding that Defendants have failed to establish that the claims contained in the Amended Complaint were brought "primarily because [they] exercised [their]

constitutional right of free speech in connection with a public issue[,]" the Court need not reach the issue of whether the Attorney General's claims are "without merit."[7]

It is therefore **ORDERED** that:

1. The Motion for Dismissal Pursuant to Fla. Stat. § 768.295 filed by Defendants World Professional Association for Transgender Health, Inc. and The Endocrine Society, and Motion for Dismissal Pursuant to Fla. Stat. § 768.295 filed by Defendant American Academy of Pediatrics, are **DENIED** for the reasons set forth herein.

**DONE AND ORDERED** in Fort Pierce, St. Lucie County, Florida on August 21, 2026.

08/21/2026 11:03:24

eSigned by MICHAEL PORTER 08/21/2026 11:03:25

Michael D. Porter
Circuit Judge

Copies furnished to:

All Counsel of Record

[7] Defendants each have pending motions to dismiss the Amended Complaint, in which they argue, among other things, that each claim contained in the Amended Complaint fails as a matter of law. The Court will address whether the Amended Complaint states viable causes of action against each Defendant when ruling on the motions to dismiss.